# 24-0999-cv

## United States Court of Appeals

*for the*

## Second Circuit

AVALON HOLDINGS CORPORATION,

*Plaintiff-Appellee,*

– v. –

GUY GENTILE,

*Defendant-Appellant,*

MINTBROKER INTERNATIONAL, LTD., JOHN DOES 1 THRU 10,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
### Volume 8 of 8 (Pages A-1751 to A-1933)

THOMAS J. FLEMING
KERRIN TENEYCK KLEIN
OLSHAN FROME WOLOSKY LLP
*Attorneys for Defendant-Appellant*
1325 Avenue of the Americas
New York, New York 10019
(212) 451-2300

CP COUNSEL PRESS   (800) 4-APPEAL • (331518)

i

## TABLE OF CONTENTS

**Page**

District Court Docket Entries .................................... A-1

Complaint, dated August 13, 2018............................ A-36

Amended Complaint, dated September 28, 2018 ...... A-50

Answer, dated October 15, 2019............................... A-62

Defendants' Local Rule 56.1 Statement, dated
August 10, 2020...................................................... A-70

Plaintiff's Local Rule 56.1 Statement, dated
August 10, 2020...................................................... A-85.1

Affidavit of Miriam Tauber in Support of Plaintiff's
Motion for Summary Judgment, dated
August 10, 2020...................................................... A-86

Exhibit A to Tauber Affidavit -
Excerpts from Deposition Transcript of Guy
Gentile, dated February 24, 2020 .......................... A-88

Exhibit B to Tauber Affidavit -
Joint Stipulation as to Certain Facts for Purposes
of Summary Judgment, dated May 13, 2020......... A-126

Exhibit C to Tauber Affidavit -
Excerpts from Deposition Transcript of Brad
Klauseger, dated May 27, 2020 ............................. A-129

Exhibit D to Tauber Affidavit -
Activity Statement for Interactive Account No.
UL1043811, for the Period from January 1, 2018
to December 31, 2018............................................. A-152

**ii**

**Page**

Exhibit E to Tauber Affidavit -
Activity Statement for Interactive Account No.
US1043812 for the Period from January 1, 2018
to December 31, 2018 ............................................ A-296

Exhibit F to Tauber Affidavit -
Schedule 13D filed by MintBroker International
Ltd. and Guy Gentile, dated September 17, 2018.. A-309

Exhibit G to Tauber Affidavit -
Spreadsheet Produced by Defendants .................... A-430

Exhibit H to Tauber Affidavit -
Spreadsheet Reflecting Combined GBR Trading
Activity from Activity Statements ......................... A-467

Exhibit I to Tauber Affidavit -
Historical Trading Data and Graph from Yahoo
Finance .................................................................. A-507

Exhibit J to Tauber Affidavit -
"Squeezing the Shorts in Small Cap Stocks"
(Bocconi University, Nov. 21, 2019) ..................... A-510

Exhibit K to Tauber Affidavit -
E-mail Notification from Interactive Brokers,
dated October 31, 2019 .......................................... A-565

Exhibit L to Tauber Affidavit -
Mintbroker International Ltd. Portfolio Report as
of March 13, 2018 .................................................. A-567

Exhibit M to Tauber Affidavit -
Plaintiff's Computation of Profits .......................... A-572

Exhibit N to Tauber Affidavit -
"Commission Faces Battle Over Broker's
Winding-Up" (The Tribune, April 8, 2020) ........... A-603

**iii**

                                                                        **Page**

Exhibit O to Tauber Affidavit -
(i) 17 C.F.R. § 242.200 – Definition of "Short
Sale" and Marketing Requirement, effective
May 10, 2010 ........................................................    A-609

(ii) 17 C.F.R. § 242.201 – Circuit Breaker ............    A-613

(iii) 17 C.F.R. § 242.203 – Borrowing and
Delivery Requirements .........................................    A-618

(iv) 17 C.F.R. § 242.204 – Close-out
Requirement...........................................................    A-622

Exhibit P to Tauber Affidavit -
"Key Points About Regulation SHO" (SEC
Publication, April 8, 2015).....................................    A-625

Defendants' Local Rule 56.1 Statement in
Opposition to Plaintiff's Motion for Summary
Judgment, dated September 23, 2020 ....................    A-641

Declaration of Danielle M. McLaughlin, for
Defendant, in Opposition to Plaintiff's Motion
for Summary Judgment, dated
September 23, 2020 ...............................................    A-659

Exhibit 1-a to McLaughlin Declaration -
"Fails-to-Deliver Data" (SEC Publication,
modified August 28, 2020) ....................................    A-661

Exhibit 1-b to McLaughlin Declaration -
Page 1 of SEC "Fails-to-Deliver Data" for "July
2018, First Half" ....................................................    A-676

Exhibit 1-c to McLaughlin Declaration -
"March of the machines: The stockmarket is now
run by computers, algorithms and passive
managers" (The Economist, October 5, 2019) ......    A-678

iv

**Page**

Exhibit 2 to McLaughlin Declaration - Daily Balance Report of GBR Float ...................... A-689

Defendant Guy Gentile's Letter Motion for Leave to Introduce Newly Obtained Evidence, to Extend the Briefing Schedule and to Request a Plenary Hearing, dated May 20, 2022 ................................ A-691

Order of the Honorable Robert W. Lehrburger, dated October 18, 2022........................................... A-697

Defendant Guy Gentile's Letter Motion for Leave to File Motion for Issuance of Letters Rogatory, dated November 14 2022....................................... A-699

Order of the Honorable Denise L. Cote, dated November 16, 2022 ............................................... A-701

Request for International Judicial Assistance (Letter Rogatory), filed November 29, 2022..................... A-703

Plaintiffs' Motion *In Limine* to Exclude Defendants' Post-Discovery Production, Expert Testimony and Reports, filed January 28, 2023 ...................... A-706

Transcript of Inquest Hearing, dated February 1, 2023.................................................. A-726

Opening (Plaintiffs) .............................................. A-728

Opening (Defendants)........................................... A-734

Defendants' Witness:

Guy Gentile          Direct............................ A-759
                     Cross (by Mr. Lopez) ... A-813
                     Cross (by Ms. Tauber) .. A-841
                     Redirect ....................... A-910

v

**Page**

Transcript of Inquest Hearing, dated
  February 2, 2023 ..................................................... A-913

Defendants' Witnesses:

  Robert Christian          Direct ........................... A-949
                            Cross (by Ms. Tauber) .. A-258

  Brendan Beresford         Cross (by Ms. Tauber) .. A-1014

Plaintiff's Trial Exhibit:

PX-2    Deposition Transcript of Brad Klauseger,
        dated May 27, 2020 ..................................... A-1054

Defendants' Trial Exhibits:

DX-1    Independent Accountant's Report by
        Robert Christian, CPA, dated
        May 19, 2022 .............................................. A-1258

DX-19   Forensic Accountant's Report by Brendan
        Beresford, CPA, dated May 18, 2022 .......... A-1262

DX-28   Affidavit of Stephen Darville, sworn to
        May 4, 2022 ................................................. A-1264

DX-32   Deposition Transcript of Guy Gentile,
        dated February 24, 2020 .............................. A-1268

DX-33   Deposition Transcript of Guy Gentile,
        dated October 26, 2022 ............................... A-1499

DX-34   Deposition Transcript of Stephen Darville,
        dated January 25, 2023 ................................ A-1668

Defendant Guy Gentile's Post-Hearing Brief, dated
  April 19, 2023 ....................................................... A-1822

Plaintiffs' Post-Hearing Brief, dated April 19, 2023 .. A-1844

vi

**Page**

Defendant Guy Gentile's Response in Opposition to
Plaintiffs' Post-Hearing Brief, dated
May 19, 2023 ........................................................  A-1872

Plaintiffs' Post-Hearing Reply Brief, filed
May 19, 2023 ........................................................  A-1883

Defendant Guy Gentile's Objections to Report and
Recommendation of the Honorable Robert W.
Lehrburger to the Honorable Denise L. Cote:
Short-Swing Profits Award, dated
November 3, 2023 .................................................  A-1895

Declaration of Nicholas Abadiotakis, dated
November 2, 2023 .................................................  A-1924

Exhibit A to Abadiotakis Declaration -
List of Trades ........................................................  A-1927

Exhibit B to Abadiotakis Declaration -
List of Gross Profits...............................................  A-1930

Notice of Appeal, dated April 15, 2024 .....................  A-1933

A-1751

Page 84

STEPHEN DARVILLE

Q.     In the IBOS system under whose account?  Under MintBroker's account, or --

A.     Well, that would have been MintBroker at the time, yeah.

Q.     Okay.  And so if MintBroker had, for example, a subsidiary or an affiliated company that had a different account with IBOS or with another broker somewhere, that wouldn't be reflected in these trades, would it?

          MR. FORD:  Objection.

A.     Sorry, if they had another affiliated Co., would it be reflected in the trades?

Q.     Well, for example, ETC Clearing, which is the company you mentioned, told us in their responses to our discovery requests that MintBroker was a client of another introducing broker called Mint Global Markets that was ETC's client.

          MR. FORD:  Objection.

Q.     And that ETC, as far as ETC

A-1752

Page 85

STEPHEN DARVILLE

knew, Mint Global Markets was the client and not MintBroker.

Now, would trades that were executed by MintBroker through Mint Global Markets with ETC be included in the data that you produced to us?

A.    I really wouldn't have that information.  I don't know.  I couldn't say, because I had limited knowledge of the trading part of the company.  So I don't know how that part of it was handled.

Q.    When you spoke with Mr. Christian about the data, did he ask you whether the data was the complete record of all MintBroker transactions in these securities during this time period?

A.    He didn't really ask me anything.

Q.    Did you represent to him that the --

A.    I told him that was all the records that was present in the system at that time.

Page 86

STEPHEN DARVILLE

Now, I couldn't really answer to say if that was the complete -- to my knowledge, it was the complete records. You know, I couldn't really speculate if there was some other company clearing different orders.  I don't know.

Q.    And are you aware -- I just told you about Mint Global Markets.  Are you aware of any other traders that traded on MintBroker's behalf?

A.    No, I am not aware.

Q.    Now, Mr. Christian said he went -- he went through the database with you remotely and had you pull up certain examples of client accounts and to confirm that accounts starting with letters were client accounts; do you remember doing that with Mr. Christian?

MR. FORD:  Objection.

A.    Yes.

Q.    Okay.  And when you did that with Mr. Christian, who chose the example to look up?

A.    I don't recall exactly who.

Page 87

STEPHEN DARVILLE

Q.    Okay.

A.    I think it might have been him.

Q.    Do you know if you looked at that particular account that we went through, the one that was MBS010067?

A.    I don't recall.

Q.    Okay.  Are you aware that that particular account comprised a significant portion of the trading records, the trades, account trades that you provided?

A.    I wasn't aware of it, no.

Q.    You didn't notice that as you were going through the database records?

A.    It's a very large database with thousands of records.  I didn't really examine every single record.

Q.    Okay.

A.    It's a lot of information.

Q.    Do you know if MintBroker ever engaged in short sales to its customers?

A.    I don't know.  I couldn't say.

Q.    Do you know what a short sale is?

A-1755

Page 88

STEPHEN DARVILLE

A.    No.

Q.    When you spoke with Mr. Gentile about providing the records to Mr. Christian and Mr. Beresford, did Mr. Gentile place any limits on what types of documents you could show those experts?

A.    No, he didn't.

Q.    Okay.  Now, you mentioned in your affidavit that you -- that in around September of 2022, that you were informed by Mr. Gentile that the Court in this case had ordered you to produce certain records including client account statements and financial records for clients; do you remember that?

A.    Sorry, you said in September?

Q.    In around September of 2022, so around four months ago, in your affidavit you describe that Mr. Gentile had told you that the Court in this case had ordered you to produce client account statements and financial records?

A.    Yes.

A-1756

Page 89

STEPHEN DARVILLE

Q.    And in your affidavit, you say that you consulted your lawyers about this and they had told you that would be prohibited?

A.    Yes.

Q.    Okay.  And by your lawyers, do you mean Davis & Co.?

A.    Yes.

Q.    Are those the company's lawyers, also?  By the company, I mean are those MintBroker's lawyers?

A.    I believe they are.  But I have a very long relationship with Davis & Co.

Q.    You mean apart from their work for MintBroker?

A.    Yes, I have worked with them for over 15 years doing their IT.

Q.    Their IT?

A.    Yeah.

Q.    Did those lawyers ever tell you that there might be a conflict of interest in providing you with advice when they were also representing MintBroker or Mr. Gentile?

A-1757

Page 90

STEPHEN DARVILLE

MR. FORD: Objection.

A. No comment on that one.

MR. FORD: Yeah. On behalf of Mr. Darville, I will let you know that you are not required to answer questions that would breach the attorney/client privilege.

Q. Are you going to invoke the attorney/client privilege and not answer the question?

A. Yes.

MR. FORD: You did ask him what --

MS. TAUBER: That's totally fair. Just wanted to get the record clear on that point.

Q. And did you -- you mentioned speaking to Mr. Christian. Just to be clear, did you also speak with Mr. Beresford directly?

A. I don't think I did, no. I don't recall speaking with him.

MS. TAUBER: I think I am ready for another break and I am close to

A-1758

Page 91

STEPHEN DARVILLE

finishing up. So I expect that I might come back and say that I have no more questions. I am not going to promise that, but I am expecting that to be the case. But maybe we will take a five to 10-minute break.

MR. FORD: I'm okay with just five. The witness, Mr. Darville, do you need more than five minutes?

THE WITNESS: No, five minutes is fine.

MS. TAUBER: I don't need more than five minutes. Just to make sure that I am not forgetting anything, I just want to have enough time to go over my notes before ending. So I would appreciate maybe eight minutes, possibly.

MR. FORD: Why don't we do 10. It's 7:30, and we'll do 10.

MS. TAUBER: 8:30 for me.

MR. FORD: See everybody back at 8:40.

MS. TAUBER: Sounds good.

Page 92

STEPHEN DARVILLE

THE VIDEOGRAPHER:  The time is 8:31, we are going off the record.

(Off the record.)

THE VIDEOGRAPHER:  The time is 8:41 and we are back on the record.

BY MS. TAUBER:

Q.    I just have two more questions for you I think.  The first is, were you in contact with Mr. Gentile at any point between the dissolution in December of 2019 and his request to you in, I believe, April 2022 that you produced these documents for us?

A.    No, I hadn't heard from Mr. Gentile since the company had closed.

Q.    So since December of 2019 or since --

A.    Yes, since December.

Q.    To your knowledge, was Mr. Gentile aware that you had maintained custody of these trading records?

MR. FORD:  Objection.

A.    No, I don't think he would have known about it.  But he didn't really ask

A-1760

Page 93

STEPHEN DARVILLE

me.  We haven't really spoken.

Q.  And you had mentioned that I think Antonio Collie you said was aware that you maintained custody of these records?

A.  Mr. Cooper.

Q.  Cooper, I'm sorry.  And what is Mr. Cooper's first name?

A.  Edward.

Q.  Okay.  And what about Drameko Moore?

A.  Sorry, if he knew?

Q.  Do you know who Drameko Moore is?

A.  Drameko, yeah.

Q.  I'm sorry, Drameko, who is that?

A.  He was a trade desk manager.

Q.  Trade desk manager?

A.  Yeah.

Q.  Okay.  So was he aware that you had maintained custody of these files?

A.  No, he wouldn't be -- I haven't spoken to him since the company dissolved

A-1761

Page 94

STEPHEN DARVILLE

either.

MS. TAUBER: That's all the questions I have for you. Thank you again for joining us.

MR. FORD: I know it's late everybody, but I do have a few follow-up questions.

Mr. Darville, if you have some more time, I don't think it will be too long.

THE WITNESS: Okay. No problem, go ahead.

BY MR. FORD:

Q. First do you recall Ms. Tauber asking you about the manner in which customers opened accounts at SureTrader?

A. Mm-hmm.

Q. Is that a yes?

A. Yes.

Q. And you said that you were not part of that group within the company; is that right?

A. Right, that's correct.

Q. But that you were able to

A-1762

Page 95

STEPHEN DARVILLE

answer some of her questions and provide some insight?

A.     Yeah, I was familiar with the process by which the clients had to follow the sign-up.

Q.     Were there any measures in place to prohibit the solicitation of United States citizens from opening accounts with SureTrader?

A.     Yes, we had -- there was a disclaimer that was put up on the website.  So as soon as anybody had the website, they would immediately see a pop-up stating that, you know, we wouldn't be soliciting any U.S. clients and you have to accept that, you know, as a part of agreeing to sign up.  That you weren't being solicited.

Q.     Were you -- you said it was a pop-up blocker; is that right?

A.     A pop-up that came up on the website.

Q.     Do you recall what it said on the pop-up?

A-1763

Page 96

STEPHEN DARVILLE

A.     It basically said that you, you know, you were agreeing that you weren't solicited by the company, you know, to sign up or join, you know, SureTrader.

Q.     Were you involved in any way in the creation of it?

A.     No, I wasn't personally involved in that part of it.

Q.     Can you describe to me from an IT perspective how that pop-up blocker would work, for example, if a person in the United States went to SureTrader's website?

A.     As soon as they would type in the SureTrader address the pop-up would come up out of the website and you would have to acknowledge it before you would be allowed to actually get to the site.

Q.     What about in the context of advertising, were there any similar measures to prohibit the solicitation of U.S. customers?

A.     Yes.  Our marketing team also made that known during advertisements,

A-1764

Page 97

STEPHEN DARVILLE

that we are not soliciting any U.S.

clients.

Q.    And what about when customers

filled out their forms?

A.    And when they had to fill out

their applications, it was also a part of

the application form that they weren't

solicited.

Q.    While you were employed at

SureTrader, about how many employees were

there?

A.    During my tenure, we grew to

about almost 70 people, 70-something

people, roughly.

Q.    And to the extent you have

knowledge of this, were these procedures

aimed at prohibiting the solicitation of

U.S. customers abided by by the company?

A.    Yeah, definitely.

Q.    Were they abided by by the

individual employees of the company?

A.    Yup.  We were told to mention

that to the clients.

Q.    Who told you that?

A-1765

Page 98

STEPHEN DARVILLE

A.    That would have been the executive team.

Q.    Okay.  Do you recall who was on the executive team?

A.    Basically Mr. Cooper and Mr. Collie, they made it clear to let the customers know, if there were any U.S. customers, that they weren't solicited.

Q.    Would the chief compliance officer have been involved in those sort of discussions?

A.    Yes.

Q.    And do you recall any of the chief compliance officers, their names while you worked there?

A.    Yes.  One was Edward Cooper and then the next one was Philip Dorsett.

Q.    Okay.  Did Philip Dorsett work at the company for the entire time that you were there?

A.    No, he was only there for a brief period and then he was let go.

Q.    Can you tell me anything about the circumstances of him being fired?

A-1766

Page 99

STEPHEN DARVILLE

A.    Yes, he was found to be doing some shady business with forwarding company e-mails to his personal e-mails. So he was let go for breach of confidentiality.

Q.    And how did you come to know that?

A.    From monitoring his work machine, his work computer.

Q.    In your process of monitoring his work computer, did you ever observe him sending work e-mails to his personal e-mail address?

A.    Yes.  That was one of the things that I observed him doing.

Q.    And do you know, would that have been a violation of company policy?

A.    Yes, that was definitely a violation of company policy.

Q.    Was that the sort of thing that Mr. Dorsett would have been made aware of?

A.    Yeah, he was aware of that, because we all had to sign agreements

A-1767

Page 100

STEPHEN DARVILLE

when being onboarded by the company.

Q.    Do you know whether Mr. Dorsett had a company computer?

A.    Yes, he did.

Q.    And was it your job responsibility to hand out computers or take them back when an employee came or went?

A.    Yes.

Q.    Can you tell me about after Mr. Dorsett was fired, what, if anything, happened with his computer, if you recall?

A.    From what I recall, his computer probably would have been redistributed, cleaned up and redistributed to another person.

Q.    That is ordinarily what would happen, the company would take the computer back, wipe it?

A.    Wipe it clean and redistribute it to another person.

Q.    Okay.  Do you have any idea whether he -- you said you're not -- do

A-1768

Page 101

STEPHEN DARVILLE

you know whether or not he took the computer or gave it back; do you recall?

A.    I don't recall if he gave it back.  I don't recall the particular -- if he took it or if we got it.

Q.    But your understanding is that it would have been against company policy for him to have taken the company computer?

A.    Definitely, yes.

Q.    Okay.  What about the chief operating officer, would he have been involved in discussions related to the solicitation of U.S. customers?

A.    I believe he would have.

Q.    Were you familiar with a chief operating officer named Yaniv Franz or Yan Franz?

A.    Yes, I do recall Mr. Franz.

Q.    What can you tell me about him?

A.    He was a very horrible guy. Just was an unpleasant individual.  Came into the company and, you know, basically started firing people and just was -- he

A-1769

Page 102

STEPHEN DARVILLE

would insult vendors who he would have come in to do work at the company. Just a real mean guy.

Q. Did you think he was mean?

A. I didn't have any personal clashes with him. I tried to keep on his good side for the most part. But I witnessed him in action speaking with other staff members and firing people.

And with the EC technician, he told the guy -- I don't know how he didn't get punched, he said some really mean things to the guy. Just like a malicious fellow.

Q. How was his -- how did his employment end, do you recall?

A. So basically a lot of the staff members complained to the labor board of the Bahamas. And they actually sent a team of people to the company and they interviewed everybody, and after that process took place, his immigration, his papers were not renewed. So he was asked to leave the country once his paperwork

A-1770

Page 103

STEPHEN DARVILLE

expired.

Q.    When you were talking about Mr. Dorsett, you had mentioned that you were monitoring his e-mail because it appeared that he was doing improper or unlawful things with his e-mail.  Was there anything similar with Mr. Franz, with Yan Franz?

A.    I didn't personally monitor his machine.  But I know when he left, he did -- it was kind of a bad situation, as well.  He did take his machine as well, when he left.

Q.    And was that --

A.    We were unable to get it.

Q.    Was that a violation of company policy?

A.    Yes, it was a violation.

Q.    Would he have known about it, and if so, how?

A.    Yeah, because he would have -- he would have seen our policies, our IT policies, and been familiar with the procedures because he did a lot of

A-1771

Page 104

STEPHEN DARVILLE

firing, so.

MR. LOPEZ:  Mr. Ford, does this line of questioning have anything to do with this case?

MR. FORD:  Well, it does, because I have information in my possession that suggests that these individuals may have taken company documents, and while that is likely to have occurred prior to the events at issue in this case, I don't know the extent to which they may have documents, so that's why I am inquiring.

MR. LOPEZ:  Okay.

Q.    In addition to the internal policies of MintBroker, would there be anything else wrong with him taking, with Mr. Franz taking his work computer; do you know?

A.    Would there be anything wrong? I mean that's basically stealing if you look at it, you know.  He was not authorized to take the machine.

A-1772

Page 105

STEPHEN DARVILLE

Q.     In your estimation, from what you know about the situation, is there any reason to believe that he was acting vindictively when he stole that company property?

A.     Yes, definitely.

Q.     Why do you say that?

A.     Just because he was very unhappy with the situation of him being, you know, told to leave the country.  And he felt like the company was behind it. And that Mr. Gentile was against him and trying to get rid of him.  You know, and when it was actually his own actions that led to him being, you know, asked to leave the country.

Q.     Aside from Mr. Franz and Mr. Dorsett, where there seems like there was a lot of drama, was there other drama between the 70 or so employees that you worked with that you recall?

A.     For the most part, it was pretty quiet.

I did have another -- when we

A-1773

Page 106

STEPHEN DARVILLE

had our sales department, I did have a guy who was manipulating the -- because we had a top performer reward, and he was basically manipulating the system to get all of the, I guess, the clients who were funded with large amounts. So he would take that title home every month. So we had to monitor his system for a few weeks and I basically found out what he was doing and we had to let him go.

Q. And he was eventually, he was fired?

A. Yeah, he was fired.

Q. What was Mr. Gentile's role with the company while you worked there?

A. We didn't really see him often. He was just like an executive of the company. You know, we didn't -- as far as I know, he was running the company along with the executive team.

Q. And who else was on the executive team?

A. It would have been Janay, Janay Pyfrom, Antonio Collie and Edward Cooper.

A-1774

Page 107

STEPHEN DARVILLE

Q.    About how often would Mr. Gentile be in the office physically?

A.    Every few months we would see him pop him and say hello to everybody. Every three months or six months he would come in.

Q.    And what about other employees, would they come in sort of five days a week?

A.    Yeah, mostly, everyone else, you know, regular Monday through Friday, 9 to 5.

Q.    How about Mr. Collie, how often would he be in?

A.    Mr. Collie would be in almost daily.

Q.    Almost daily?

A.    Yes.

Q.    And Mr. Gentile would be like every few months he would pop in?

A.    Yeah, every few months.

MR. FORD:  So I am just going to request a three-minute break.  If we can do that.  I don't think I will

A-1775

Page 108

STEPHEN DARVILLE

have any more questions when I come back, but I just want to make sure.

MS. TAUBER: Okay, I might have a few follow-up questions after that, but it won't be long.

MR. FORD: Okay.

THE VIDEOGRAPHER: The time is 9 p.m., we are going off the record.

(Off the record.)

THE VIDEOGRAPHER: Time is 9:03, we are back on the record.

MR. FORD: Mr. Darville, just a few more questions.

BY MR. FORD:

Q. We had talked about the process of approving customers. Was Mr. Gentile involved in that process, do you recall?

A. No.

Q. Who would have been involved in the process of approving customer applications?

A. That would have been Mr. Cooper and his team.

Q. What about Mr. Dorsett, would

Page 109

STEPHEN DARVILLE

he have been involved?

A.    Yes, Mr. Dorsett was involved, was a part of it.

Q.    What about Mr. Franz?

A.    Mr. Franz, I am not 100 percent sure if he had any involvement.  To my knowledge, no.  But he quite possibly might have, but I wouldn't have been aware, as far as I know.

Q.    Do you recall when Mr. Franz left the company -- strike that.

Do you recall when Mr. Dorsett was fired from the company?

A.    Yes, I do.  I don't remember the exact time, but I do remember when he left.

Q.    And when was that about?

A.    I will say it has been roughly about a year after he started, from what I can recall.  So somewhere in 2017 maybe.

Q.    So to the extent Mr. Dorsett had stolen documents from the company, would he have been able to access

A-1777

Page 110

STEPHEN DARVILLE

documents after he left?

    A.    No, he shouldn't have been able to.

    Q.    So any documents he stole from the company would have been before he left in 2017?

    A.    Yes.

    Q.    And what about Mr. Franz, do you remember when he was fired?

    A.    He, I don't recall the exact date, but I believe it was sometime in, before we closed, maybe 2018.

    Q.    Would that have been early 2018?

    A.    Possibly.  I don't recall exactly the date.  This has been a few years now.

    Q.    Understood.  But the same thing as Mr. Dorsett, had he had stolen documents from the company, he would not have been able to steal anymore after he's fired?

    A.    Exactly.

            MR. FORD:  I think that is all

A-1778

Page 111

STEPHEN DARVILLE

of my questions for you.  We
appreciate you taking the time.  I
know it's a late night here.
Hopefully we'll be out of here in a
few moments here.

BY MS. TAUBER:

Q.    I just have a few questions
based on that whole exchange.  You
mentioned the application form contained
some language, I think about soliciting
customers, the account application form?

A.    Mm-hmm.  U.S. customers, yeah.

Q.    Do you have a copy of the
application form?

A.    I do not, no.

Q.    And then you had mentioned
somebody, I don't recall who, had
manipulated data or manipulated some
trading lists?

A.    Not a trading list.  It was a
member of the sales department.  He
had -- he was manipulating his sales
numbers through the system.  He was using
the e-mail system to basically change a

A-1779

Page 112

STEPHEN DARVILLE

template that we had for the clients.
When we had new clients coming into the
e-mail, he would change it to reflect his
name.  So we basically caught him forging
the e-mail and that's why we had to let
him go.

Q.      Where would he -- where would
he change his name, on what system?

A.      It was an e-mail system.  He
would alter an e-mail that he had gotten,
you know, months ago and change it to the
client's name and basically claim the
client as his in the sales, in the sales
system.

Q.      For commission purposes or for
what purpose?

A.      Yeah, for commission because
the sales team was paid based on a
commission.

Q.      Okay.  So whenever a commission
was charged to a client, somebody at
MintBroker got a portion of that
commission; is that what you're saying?

A.      Yeah, I don't recall exactly

A-1780

Page 113

STEPHEN DARVILLE

how they paid them out. But, you know, based on the amount of clients they brought in and how much they funded, they would get a small commission.

Q.    And how were those records kept of who was responsible for bringing in what client?

A.    We had a system set up for it. It was a hot-spot system that our marketing team had set up.

Q.    Was that information included in the disk that you gave in to the Bahamas lawyers?

A.    No, because that sales program was shut down and discontinued a few months after it started up.

Q.    Okay. So what happened to the files that had like the customers' names and the employees' names who recruited them?

A.    I don't know where those files would have went. After the company closed, I don't know who took possession of those documents.

A-1781

Page 114

STEPHEN DARVILLE

Q.     But when you copied the information onto a disk to give to the Kensington and Davis & Co. lawyers, did you copy selective information from MintBroker's servers or did you copy everything?

A.     We were told to have the financial records.  So that's why it was just the -- mostly the trading records. Maybe the funding records.

Q.     Maybe the what, I'm sorry?

A.     Funding.

Q.     Oh, funding.  Meaning like the account opening documents, would those have been in there?

A.     I don't think any of the account opening documents were there. They were kept with HR.

Q.     And they weren't copied and sent over to the Bahamas law firm?

A.     I don't know.  I don't know.  I really wouldn't know that part.

Q.     Didn't you say that you did the actual copying?

A-1782

Page 115

STEPHEN DARVILLE

A.     Only of the financial data, because that was requested by the law firm and the securities commission.

Q.     Was there any information in the disk that you prepared that you didn't personally put on there?

A.     If there was other information on it?

Q.     I thought you said that you created this disk that was delivered to those law firms?

A.     Yes, it was a backup of the IBOS system.

Q.     Which had the trading records in it?

A.     Right.

Q.     And was there anything else on the disk that was delivered?

A.     No, it would have just been those records.

Q.     Did you personally deliver it to Kensington Law and Davis & Co., or did you give it to somebody else to give to them?

A-1783

Page 116

STEPHEN DARVILLE

A.     Yeah, I personally delivered.

Q.     By hand or --

A.     By hand, yeah.

Q.     So you would know if there was other information on the disk that was delivered?

A.     Yes.

Q.     And did you ever hear anything further from those law firms about wanting more data or any other follow-up information?

A.     No, I never heard back from them on that.

Q.     And the system that you had said that this person manipulated, would that have in any way impacted the trading records that went to the law firm?

A.     Not at all.

Q.     What about the commission that was being charged or other information on there that was associated with the manipulated data?

A.     No.  It would have just been, you know, the commission stuff.  Nothing

A-1784

Page 117

STEPHEN DARVILLE

to do with trading.

Q.     But on the trading records, isn't there some commission information in there?

A.     No, that commission stuff is not related to the sales department. That's the company's commission.

Q.     And that's not what you're saying that he manipulated?

A.     Not that.

Q.     So it was a different commission that was charged that was manipulated?

A.     It was the sales -- remember I told you there was a sales team. So he was basically claiming all of big clients so that his commission was more than the rest of the team.

Q.     But the commission that he was claiming was part of the commission that appears on the trading records where it says, for example --

A.     No. It had nothing to do with the trading records, no.

A-1785

Page 118

STEPHEN DARVILLE

Q.    So where was this other commission that he was claiming a part of, where was that reflected?

A.    That probably would have come out of the company's commission.  What profit the company would have gotten, you know, they would have worked out something with the sales team.

Q.    And was there a record of --

A.    There would have been a record. Now, where that record was kept, I don't know because I didn't, you know, that wouldn't have been a part of the IBOS system.  That was handled by the sales team at the time.

Q.    So would that other system pull information from the trading system?

A.    No, that would pull applications from the back office system which is totally separate from the trading platform.

Q.    Did you participate in this contest as well?

A.    No, I wasn't allowed to.

A-1786

Page 119

STEPHEN DARVILLE

Q.    So it was just the sales team?

A.    Right, it was just the sales team.

Q.    And do you know how they were paid those commissions in the trades?

A.    I don't know the details of the payouts for the sales team.

Q.    Okay.

A.    I just know that they got a small commission based on the amount of people they would bring on board.

Q.    I thought you said it was the amount of money they would deposit?

A.    Well, that would be a factor of the commission they would get.  How much the person funded with.

Q.    Were you involved in creating that algorithm that determined how much commission people would get?

A.    No.

Q.    Were you involved in developing any of the algorithms, the trading algorithms that were used by MintBroker?

A.    No, I didn't have any

Veritext Legal Solutions

212-267-6868                www.veritext.com                516-608-2400

A-1787

Page 120

STEPHEN DARVILLE

affiliation with that.

Q. How about any troubleshooting of the algorithms?

A. No.

Q. Okay. Did you ever assist any clients in implementing any trading algorithms?

A. No.

MS. TAUBER: Okay. I think I'm done.

THE VIDEOGRAPHER: Can I close the record?

MS. TAUBER: Yes, please.

THE VIDEOGRAPHER: This concludes today's deposition given by Stephen Darville. The number of media units used is two. They will be retained by Veritext Legal Solutions. We are going off the record at 9:16 p.m. Eastern Standard Time. Thank you everybody and stay safe.

(Time noted: 9:16 p.m.)

A-1788

Page 121

ACKNOWLEDGMENT OF DEPONENT

I have read the foregoing transcript of my deposition and except for any corrections or changes noted on the errata sheet, I hereby subscribe to the transcript as an accurate record of the statements made by me.

_____
STEPHEN DARVILLE

SUBSCRIBED AND SWORN before and to me this _____ day of _____, 2023.

_____
NOTARY PUBLIC

My Commission Expires:

A-1789

Page 122

CERTIFICATION

I, DAWN MATERA, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of January, 2023.

_____

DAWN MATERA

\* \* \*

A-1790

Page 123

I N D E X

Witness                                                    Page

STEPHEN DARVILLE

Examination by Ms. Tauber                              6, 112
                Mr. Ford                                     95

E X H I B I T S

Darville                                                   Page
Exhibit 1  Reviews of SureTrader                             15
Exhibit 2  Excerpt from Exhibit A to                        27
           Mr. Darville's affidavit

Exhibit 3  Defendants' responses to                        29
           Plaintiff's second
           interrogatories

Exhibit 4  Letter from Ernst & Young                       35
           dated June 8th, 2020
Exhibit 5  Document previously marked                      64
           Gentile Exhibit 9

Exhibit 5A  Document previously marked                     64
            Gentile Exhibit 9A
Exhibit 6  Document previously marked                      73
           Gentile Exhibit 7

-o0o-

A-1791

Page 124

ERRATA SHEET
VERITEXT
CASE NAME: Avalon v. Gentile
DATE OF DEPOSITION:  January 25, 2023
WITNESS'S NAME:  Stephen Darville
PAGE/LINE(s)/     CHANGE              REASON
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____

                     _____
                         STEPHEN DARVILLE

Subscribed and Sworn To
Before Me This_____Day
of_____, 2023.


_____
    Notary Public
My Commission Expires_____

A-1792

**[& - 9a]** Page 1

**&**

**&** 23:21 25:12 35:4,13,24 36:2 38:16 49:10 77:25 89:8,14 114:4 115:23 123:11

**0**

**03717** 62:8

**1**

**1** 15:13,14 18:12 35:23 38:12 123:7
**10** 13:3 91:7,20 91:21
**100** 38:24 39:16 49:18 57:20 62:11 69:3,15 70:16 82:15,19 109:6
**10075** 2:5
**1099** 77:5
**112** 123:3
**15** 89:18 123:7
**18** 1:3,10 3:24 4:6
**18th** 32:8

**2**

**2** 18:14 26:23 26:25 27:3 38:22 123:8
**20** 13:3
**2016** 7:18,22

**2017** 109:21 110:7
**2018** 32:8,8 110:13,15
**2019** 7:20,21,21 7:22 24:21,23 25:21 26:9,15 26:15 32:20 44:15 92:12,17
**2020** 7:18,24 16:18 24:19 31:13 32:3 35:5,13 123:12
**2022** 33:7 88:12,19 92:13
**2023** 1:18 3:5 121:18 122:19 124:3,22
**20th** 33:7
**24th** 32:8
**25** 1:18 124:3
**25th** 3:5
**27** 123:8
**27th** 122:18
**29** 123:9
**2a** 2:4

**3**

**3** 29:11,12,17 35:22,22 38:12 40:22 123:9
**32810** 53:3,18 53:23 61:18
**32812** 53:3,18 53:23 54:17,21 55:13 59:23

60:5,10 61:18 82:4,13
**32816** 53:3,7,20 54:15 61:18
**35** 123:11
**35,196** 61:16
**3700** 2:10

**4**

**4** 23:13 35:10 35:12 123:11
**42,437** 61:15

**5**

**5** 29:24,25,25 30:12 39:23 40:10 63:25 64:3 107:13 123:13
**5777** 122:21
**5a** 63:25 64:7 123:14

**6**

**6** 40:4,10 73:4 73:5,11 123:3 123:16
**620** 2:10
**64** 123:13,14
**6:38** 1:18

**7**

**7** 41:4 73:6,10 123:16
**7,240** 61:19
**70** 97:14,14 105:21

**700** 61:20,24 62:2
**7291** 1:3 3:24
**73** 123:16
**78738** 2:11
**7:24/2018** 58:22
**7:30** 91:21
**7:32** 51:13
**7:42** 51:18

**8**

**8** 38:12
**800** 60:10,17,25 61:2
**885** 2:4
**8896** 1:10 4:6
**8:30** 91:22
**8:31** 92:3
**8:40** 91:24
**8:41** 92:6
**8th** 35:4,13 123:12

**9**

**9** 63:17 64:4,14 64:19 107:13 108:8 123:13
**95** 123:4
**9:03** 108:11
**9:43:08** 58:19 58:22 59:22 60:3 68:10
**9a** 63:17 64:8 64:14,22 123:15

[aaron - agreements]    Page 2

**a**

**aaron** 2:12
**abided** 97:19
  97:21
**able** 32:12 33:2
  42:22 49:24
  94:25 109:25
  110:3,22
**above** 1:22
**accept** 95:17
**access** 12:14
  21:22,23 22:4
  22:6 32:25
  33:8 38:4 42:7
  43:10,17 45:6
  68:24 69:24
  72:21 73:15
  74:25 77:23
  78:2,5,7,14
  109:25
**accessed** 21:25
  32:20
**accessing** 21:6
  21:8 23:10
**accomplishing**
  72:13
**account** 13:18
  22:24,25 23:2
  23:5,7 26:8
  28:19,20 30:6
  30:11,19 36:11
  36:16 38:21
  39:24 40:5,18
  41:15 45:24
  46:7,19,23,24

47:5,10 48:9
48:16,24 49:21
50:7,12,17,18
50:19 52:12,13
52:14 53:7,22
54:2,3,7,15,17
54:21,23,24,25
55:2,8,9,13,15
55:16,20,21,25
56:2,19 57:19
59:13 60:4,10
60:15 61:25
62:3,5,8,13,16
62:17,19,20
65:20 68:5,9
69:12,18 72:8
75:8,13 78:10
78:15,23,25
79:23 81:20,22
82:4,5,6,12,13
82:14,21 84:3
84:3,10 87:5,9
87:11 88:15,23
111:12 114:15
114:18
**accountants**
  19:5,16,20
**accounts** 28:10
  28:11,11,13,15
  28:16 29:3
  30:14 31:10,14
  31:20,21 32:6
  36:17 41:3
  45:16,19 52:4
  52:7,7,8,9,18

52:19 53:3,11
53:17,25 59:15
61:17 63:7,9
63:10,11,12
69:18 75:20,22
76:3,4,12,13,17
80:13 81:7
86:16,17,18
94:17 95:10
**accurate** 74:6
  121:8
**acknowledge**
  96:18
**acknowledg...**
  121:2
**acting** 105:4
**action** 1:22
  4:13 5:24
  102:9 122:14
**actions** 105:15
**activities** 33:25
**activity** 36:15
  39:24 47:18
**actual** 56:14
  69:11 114:25
**actually** 7:5
  22:15 41:8
  62:11 68:17
  96:19 102:20
  105:15
**adding** 23:8
**addition**
  104:17
**address** 17:13
  96:16 99:14

**advertisements**
  96:25
**advertising**
  96:21
**advice** 89:23
**advised** 80:12
**affidavit** 6:14
  7:23 19:3
  20:18 23:12
  24:17 26:19
  27:2,5,11 28:2
  28:8 40:13
  52:2,3 53:2,14
  54:13 55:4
  56:16 61:13
  82:3 83:13
  88:11,20 89:2
  123:8
**affidavits** 6:10
  6:11 18:17,19
**affiliate** 49:22
**affiliated** 84:9
  84:15
**affiliation** 83:7
  120:2
**affiliations**
  4:19
**ago** 73:22
  88:20 112:12
**agree** 3:14
**agreeing** 95:18
  96:3
**agreements**
  30:3,7 99:25

**[ahead - back]** Page 3

ahead 35:20 46:14 94:13
aimed 97:18
alerted 50:6,10
alexis 13:12 67:8
algorithm 119:19
algorithms 119:23,24 120:4,8
allow 72:4
allowed 23:3 62:15,21 96:19 118:25
alongside 8:14
alter 22:6,9 42:15 112:11
altogether 18:8
america 6:18 6:25 8:18 9:22 12:11 13:5,23 74:9
amount 113:3 119:11,14
amounts 106:7
annual 71:22
answer 26:5 30:23 31:3,23 59:7 75:25 86:2 90:6,10 95:2
antonio 93:4 106:25

anybody 10:15 19:21 21:13,14 22:5 95:13
anymore 42:23 79:18 110:22
anyway 18:9
apart 89:15
api 65:17
appear 54:22
appearance 4:17
appearances 2:2 4:19
appeared 103:6
appearing 5:9 5:16 6:3,5
appears 55:14 117:22
application 97:8 111:10,12 111:15
applications 97:7 108:22 118:20
applying 48:5
appreciate 91:18 111:3
approve 47:9
approving 108:17,21
approximately 7:18
april 33:7 92:13

aprotrader 18:2
arrangements 30:3
arrest 47:19
aside 38:8,10 105:18
asked 19:7 32:4 32:5 33:7 34:6 37:24 102:24 105:16
asking 15:20 17:8 31:8,16 36:3 38:10 76:6 94:16
aspect 52:17,23 59:20 81:24
assets 76:16
assist 32:4 46:21 120:6
assistant 10:9 10:11 67:15
associated 116:22
assumed 24:14
attached 18:18 19:3 27:11
attachment 63:21 64:25 65:8,22,25
attested 29:2
attorney 4:21 90:8,10
attorneys 2:3 2:10 23:20

audio 3:12
auditors 19:5,6 19:15,19
austin 2:11
authenticate 17:7
authenticated 37:8,22 38:9
authentication 64:15
authorities 5:23
authorized 22:6 104:25
automatically 12:18
avalon 1:4 3:19 30:5,10 31:10 32:6 124:3
avenue 2:4
aware 24:24 25:20 26:6,10 28:23 70:21 72:22 77:17 86:8,10,12 87:8,13 92:21 93:4,22 99:22 99:24 109:10
awx 56:23 61:14

**b**

b 2:11 10:14 20:19 123:5
back 23:9 31:13 51:7,18

**[back - certainly]** Page 4

91:3,23 92:6 100:8,21 101:3 101:5 108:3,12 116:13 118:20
**background** 6:15 47:16
**backup** 115:13
**bad** 103:12
**bahamas** 1:23 5:22 13:5 23:21 102:20 113:14 114:21
**bain** 10:12 67:12,14
**balances** 41:16
**banking** 13:22 14:6 15:3,4 77:15
**based** 14:3,23 69:14 111:9 112:19 113:3 119:11
**basic** 46:16 57:24
**basically** 10:4 11:18,25 14:21 21:4,24 22:16 23:7 25:8 33:15 44:10 56:4,7 68:23 72:5 96:2 98:6 101:24 102:18 104:23 106:5 106:10 111:25 112:5,13

117:17
**basis** 70:24,25 71:9
**bates** 16:10 17:14,18,23 27:20
**beginning** 4:20 46:24
**behalf** 4:25 20:21 86:11 90:4
**believe** 24:11 38:23 57:20 66:8,11 70:15 72:2,10,24 89:13 92:13 101:16 105:4 110:12
**belonged** 61:16
**belonging** 61:19
**beresford** 19:10 41:20 58:11,14,17 88:5 90:21
**better** 37:5
**bid** 15:25
**big** 117:17
**bit** 6:14 55:5 56:6 57:10
**blocker** 95:21 96:11
**blood** 122:14
**blotter** 54:18

**board** 102:19 119:12
**booking** 52:8 52:14
**bottom** 35:22 72:18
**box** 29:20 73:11
**boxed** 15:23 73:12,12 74:21
**breach** 21:5 90:7 99:5
**breaches** 21:12
**break** 37:18 50:23 51:5,7 90:25 91:7 107:24
**brief** 98:23
**briefly** 80:20
**bring** 119:12
**bringing** 113:7
**broker** 56:11 72:9 82:5 83:3 84:10,22
**broker's** 55:15
**brokerage** 77:7
**brokers** 24:12 57:15 82:11
**brought** 113:4
**business** 19:17 20:23 48:13 50:22 52:22 59:20 61:11 76:21 81:24 99:3

**buy** 56:20 60:17

**c**

**calculate** 71:8
**calculated** 71:5
**call** 13:18 15:12
**called** 6:17 9:22 80:13 84:22
**calls** 9:24
**camera** 3:9
**capacity** 73:14
**caption** 3:25
**cara** 2:14
**case** 1:3,11 3:21,23 4:6 5:17 6:9 19:3 19:14,24 25:22 26:14 27:12 28:24 29:19 31:7,18 32:12 38:4 41:24 58:12 83:11 88:14,22 91:6 104:5,12 124:3
**cash** 76:16
**categories** 52:9
**category** 36:12
**caught** 112:5
**cc** 65:18
**certain** 36:5 42:18 58:15 86:15 88:14
**certainly** 17:3 38:3

**[certification - company]** Page 5

**certification** 122:2
**certified** 4:8
**certify** 122:6,12
**cfilippelli** 2:14
**change** 21:15 21:19 22:15 42:15 111:25 112:4,9,12 124:5
**changes** 121:6
**charged** 112:22 116:21 117:13
**charts** 68:24 69:9
**chat** 9:25
**check** 39:15
**checking** 50:5
**checks** 33:19 48:11 62:23
**chief** 98:10,15 101:12,17
**chose** 86:23
**chosen** 81:5,9
**christian** 19:10 41:22 43:10 44:18 45:13 58:11 85:15 86:13,19,23 88:5 90:19
**ci** 65:19
**circumstances** 98:25
**citizens** 95:9

**claim** 112:13
**claiming** 117:17,21 118:3
**clarify** 37:4
**clarifying** 6:8 8:6
**clashes** 102:7
**clean** 100:22
**cleaned** 100:17
**clear** 17:21 59:12 76:14 90:17,20 98:7
**clearing** 54:24 55:16 56:12 82:6,12 84:18 86:6
**clearly** 31:13
**client** 9:20 12:10 13:15,16 14:9,22 26:7 28:11,19 29:2 31:20 36:10,11 36:14,14,15,16 38:21 39:17,24 40:17 45:16 46:18,22,23 47:6 49:16 59:14,15 62:12 62:17,18 63:10 68:14 75:20,22 76:3,16,24 79:16 83:2 84:21,23 85:2 86:16,18 88:15

88:23 90:8,10 112:14,22 113:8
**client's** 54:25 55:8,19,25 71:5 112:13
**clients** 9:13 11:13,24 22:20 36:7,13 39:25 40:5,22 41:3 41:15 47:8 56:8,10 61:20 62:12,15 67:4 68:22 70:18,24 73:14 74:24 76:4,10,18 77:2,6 88:17 95:5,16 97:3 97:24 106:6 112:2,3 113:3 117:17 120:7
**close** 15:22 18:9 72:7 90:25 120:12
**closed** 8:3 25:19 80:11 92:16 110:13 113:24
**closing** 79:16 79:23 80:6,8 80:15,19
**colleague** 17:16
**collect** 26:13
**collie** 93:4 98:7 106:25 107:14

107:16
**column** 28:3,4 56:20,20,25 57:7 68:2,6
**columns** 56:21 56:22
**come** 14:22 51:7 91:3 96:17 99:7 102:3 107:7,9 108:2 118:5
**coming** 112:3
**comment** 90:3
**commission** 112:16,18,20 112:21,24 113:5 115:4 116:20,25 117:4,6,8,13,18 117:20,21 118:3,6 119:11 119:16,20 121:23 124:25
**commissions** 119:6
**companies** 7:2
**company** 7:6,7 8:21 21:9 22:25 23:5,21 24:15 25:4,7 25:19 28:15 34:5 46:16 52:19,24 57:22 59:13 75:5,6 75:12 80:22,24

A-1797

[company - custody]

Page 6

83:8 84:9,18 85:11 86:6 89:11 92:16 93:25 94:22 96:4 97:19,22 98:20 99:4,18 99:20 100:2,4 100:20 101:8,9 101:24 102:3 102:21 103:17 104:9 105:5,12 106:16,19,20 109:12,14,24 110:6,21 113:23 118:7

**company's** 34:24 75:7 89:10 117:8 118:6

**compel** 5:23

**compensation** 30:8

**complained** 102:19

**complaint** 16:4 16:6 79:12

**complaints** 36:14

**complete** 36:14 39:24 83:15 85:16 86:3,4

**compliance** 47:14 48:6,8 63:4 98:10,15

**comprised** 87:9

**computer** 6:23 12:8 42:12 43:7,8,9,11,14 99:10,12 100:4 100:13,16,21 101:3,10 104:20

**computers** 9:18 12:4,6 100:7

**concept** 1:12 3:25 31:12 32:7 55:3

**concern** 37:9

**concerned** 14:10

**concludes** 120:16

**conducted** 3:7

**confidentiality** 99:6

**confirm** 16:18 33:11,20 34:2 61:8 86:17

**conflict** 89:22

**connected** 45:3

**connection** 3:9 18:15

**consisted** 6:22

**consistent** 30:17 31:17

**consulted** 89:3

**contact** 12:10 66:12 92:10

**contain** 52:4

**contained** 61:15 111:10

**contest** 118:24

**context** 96:20

**continue** 3:13 50:24

**cooper** 23:14 23:19 47:15 93:7,8 98:6,17 106:25 108:23

**cooper's** 93:9

**copied** 114:2,20

**copies** 23:14 49:3

**copy** 16:9 35:9 39:11 111:14 114:5,6

**copying** 114:25

**corp** 1:4

**corporation** 3:19

**correct** 5:12 6:7,19 7:19,25 8:22 10:25 18:19,20 19:12 23:17,22 24:21 25:15 28:6,7 28:14,22 34:16 39:5,6 41:9 42:13 43:9 44:6 46:3,4,25 49:2,7 57:8 59:10 66:13 74:2,13 76:5

94:24

**corrected** 24:19

**corrections** 121:6

**correctly** 33:12 50:13

**corresponden...** 36:13 40:21

**corrupted** 33:16

**counsel** 4:18 51:20

**country** 102:25 105:11,17

**couple** 15:18 18:17

**course** 19:16 20:23

**court** 1:2 3:22 4:5,9 5:21 6:3 88:13,22

**cover** 64:23 65:6

**created** 115:11

**creating** 119:18

**creation** 96:7

**credentials** 43:13

**criminal** 47:18

**custodian** 81:16

**custody** 23:16 39:3 92:22 93:5,23

A-1798

**[customer - december]**                                                                                    Page 7

**customer** 10:16 10:21 12:10,19 12:21,24 13:13 14:4,7,15 15:2 47:20,24 48:17 49:3,20 50:15 67:10 71:13 72:7 77:15,17 79:12,14 80:2 108:21

**customers** 9:13 69:17 71:23,25 72:20 75:11 80:11 81:6 87:22 94:17 96:23 97:4,19 98:8,9 101:15 108:17 111:12 111:13 113:19

**cv** 1:3,10 3:24 4:6

**d**

**d** 5:2 11:3 68:2 123:1

**daily** 71:9,14 107:17,18

**darville** 1:21 3:18 5:1,8 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 15:13,14 16:1 17:1,8 18:1 19:1 20:1 21:1 22:1 23:1 24:1

25:1 26:1 27:1 27:3 28:1 29:1 29:12 30:1 31:1,23 32:1 33:1 34:1 35:1 35:12 36:1 37:1,23 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1,3,7 65:1,5 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1,5 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1,5 91:1,9 92:1 93:1 94:1 94:9 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1,13 109:1 110:1 111:1

112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1,17 121:12 123:2,6 124:4,20

**darville's** 27:4 123:8

**das** 11:2,4,6,12 11:13,16 20:9 20:12,16 22:17 22:20 45:22,25 46:8 56:14 65:20 66:9,11 66:13 69:5,5

**dastrader** 65:16

**data** 20:5,8 21:15,19 22:7 22:9,10,12,13 26:13 33:5,10 33:12,16,20 34:2,7,19,21 40:15,19 41:19 41:25 42:3,7 42:10,15 44:12 44:14 49:13,14 66:5 85:7,15 85:16 111:19 115:2 116:11 116:23

**database** 44:12 86:14 87:15,16

**date** 15:16 27:6 29:15 35:15 56:20 60:16 64:6,10 72:4,5 73:8 110:12,17 124:3

**dated** 35:4,13 123:12

**dates** 34:23

**david** 2:7

**davis** 23:21 25:12 32:19 36:2,23 38:16 49:10 77:25 89:8,14 114:4 115:23

**dawn** 1:24 4:9 122:4,22

**day** 22:17 121:17 122:18 124:22

**days** 107:9

**deal** 12:2,20 52:16 59:18 77:19

**dealing** 67:17

**dealt** 13:12 15:21 50:3 63:5 66:25 67:22 77:11,12 78:17

**december** 8:3 24:20,23 25:19 26:15 32:20 44:15 92:11,17

[december - document]                                                    Page 8

92:19
**defendants** 1:8
  1:16 2:10 4:25
  29:12,17 31:9
  123:9
**definitely** 97:20
  99:19 101:11
  105:7
**definitions**
  52:18
**deliver** 23:19
  36:3 115:22
**delivered** 32:18
  36:23 38:16
  39:4,20 44:15
  115:11,19
  116:2,7
**delivery** 25:10
**department**
  13:23,25 14:5
  14:7,8,16,25
  15:5 47:15
  48:6,8 50:2
  63:4 67:11,15
  72:16 75:16
  77:16 80:2
  106:2 111:22
  117:7
**departments**
  14:17
**depending**
  40:15
**depends** 3:8
**deponent** 121:2

**deposit** 119:14
**deposited**
  13:16
**deposition** 1:20
  3:6,17 5:10
  16:17 25:25
  26:25 63:18
  73:10 120:16
  121:5 124:3
**depository**
  81:16
**describe** 23:13
  28:3 36:4
  88:21 96:10
**described** 28:9
  54:15 61:17
**describing**
  65:23 73:17
**designated**
  50:13
**desk** 9:23,25
  11:18,19 12:14
  12:20,24 13:20
  13:24 14:2,15
  14:18,21 15:5
  16:7 52:22
  54:5 66:18
  67:2,6,18,19
  93:19,20
**details** 47:13
  119:7
**determine**
  60:20
**determined**
  119:19

**developing**
  119:22
**devised** 45:20
**difference**
  52:12
**different** 11:15
  13:25 34:22
  40:17 48:3
  67:20 68:23,24
  69:8,9 72:9
  76:4,10,12
  84:9 86:7
  117:12
**direct** 7:11
  11:13,19 14:4
  72:20 73:15
  74:24
**directed** 13:22
  54:20
**directly** 7:8
  75:3 79:25
  90:21
**disclaimer**
  95:12
**disclosure**
  72:18 73:2,16
  73:17 74:16
**discontinued**
  113:16
**discovery**
  29:19 31:7
  84:20
**discussed** 25:12
  31:19 32:19
  48:19 52:5

**discussing**
  59:22
**discussion** 64:2
  79:21
**discussions**
  98:12 101:14
**disk** 34:14,18
  36:22 38:16
  39:13 41:8,9
  41:25 113:13
  114:3 115:6,11
  115:19 116:6
**dismantle** 78:4
**display** 70:15
**dispute** 64:15
**dissolution**
  25:3,21 92:11
**dissolved** 24:24
  25:8 93:25
**district** 1:2,2
  3:22,23 4:4,5
**dividends** 79:8
  79:13,18 80:9
**division** 14:18
**dlc** 1:3,10
**docket** 35:7,7
  37:18,19,21
  38:4,5
**document**
  16:21 17:6
  18:8 25:23
  26:6 27:24
  28:17 29:19
  30:18 31:6
  35:2,3 37:7,15

**[document - events]** Page 9

37:17,24 38:8 51:24 64:3,7 64:25 73:5,24 123:13,14,16

**documents** 17:22 18:7,17 20:19 25:11,24 29:7 32:21 36:3,5,12 38:22 39:17 40:3 48:20 65:10 77:18,24 77:24 78:2 82:22 88:7 92:14 104:10 104:14 109:24 110:2,5,21 113:25 114:15 114:18

**doing** 86:19 89:18 99:2,16 103:6 106:11

**dorsett** 98:18 98:19 99:22 100:3,12 103:4 105:19 108:25 109:3,13,23 110:20

**doubt** 37:20 40:23

**download** 42:10

**drama** 105:20 105:20

**drameko** 93:11 93:14,16,17

**drive** 44:19,21 44:22

**driver's** 47:21 48:25

**drivers** 49:4

**dropbox** 43:25 65:11,14

**duly** 5:3 122:8

**dump** 27:15

**duplicate** 58:4

**duplicative** 58:6

**e**

**e** 5:2,2,2 10:2 36:9 63:20 64:23 65:7,9,9 65:15,15,23 66:8,20 99:4,4 99:13,14 103:5 103:7 111:25 112:4,6,10,11 123:1,5

**earlier** 16:17 24:19 62:7

**early** 110:14

**ease** 29:22

**eastern** 3:4 120:21

**ec** 102:11

**ecf** 1:3,11

**edgx** 57:8

**edward** 23:14 23:19 93:10

98:17 106:25

**eight** 91:18

**either** 27:21 54:25 55:7,19 55:25 58:9 77:14 79:10 82:11 94:2

**electronic** 23:15

**elite** 69:6

**else's** 43:8

**employed** 24:17,18 25:2 77:20 97:10

**employee** 25:14 47:6 100:8

**employees** 22:2 23:8 67:20 97:11,22 105:21 107:8 113:20

**employment** 102:17

**enabled** 42:10 42:14

**energy** 1:12 4:2

**engaged** 87:22

**entail** 47:12

**enter** 10:22 44:5

**entered** 37:17 37:21

**entire** 8:8 26:21 98:20

**entirety** 32:11

**entities** 63:9

**entitled** 1:22 79:14

**entity** 47:25 48:2,4,9,20,20 49:21 50:16 62:20 74:12 80:13 81:5,5

**entries** 28:4 58:4 60:24 61:15

**entry** 20:4,8 59:24 60:8,14 60:25 61:2

**equipment** 12:5

**ernst** 35:4,13 35:24 123:11

**errata** 121:7 124:1

**error** 8:4 53:7 54:15

**especially** 59:12

**esq** 2:6,7,12,14

**essentially** 5:21

**estate** 8:20

**estimation** 105:2

**etc's** 84:23

**evening** 3:2 5:8 6:6

**events** 104:11

[eventually - firm]                                    Page 10

**eventually**
  106:12
**everybody**
  91:23 94:7
  102:22 107:5
  120:22
**exact** 12:25
  48:11 54:11
  58:24 109:16
  110:11
**exactly** 5:19
  41:17 53:11
  54:6 57:23
  59:17 69:7
  86:25 110:17
  110:24 112:25
**examination**
  5:6 123:3
**examine** 87:18
**examined** 5:4
**example** 48:18
  58:17 59:21
  60:9 62:4
  68:11 83:13
  84:8,17 86:23
  96:12 117:23
**examples** 86:16
**except** 121:5
**excerpt** 26:18
  26:19 27:3
  123:8
**exchange** 56:25
  57:3,3 70:14
  111:9

**executed** 57:4
  58:16,18 59:4
  73:13 82:10
  83:2,16 85:5
**executive** 98:3
  98:5 106:18,21
  106:23
**exhibit** 15:7,13
  15:14 18:12,13
  18:14 26:18,23
  26:25,25 27:3
  27:4,11 29:11
  29:12,17 34:9
  34:12 35:10,12
  40:12,13 63:14
  63:17,25 64:3
  64:4,7,8,19,21
  64:22 73:3,3,5
  73:6,10,11
  83:13 123:7,8
  123:8,9,11,13
  123:13,14,15
  123:16,16
**exhibits** 18:18
  20:19 64:13,17
**expect** 17:11
  82:9 91:2
**expected** 14:12
**expecting** 91:5
**experience** 8:24
  9:3,5,11
**experiencing**
  65:24
**expert** 19:10
  37:11

**experts** 41:23
  88:8
**expire** 42:17
**expired** 103:2
**expires** 121:23
  124:25
**explain** 52:11
  55:6,10
**explanatory**
  74:22
**extensive** 47:8
**extent** 97:16
  104:13 109:23
**external** 44:21
  44:23

**f**

**f1** 80:13,17
**fact** 34:3
**factor** 119:15
**factual** 37:12
**fair** 90:16
**familiar** 5:19
  11:5,7 66:23
  95:4 101:17
  103:24
**far** 40:7 46:10
  49:11 62:21
  70:20 71:20,24
  81:2 83:21
  84:25 106:19
  109:10
**february** 7:24
  8:2 16:17
  24:18

**fees** 30:7
**fellow** 102:15
**felt** 79:14
  105:12
**file** 77:7
**filed** 3:21 4:4
  35:6,17 38:9
**files** 32:18
  38:19 39:18,19
  40:20 48:17
  49:9 93:23
  113:19,22
**filippelli** 2:14
**fill** 15:25 16:2
  97:6
**filled** 70:11,11
  70:14 97:5
**final** 36:15 40:5
**financial** 26:8
  88:16,24 114:9
  115:2
**financially** 4:13
**fine** 91:12
**finish** 51:8
**finishing** 91:2
**fired** 98:25
  100:12 106:13
  106:14 109:14
  110:10,23
**firing** 101:25
  102:10 104:2
**firm** 2:3 4:10
  8:21 36:2
  44:16 114:21
  115:4 116:18

A-1802

**[firm's - global]** Page 11

**firm's** 52:6
**firms** 8:24
  23:24 24:6,9
  34:15 39:20
  46:2,8 49:16
  115:12 116:10
**first** 5:3 6:13
  28:4 34:10
  56:19 59:21,23
  60:3,25 66:4
  73:23 92:9
  93:9 94:15
**five** 34:23,24
  51:5,7 58:23
  91:7,9,10,11,14
  107:9
**folder** 17:22
  65:11
**follow** 17:20
  46:8 94:8 95:6
  108:5 116:11
**followed** 63:6
**follows** 5:5
**footnote** 53:2
  54:13 57:2
  61:12
**ford** 2:9,12
  4:24,24 16:8
  16:13,19,24
  17:14,25 18:11
  24:13 26:3,23
  27:23 29:5
  30:21 31:22
  32:14 35:19
  36:25 37:6,20

39:14 42:4
46:9 50:8 51:3
59:6 60:13
61:4 62:14
65:5 66:10
68:15 83:4
84:13,24 86:20
90:2,4,13 91:8
91:20,23 92:23
94:6,14 104:3
104:6 107:23
108:7,13,15
110:25 123:4
**fordobrien.com**
  2:13,14
**foregoing**
  121:4
**forensic** 19:6
**forget** 53:21
**forgetting**
  91:15
**forging** 112:5
**forgot** 77:22
**form** 30:8 77:6
  97:8 111:10,12
  111:15
**format** 40:11
  45:24 66:6,7
**forms** 47:23
  77:2,3,18 97:5
**forth** 122:8
**forwarding**
  99:3
**found** 99:2
  106:10

**foundation**
  37:8
**four** 58:23
  88:20
**franz** 101:18
  101:19,20
  103:8,9 104:20
  105:18 109:5,6
  109:11 110:9
**free** 31:3
**frequently** 71:8
**friday** 107:12
**friedman** 2:17
  4:7
**function** 54:17
**funded** 106:7
  113:4 119:17
**funding** 13:22
  14:6 15:4
  77:14 114:11
  114:13,14
**funds** 13:17
  76:24
**further** 116:10
  122:12

**g**

**gain** 22:3
**geared** 12:3
**general** 12:13
  41:19
**generally** 11:5
  11:7 12:9
  75:12
**generate** 18:21
  18:25 69:20,23

70:23 71:25
**generated**
  12:18 19:24
  20:10 22:13
  71:23
**gentile** 1:7,14
  3:20 4:2 7:9
  19:7 24:7,10
  24:15 25:24
  26:12 33:7
  63:17 64:4,8
  64:13,22 73:6
  80:25 88:3,6
  88:13,21 89:25
  92:10,16,21
  105:13 107:3
  107:20 108:17
  123:13,15,16
  124:3
**gentile's** 16:16
  23:25 30:4,9
  49:23 63:18
  73:10 106:15
**getting** 79:17
**ggentile** 65:18
**give** 42:6 114:3
  115:24,24
**given** 22:20
  27:22 46:16,23
  69:17 120:16
  122:10
**global** 81:11,12
  84:22 85:2,6
  86:9

**[gluck - implementing]** Page 12

**gluck** 35:18 38:9
**gmail.com** 2:6
**go** 3:14 14:12 15:21 16:18 22:14 35:20 44:11 46:14 51:9 91:16 94:13 98:23 99:5 106:11 112:7
**going** 3:3 6:13 16:12,19 18:12 20:2 26:17 29:10,21 34:25 35:19,21 51:3 51:13,23,25 60:21 63:13,16 65:3 72:25 80:9 87:15 90:9 91:4 92:3 107:23 108:9 120:20
**good** 3:2 5:8 91:25 102:8
**gotten** 112:11 118:7
**governing** 30:3
**grew** 97:13
**group** 58:18 94:22
**guess** 7:14 15:8 33:3 38:2 41:15 42:5 48:10,13 74:3

75:2 106:6
**guidelines** 63:6
**guy** 1:7,14 3:19 4:2 7:9 79:22 79:24 80:6 101:22 102:4 102:12,14 106:3
**guys** 67:21

**h**

**h** 5:2 123:5
**hand** 100:7 116:3,4 122:18
**handled** 16:7 72:16 75:17 77:16 79:8 85:13 118:15
**handling** 67:3
**hannah** 13:12 67:8
**happen** 22:18 100:20
**happened** 100:13 113:18
**happening** 62:25
**happens** 32:9
**hard** 44:21
**hear** 78:24 79:11 80:21 116:9
**heard** 3:10 30:24 68:18,20 80:17,20 81:10 92:15 116:13

**held** 76:15
**hello** 107:5
**help** 9:23,25 11:19 12:14 13:18,19,24 14:2,18,19,21 16:7 32:12 46:19 53:24
**helpful** 65:6
**helps** 14:5
**hereunto** 122:17
**hierarchy** 14:20
**highly** 40:23
**hired** 8:11
**history** 70:5,6,8 70:9
**hmm** 71:15 82:8 94:18 111:13
**hold** 15:8 16:20 26:22
**holding** 3:19
**holdings** 1:4
**hollwedel** 65:16
**home** 106:8
**honest** 38:25 59:8 73:19
**hope** 51:10
**hopefully** 111:5
**hoping** 53:24
**horrible** 101:22

**hot** 113:10
**hour** 51:9,11
**hr** 7:15 114:19
**hu** 58:21
**huh** 57:13 68:7

**i**

**ib** 57:12 65:17
**ibkr.com** 65:19
**ibos** 33:4 41:11 42:11 43:20 44:9 69:25 71:7 83:25 84:2,10 115:14 118:14
**idea** 17:25 100:24
**identification** 15:16 27:6 29:15 35:14 64:5,9 73:7
**identify** 30:2 31:9 32:6
**identifying** 17:19
**identity** 50:12
**ids** 47:20,21
**immediately** 95:14
**immigration** 102:23
**impacted** 116:17
**implementing** 120:7

A-1804

**[important - joint]**

**important**
64:24
**imported** 33:21
41:11
**improper** 103:6
**include** 49:16
**included** 36:22
38:15 39:18
40:20 49:9
56:18 85:6
113:12
**including** 30:6
36:9 88:15
**inclusive** 36:7
**incorporated**
4:2
**indicates** 17:5
**individual**
48:19,24 50:16
58:7 61:24
62:19 63:11
71:19 81:19
97:22 101:23
**individuals**
104:9
**information**
17:19 20:16
22:4 31:17
32:13 34:14,18
36:6,10,19,21
39:9,11,12
40:2,24,25
41:10,17 49:8
49:12,15 54:11
54:20,22 55:14

56:9 70:2,16
78:18,21 79:6
82:4 85:9
87:20 104:7
113:12 114:3,5
115:5,8 116:6
116:12,21
117:4 118:18
**informed** 46:14
88:12
**inquiries** 66:25
**inquiring**
104:15
**inquiry** 66:22
79:12
**insight** 95:3
**institution**
36:18 81:15
**institutions**
36:16 41:2
**instructed**
23:13,19
**instructions**
44:11
**insult** 102:2
**interact** 9:12
**interactive**
54:23 56:11
57:14 82:5,11
**interactive's**
55:15
**interest** 89:23
**interested** 4:14
53:22 66:2
122:15

**internal** 52:6,8
52:13 104:17
**international**
1:7,15 3:20 4:3
**internet** 3:9
**interrogatories**
29:14,18
123:10
**interviewed**
102:22
**introduce** 15:7
35:2
**introduced**
63:16 73:9
**introducing**
35:3 63:19
83:3 84:21
**inventory** 12:7
52:7,12 54:2
55:2,9,20 56:2
57:19 75:8,13
78:11,15,19,23
78:25 79:3
81:21
**investigations**
48:14 50:3
**invoke** 90:9
**involved** 33:24
50:21 52:23
57:22 61:7
72:12 76:20,24
80:4 81:23
82:17 96:6,9
98:11 101:14
108:18,20

109:2,3 119:18
119:22
**involvement**
109:7
**irs** 77:8
**issue** 12:2
32:11 50:7,11
50:15 65:20
67:22 104:12
**issued** 5:12,17
5:22
**issues** 9:16,20
11:11 12:21,22
15:20 18:6
66:16,18,19
67:3,4
**item** 38:22
**itemized** 36:21
38:15
**items** 36:8
38:12,14

**j**

**janay** 106:24
106:24
**january** 1:18
3:5 122:18
124:3
**jargon** 5:20
**job** 9:8,9 25:8
100:6
**john** 65:16
**join** 96:5
**joining** 94:5
**joint** 36:4

**[joking - levels]** Page 14

**joking** 80:5
**jonathan** 10:12
  67:12,14
**judgment**
  28:25
**july** 32:8,8
**june** 35:4,13
  123:12
**justin** 7:10 8:7

**k**

**k** 8:19
**keep** 80:8 102:7
**keeping** 12:6,7
**kensington**
  23:20 25:11
  32:18 36:24
  38:17 49:10
  77:25 114:4
  115:23
**kept** 34:5 76:23
  78:11 79:4
  113:6 114:19
  118:12
**kind** 16:6 18:21
  19:4 45:4 66:5
  66:22 77:6
  78:21 79:22
  103:12
**knew** 85:2
  93:13
**know** 11:25
  12:7,12 15:10
  16:15,21 17:3
  17:15,16,19
  18:2,3 19:19

19:22 21:19,21
33:16,22,23
38:6,13,23
40:7 41:14,16
46:10 47:4,15
47:17 48:11,12
49:11 50:20
52:17,18 53:10
53:11 54:5,6
56:9,13 58:5
59:8 62:16
65:17 67:3,24
68:8,16,17
69:21 70:20
71:10,24 72:4
72:17 75:15,17
75:19 76:8,11
76:15,19,23
77:9 78:9,13
78:21,22 79:2
79:5,7,15,20
80:7,11 81:2,3
81:4,8,8,14,18
83:5,6,21 85:9
85:12 86:5,7
87:4,21,23,24
90:5 93:14
94:6 95:15,17
96:3,4,5 98:8
99:7,17 100:3
101:2,24
102:12 103:11
104:12,21,24
105:3,11,14,16
106:19,20

107:12 109:10
111:4 112:12
113:2,22,24
114:22,22,23
116:5,25 118:8
118:13,13
119:5,7,10
**knowledge**
  21:14,17 30:2
  34:20 37:12
  41:6 56:6
  57:25 63:8
  80:25 85:10
  86:4 92:20
  97:17 109:8
**knowledgeable**
  61:10
**known** 6:16
  92:25 96:25
  103:20
**knows** 64:16

**l**

**l** 5:2,2
**labor** 102:19
**laid** 37:9
**landy** 2:9
**language**
  111:11
**laptops** 12:5
**large** 13:2
  87:16 106:7
**late** 94:6 111:4
**law** 2:3 23:21
  23:24 24:6,9
  32:18 34:15

35:25 36:24
38:17 39:20
44:16 49:10,16
77:25 114:21
115:3,12,23
116:10,18
**lawyer** 24:2
**lawyers** 23:25
  25:11 89:3,7
  89:11,12,21
  113:14 114:4
**leave** 18:12
  102:25 105:11
  105:17
**leaving** 61:19
**led** 105:16
**left** 103:11,14
  109:12,17
  110:2,7
**legal** 4:8,11
  5:20 120:19
**legitimate** 17:5
  21:9
**lending** 12:21
**letter** 30:19
  35:3,12 38:13
  46:6,24,25
  123:11
**letters** 5:11,16
  28:5,11 45:17
  47:3 86:18
**level** 69:10,10
**levels** 68:24
  69:8

A-1806

[license - marriage]                                                Page 15

**license**  47:21 48:13,25
**licenses**  49:4
**likely**  104:10
**limited**  36:7 85:10
**limits**  88:6
**line**  15:25 65:19 82:2 104:4 124:5
**link**  43:24,25
**liquidators**  36:4
**list**  36:8,21 38:11,15,19 59:23 111:21
**lists**  111:20
**litigation**  18:16 19:14
**litigations**  18:22
**little**  6:14 57:10
**llp**  2:9
**load**  32:25 33:15
**located**  1:22 13:4
**location**  78:10
**log**  42:23 43:12 43:14,14,16
**logged**  44:8
**login**  22:21 42:6,9,14,17 43:18 44:5

**logs**  36:13
**long**  17:20 41:18 42:20 53:9 57:21 61:6 73:22 89:14 94:11 108:6
**look**  19:24 29:7 29:21 53:13 57:10 65:12,13 67:25 74:17 86:24 104:24
**looked**  12:15 30:18 34:11 40:14 58:17 83:12 87:4
**looking**  36:5 66:2 67:23 68:10
**looks**  27:14,17 66:9
**lopez**  2:7 17:17 104:3,16
**loss**  71:5,9,14 71:16,18
**lot**  17:21 87:20 102:18 103:25 105:20

**m**

**ma'am**  6:12 8:25 28:22
**machine**  99:10 103:11,13 104:25

**made**  25:5 63:11 96:25 98:7 99:22 121:9
**mail**  10:2 63:20 64:23 65:7,9,9 65:15,15,23 66:8,20 99:14 103:5,7 111:25 112:4,6,10,11
**mails**  36:9 99:4 99:4,13
**maintain**  39:10 75:21
**maintained**  39:3 44:14 75:20 92:21 93:5,23
**maintaining**  20:20,25 21:10
**majority**  63:12
**make**  22:3 23:14 37:4 47:17 49:20 64:16 91:14 108:3
**making**  21:5,7 21:11
**malicious**  102:15
**managed**  13:14 30:6,10,13 31:9,14
**management**  30:7

**manager**  6:16 6:21 7:11,14 7:15,17 13:9 13:10,11 93:19 93:20
**managers**  8:13 67:20
**managing**  6:22
**manipulated**  111:19,19 116:16,23 117:10,14
**manipulating**  106:3,5 111:23
**manner**  94:16
**marc**  2:17 4:7
**mark**  63:25 64:11
**marked**  15:15 27:5 29:14 35:14 64:4,5,8 64:9,18 73:3,6 73:7 123:13,14 123:16
**market**  61:2,3 72:21 73:15 74:24 75:3
**marketing**  96:24 113:11
**markets**  81:11 81:12 84:22 85:2,6 86:9
**marking**  15:11
**marriage**  122:14

A-1807

matched  33:21
matera  1:24
  4:10 122:4,22
matt  35:6 37:3
matter  3:18
  122:16
matters  9:15
matthew  2:12
  4:24 27:19
mbs  62:7,8
mbs010067
  60:15 62:4
  68:6 87:6
mean  12:13,16
  20:24 23:5
  25:6 39:21
  40:11 42:24
  43:5 53:9
  55:22 61:23,24
  69:5,22 71:12
  74:22,25 76:15
  77:4 89:8,11
  89:15 102:4,5
  102:14 104:23
meaning  11:15
  39:10 76:4
  114:14
means  5:18
  57:3
meant  55:7
measures  95:7
  96:22
media  3:16
  51:14,19
  120:17

member  111:22
members  79:22
  102:10,19
mention  52:3
  53:2 78:24
  80:14 97:23
mentioned  6:15
  7:16 10:20
  18:15 36:2
  37:17 41:11,21
  41:22 53:6
  67:7,13 82:2
  84:19 88:10
  90:18 93:3
  103:4 111:10
  111:17
method  54:18
mford  2:13
mint  81:10,12
  84:22 85:2,5
  86:9
mintbroker  1:7
  1:15 3:20 4:3
  6:17,24 7:17
  8:19 9:8,14,22
  12:11 20:21,22
  21:15 22:24
  23:15 24:9,24
  25:14,22,23
  26:13 28:13,20
  28:24 31:21
  39:4 45:19
  46:2 47:6
  48:17 49:22
  52:4 54:16,19

54:21 61:17,20
  62:23 74:2,10
  74:11 75:19
  76:15,25 78:12
  79:7 80:10
  81:16 82:10
  83:2,16 84:6,7
  84:20 85:3,5
  85:17 87:21
  89:16,25
  104:18 112:23
  119:24
mintbroker's
  19:17 23:24
  24:12 30:5,9
  49:4 55:2,8,20
  56:2 61:14
  72:19 79:3
  81:20,21 84:3
  86:11 89:12
  114:6
minute  19:25
  51:5,7 58:24
  60:16 91:7
  107:24
minutes  16:3
  50:24 91:10,11
  91:14,18
miriam  2:3,6
  4:22 16:8
miriamtauber...
  2:6
mm  71:15 82:8
  94:18 111:13

moment  20:2
  44:16 78:5
moments  111:6
monday  107:12
money  119:14
monitor  21:4
  21:23 103:10
  106:9
monitored
  21:22
monitoring
  99:9,11 103:5
month  106:8
monthly  69:15
  70:23,24 71:16
months  88:20
  107:4,6,6,21,22
  112:12 113:17
moore  93:12,14
move  18:5,7,10
  80:12

**n**

n  5:2 10:14
  123:1
name  4:7 10:10
  10:13 13:12
  22:21 36:17
  67:8 68:14
  73:25 93:9
  112:5,9,13
  124:3,4
named  101:18
names  36:9
  49:17 76:12
  98:15 113:19

**[names - once]** Page 17

113:20
**nasdaq** 57:5
**nassau** 1:22
**nature** 14:3,23
**need** 70:3 78:20
  91:10,13
**needed** 10:6
  23:11
**netted** 58:15
**network** 6:23
  12:5 45:3
**never** 16:25
  17:2 45:11
  50:14 68:20
  77:19 116:13
**new** 1:2,12,23
  1:25 2:5,5 3:23
  3:25 4:5 23:8
  31:11 32:7
  46:18,22 80:22
  112:3 122:5
**nice** 51:4
**night** 17:17
  111:4
**normal** 19:16
**notary** 1:25 5:4
  121:20 122:4
  124:24
**note** 3:6 8:19
  27:20
**noted** 120:23
  121:6
**notes** 91:17
**notice** 87:14

**noticing** 4:20
**number** 3:16
  3:23 4:6 13:2
  28:15 29:24,25
  30:12,19 35:8
  35:23 37:19
  38:22 39:23
  40:4,10,22
  41:4 46:24
  51:15,20 54:8
  54:17,21 56:24
  60:16 62:5,9
  68:9 82:21
  120:17
**numbered** 53:3
**numbers** 28:6
  28:12,16 36:10
  45:20,24 46:6
  46:7 47:3
  52:20 56:19
  59:13 61:25
  62:3 111:24
**numerals** 52:5
**numerical** 46:6
  53:17
**nyse** 57:5

**o**

**o0o** 2:20
  123:18
**objection** 16:8
  16:20 24:13
  26:3 27:23
  29:5 30:21,24
  31:22 32:14
  35:20 36:25

37:3 39:14
42:4 46:9 50:8
59:6 60:13
61:4 62:14
66:10 68:15
83:4 84:13,24
86:20 90:2
92:23
**objections** 4:15
  30:25 31:2
**observe** 99:12
**observed** 99:16
**obtaining**
  34:21
**occurred**
  104:11
**october** 25:20
  26:9,14
**office** 6:24 7:14
  107:3 118:20
**officer** 98:11
  101:13,18
**officers** 98:15
**offices** 13:5
**oh** 7:21 114:14
**okay** 6:13 8:5
  8:17 9:12
  10:20 12:9
  13:15 14:9
  15:2,6 16:19
  18:11 19:23
  20:14 21:18
  22:23 23:18
  26:17 27:25
  28:23 30:17

32:17 34:8,17
34:25 38:20
40:9 45:11
51:6,21 52:25
53:6,13 54:9
54:12 55:6
57:2 58:2
61:12 62:18
63:13 67:23
69:13,17 70:13
70:18 72:17,25
73:20 75:7,11
76:8,22 77:22
78:6 79:2
80:10 81:4,14
81:25 82:24
83:19 84:7
86:22 87:2,8
87:19 88:10
89:7 91:8
93:11,22 94:12
98:4,19 100:24
101:12 104:16
108:4,7 112:21
113:18 119:9
120:6,10
**omnibus** 54:23
  55:15 65:20
  82:5,12
**onboarded**
  100:2
**once** 25:4 33:17
  44:7 65:4,10
  102:25

[ones - personal]                                                    Page 18

ones  19:2 52:19
open  16:20
   26:21 49:21
   50:19
opened  46:18
   46:22 50:17,18
   62:18 94:17
opening  36:12
   38:22 39:17
   47:5 48:9,24
   80:23 95:9
   114:15,18
operate  74:7
   75:16
operating
   101:13,18
opposite  54:24
   55:7,19,24
option  72:10
   81:6
order  5:21
   14:10 54:19
   57:4 70:7,9,10
ordered  6:3
   88:14,23
orders  15:24,25
   67:4 86:7
ordinarily
   100:19
ordinary  20:23
outcome  4:14
   122:15
oversee  20:4
own  6:4 11:17
   13:9 37:12

43:7 69:20,23
   71:25 72:6
   105:15
owned  80:24
   81:3
owner  47:25
   48:8 50:7,12
owning  62:12
o'brien  2:9

**p**

p  5:2
p.m.  1:18 3:4
   51:13,18 108:9
   120:21,23
page  27:10,13
   27:17 28:17
   32:10 34:13
   35:21,22,22
   38:12 53:14,17
   53:21 57:11
   58:3,19 62:7
   123:1,6 124:5
pages  26:20
paid  112:19
   113:2 119:6
paper  70:19,21
papers  102:24
paperwork
   102:25
paragraph
   23:12
parameters
   69:12 72:6
paraphrase
   55:12

paraphrasing
   28:9
park  2:4
part  13:14 22:2
   29:20 50:21
   52:21 55:17,17
   55:23 59:19
   61:10 64:24
   76:20 79:10
   82:18 83:8
   85:11,12 94:22
   95:18 96:9
   97:7 102:8
   105:23 109:4
   114:23 117:21
   118:3,14
participants
   3:10
participate
   118:23
particular  12:2
   50:2 52:23
   69:2 74:20
   76:13 87:5,9
   101:5
parties  3:14
   122:13
party  4:12
pay  68:23
paycheck  25:17
paying  69:14
payment  30:8
payouts  119:8
pdqm  57:8

people  12:23
   13:3,4,7 21:9
   22:13 47:16
   66:12 97:14,15
   101:25 102:10
   102:21 119:12
   119:20
percent  38:24
   39:16 49:18
   57:20 69:3,15
   70:16 82:15,19
   109:6
perform  48:15
performed
   25:13
performer
   106:4
performing
   56:10
period  15:22
   29:4 32:9,11
   34:24 83:17
   85:18 98:23
permitted
   50:18
person  10:19
   11:15,19 18:4
   47:5,9 67:13
   67:16 96:12
   100:18,23
   116:16 119:17
person's  67:8
   69:12
personal  24:2
   36:6 44:20

[personal - providence]

49:13 99:4,13 102:6
**personally** 22:23 66:24 96:8 103:10 115:7,22 116:2
**personnel** 54:5
**persons** 30:2
**perspective** 21:3 96:11
**pertaining** 30:4
**philip** 98:18,19
**phrased** 37:13
**physically** 43:22 79:3 107:3
**place** 3:13 49:19 62:24 88:6 95:8 102:23
**placed** 14:11 54:19
**placeholder** 18:13
**plaintiff** 1:5,13
**plaintiff's** 29:13,18 123:10
**plaintiffs** 2:3 4:23 25:22 31:8
**platform** 10:22 11:3,4,6,12 66:17 68:22 118:22

**please** 3:5 4:16 120:14
**point** 90:17 92:10
**policies** 103:23 103:24 104:18
**policy** 99:18,20 101:8 103:18
**pop** 95:15,21 95:22,25 96:11 96:16 107:5,21
**populated** 33:12
**portal** 14:22
**portion** 87:10 112:23
**position** 7:13 8:15 25:5 77:11
**positions** 36:16 40:6,18,18
**possession** 44:20 104:8 113:24
**possible** 78:8 83:10,14
**possibly** 26:21 91:19 109:8 110:16
**potential** 50:11
**prepared** 58:10 115:6
**present** 2:16 83:22 85:24

**preserve** 35:20
**pretty** 50:4 74:22 105:24
**prevent** 62:24
**previously** 64:4 64:8 73:6 123:13,14,16
**prices** 56:25
**principal** 73:14
**printed** 15:17 17:12
**printers** 12:5
**printout** 66:5
**prior** 8:23 9:2 18:23 19:13 25:21 45:12 104:11
**privilege** 90:8 90:10
**pro** 69:5
**probably** 57:7 77:13 100:16 118:5
**problem** 65:23 94:12
**procedures** 97:17 103:25
**proceedings** 4:16
**process** 45:10 46:20 48:5 72:13 81:19 95:5 99:11 102:23 108:16 108:18,21

**processed** 16:5
**processing** 59:16
**produce** 88:14 88:23
**produced** 16:13,16 17:2 17:24 20:7 26:2 34:12 40:12 82:14,22 83:11 85:7 92:13
**profit** 71:5,9,14 71:16,18 118:7
**program** 42:11 47:8,11 113:15
**prohibit** 95:8 96:22
**prohibited** 89:5
**prohibiting** 97:18
**promise** 91:5
**prompted** 44:4
**property** 105:6
**proprietary** 52:7,13 54:3
**provide** 19:7,15 23:8 72:3 76:25 95:2
**provided** 27:18 31:18 72:20 87:12
**providence** 1:23

A-1811

**[providing - records]** Page 20

**providing**
32:13 88:4
89:23
**public** 1:25 5:4
38:6 121:20
122:4 124:24
**pull** 22:10,10
22:16 23:10
33:10 34:7
40:16 43:3
53:15 69:25
70:4,7 71:6
86:15 118:17
118:19
**pulled** 20:17
32:15
**pulling** 44:12
**punched**
102:13
**purchased** 61:3
**purely** 9:9
76:21
**purports** 28:18
60:9
**purpose** 112:17
**purposes** 28:25
112:16
**pursuant** 5:11
5:11,16
**put** 29:20 33:5
59:11,15 72:6
95:12 115:7
**putting** 38:7,10
**pyfrom** 106:25

**q**
**quality** 3:7,8
**question** 24:3
29:24,25 31:5
31:24 37:4
51:25 76:2
90:11
**questioning**
104:4
**questions** 90:7
91:4 92:8 94:4
94:8 95:2
108:2,5,14
111:2,8
**quiet** 105:24
**quite** 13:2
109:8

**r**
**r** 5:2
**raise** 51:3
**ranch** 2:10
**rare** 11:25
**reach** 9:23
13:19 66:17,19
**reached** 66:16
**read** 36:22
54:12 55:12
121:4
**reading** 54:14
82:2
**ready** 90:24
**real** 8:20 18:3
102:4
**really** 9:10
11:23 21:20,21

22:9 24:20
33:22,24 34:2
49:24 50:20
52:16,17 53:10
56:12 61:5,8
75:15 78:13
81:3 83:7,18
83:20 85:8,19
86:2,5 87:17
92:25 93:2
102:13 106:17
114:23
**reason** 63:19
105:4 124:5
**recall** 6:10
12:25 41:17
46:11 52:9
53:4,10 56:5
56:13 59:11
62:22 68:8
71:20 73:18
74:19,21 81:13
82:23 86:25
87:7 90:23
94:15 95:24
98:4,14 100:14
100:15 101:3,4
101:5,20
102:17 105:22
108:18 109:11
109:13,21
110:11,16
111:18 112:25
**receive** 10:3
25:16 26:11

70:19 77:7
**received** 19:20
31:12
**receiving** 79:13
**recent** 63:18
**recipient** 38:3
**recognize** 18:6
27:13
**reconciling**
81:19
**record** 3:3,15
4:20 5:10
18:14 22:18
31:2 34:8
35:17 51:14,16
51:18 64:2
73:23 83:15
85:17 87:18
90:16 92:3,4,6
108:9,10,12
118:10,11,12
120:13,20
121:8 122:10
**recorded** 3:12
3:17
**recording** 3:8
3:13
**records** 19:8,15
20:20,22,25
21:6 23:15,20
26:8,9,13
27:14,18 39:4
39:15 41:14
43:3 47:19
54:16 56:17,18

[records - right]                                                    Page 21

61:14,19 81:21
82:14 83:10,14
83:22 85:24
86:4 87:11,15
87:17 88:4,15
88:16,24 92:22
93:6 113:6
114:9,10,11
115:15,21
116:18 117:3
117:22,25
**recruited**
113:20
**redistribute**
100:22
**redistributed**
100:17,18
**redundant** 25:5
**refer** 37:19
57:14,17 74:12
**reference** 29:22
**referred** 14:14
**referring** 19:9
56:17 61:13
64:13 68:17,21
69:11 74:17
75:8
**refers** 7:5
**reflect** 68:13
82:16 112:4
**reflected** 31:8
32:9 75:13
82:13,21 84:11
84:15 118:4

**regardless** 38:7
**regular** 107:12
**related** 1:9 4:12
11:12 36:6
41:2 66:16
101:14 117:7
122:13
**relating** 9:19
30:7
**relationship**
89:14
**relevant** 14:24
15:22
**relied** 20:22
**relying** 37:14
**remember**
23:16 45:17
53:8 54:6,10
55:3 73:19,21
74:16,20 82:7
86:19 88:17
109:15,16
110:10 117:15
**remote** 10:5,8
10:23 11:21
**remotely** 86:15
**renewed**
102:24
**repeat** 5:14
48:22
**rephrase** 26:4,5
42:5 50:9
60:21
**report** 13:7,8
32:15 40:16,19

41:6
**reporter** 1:24
4:9 15:10
35:11 63:24
**reports** 18:22
19:2,4,21,23
23:10 58:10
72:2,3
**represent** 24:6
85:21
**represented**
24:7,9,10
**representing**
89:24
**request** 14:3,24
31:11,15 32:5
35:24 72:13
92:12 107:24
**requested**
115:3
**requests** 13:13
25:23 26:7,12
77:18 84:20
**require** 47:20
**required** 47:22
48:21,25 90:6
**requirements**
48:4
**reserve** 31:2
**residence** 45:2
**responding**
32:4
**response** 29:23
29:25 30:12
31:13

**responses**
29:13,17 84:19
123:9
**responsibilities**
6:21 79:10
**responsibility**
100:7
**responsible**
113:7
**responsive**
31:14
**rest** 117:19
**restore** 78:6
**retained** 41:23
120:19
**review** 38:11
47:8,11 48:13
**reviewed** 38:11
58:9
**reviews** 15:14
15:18 123:7
**reward** 106:4
**richie** 7:11 8:7
**rid** 105:14
**right** 5:24 6:18
7:3,18 10:25
11:17 18:20
22:22 28:18
35:11,22 43:9
44:23 55:16
56:3 61:21
62:6,9 67:9
68:12,12 94:23
94:24 95:21
115:17 119:3

**[rigorous - share]** Page 22

rigorous 48:5
rjl 1:3,10
road 2:10
rogatory 5:12
 5:17
role 6:22 12:3
 22:2 106:15
roughly 97:15
 109:19
routine 70:25
row 58:20
rows 60:3,4
running 106:20

**s**

s 5:2 11:3 123:5
 124:5
safe 120:22
sale 87:24
sales 87:22
 106:2 111:22
 111:23 112:14
 112:14,19
 113:15 117:7
 117:15,16
 118:9,15 119:2
 119:3,8
save 18:8
saved 40:24
 44:19
saying 112:24
 117:10
says 15:24
 29:25 30:13
 54:16 56:22
 57:7,11 60:15

60:17 62:8
64:19 68:2,2,5
68:6 73:13,24
75:6 117:23
schedules
 36:15 40:5
screen 3:11
 15:8 20:2
 26:17 27:8
 29:6 34:10
 51:23 53:15
 64:20
scroll 35:25
se 9:11 61:9
search 72:4
searches 47:16
second 3:25
 15:9 26:22
 29:13,18 58:25
 59:5 61:2
 63:15,23
 123:10
seconds 60:17
secure 44:20,24
securities 6:18
 29:3 30:5,10
 31:10,12 32:7
 74:9 85:18
 115:4
security 21:12
see 12:17 14:10
 27:7 29:23
 30:15 44:7,9
 51:9 53:16,18
 53:20 56:8,19

57:11 58:19,25
59:24 60:2,5
60:11,18 63:21
65:6,7 68:3
70:10,13 71:18
72:24 91:23
95:14 106:17
107:4
seeing 57:6
 73:18 74:20
seeking 25:24
 26:7 49:21
seems 66:20
 105:19
seen 3:11 17:2
 17:9,10,11
 37:25 66:4
 67:25 76:9,11
 103:23
segregated
 75:20,21 76:3
selective 114:5
sell 56:20
selling 67:5
send 14:24
sending 99:13
sent 25:23
 43:13 44:2
 49:9,16 102:20
 114:21
sentence 55:12
separate 19:13
 59:4 78:10,10
 118:21

separated
 76:17
september
 88:12,18,19
served 81:14,15
server 32:25
 43:16,19,23
 45:9
servers 12:6
 21:4,11 49:5
 114:6
service 11:18
 12:19,24 13:13
 14:7,15 15:2
 67:11 77:15
 80:2
services 65:17
servicing 12:4
session 10:5,8
set 32:25 33:3,9
 33:18 43:3,6
 43:16 45:9
 69:2,4,11
 113:9,11 122:8
 122:18
seven 58:23
 60:3
several 16:2
 47:22 67:19
shady 99:3
share 15:8 20:2
 26:18 29:6
 41:24 42:2
 51:23 53:16
 63:15 64:20

[share - stephen]                                        Page 23

65:3,4
**shared** 29:16
  44:17 66:3
**shares** 56:24,24
  60:5,11,17,25
  61:2 78:11
**sharing** 34:10
**sheet** 121:7
  124:1
**short** 87:22,24
**shorthand** 1:24
**show** 13:17
  28:19 40:16
  54:18 60:10
  63:14,16 65:9
  65:10 71:14
  73:2 88:7
**showing** 28:18
**shown** 31:6
**shows** 31:19
**shut** 25:4 34:5
  113:16
**side** 75:18
  102:8
**sign** 95:6,18
  96:5 99:25
**signature**
  122:21
**signed** 28:24
**significant**
  87:10
**similar** 19:2
  31:11 66:19
  96:21 103:8

**single** 87:18
**site** 96:19
**situation** 67:17
  67:18 103:12
  105:3,10
**six** 58:23 107:6
**small** 113:5
  119:11
**software** 9:3,4
  9:17,21 33:4,4
**sold** 60:10,25
**solicitation**
  95:8 96:22
  97:18 101:15
**solicited** 95:19
  96:4 97:9 98:9
**soliciting** 95:16
  97:2 111:11
**solutions** 4:11
  120:19
**somebody** 13:8
  21:18 111:18
  112:22 115:24
**soon** 95:13
  96:15
**sorry** 5:14,19
  19:22 24:3
  30:22 31:4
  41:21 48:22
  55:10 59:25
  60:21 77:3
  78:24 79:5
  84:14 88:18
  93:8,13,17
  114:12

**sort** 15:22
  98:11 99:21
  107:9
**sound** 5:24
**sounds** 91:25
**south** 2:10
**southern** 1:2
  3:22 4:5
**speak** 90:20
**speaking** 68:25
  90:19,23 102:9
**specialist** 4:8
**specific** 11:9,11
**speculate** 86:5
**spell** 10:13
**spoke** 41:20
  79:24 85:14
  88:3
**spoken** 80:3
  93:2,25
**spot** 33:19
  113:10
**spreadsheet**
  34:11 67:24
  83:12
**staff** 12:4,4
  79:22 102:10
  102:18
**stamp** 17:18
  27:20
**stamped** 16:10
  17:15
**stamps** 17:23
**standard** 3:4
  120:21

**start** 17:7 28:5
  28:5,10,12
  51:19
**started** 46:15
  101:25 109:20
  113:17
**starting** 38:12
  45:16,20 86:17
**starts** 29:24
  35:23
**state** 1:25 4:16
  4:18 122:5
**statements**
  26:7 69:18,19
  69:20,23 70:19
  70:22,24 71:22
  81:20 88:16,24
  121:9
**states** 1:2 3:22
  4:4 95:9 96:13
**stating** 95:15
**stay** 120:22
**steal** 110:22
**stealing** 104:23
**stephen** 1:20
  3:18 5:1 6:1
  7:1 8:1 9:1
  10:1 11:1 12:1
  13:1 14:1 15:1
  16:1 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1 27:1
  28:1 29:1 30:1
  31:1 32:1 33:1

A-1815

**[stephen - systems]** Page 24

34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1,17 121:12 123:2 124:4,20

**sticker** 64:21
**stipulation** 28:24
**stock** 75:3 79:8 79:13
**stocks** 71:19 72:9 76:16 83:17
**stole** 105:5 110:5
**stolen** 109:24 110:20
**stop** 34:10 63:15
**stored** 34:4 44:25 48:17 49:4,7,12
**strict** 63:6
**strike** 109:12
**stuff** 12:8 21:10 23:11 41:16 45:9 57:24 67:5 69:9 116:25 117:6
**subject** 25:25 65:19
**submitted** 6:9 18:16 27:12
**subscribe** 68:22 69:2 121:7
**subscribed** 121:16 124:21
**subsidiary** 84:8

**suggests** 104:8
**suite** 2:4,11
**summary** 28:25
**supervisor** 8:8
**support** 10:17 10:23 11:14,21 11:24 12:11
**supported** 66:15
**supposed** 21:7
**sure** 5:18 16:23 21:5,7,11 22:3 38:18,25 39:16 47:17 49:18,20 50:4 57:7,8,8 57:17,20 59:17 64:16 68:18,25 69:3,16,19 70:17 71:2,2 72:11 75:14 82:15,19 91:14 108:3 109:7
**suretrader** 15:15,19 57:19 73:24,25 74:10 94:17 95:10 96:5,16 97:11 123:7
**suretrader's** 96:13
**sureview** 68:3 68:13
**swiss** 6:18,24 8:18 9:22 12:11 13:5,23

**swissamerica...** 65:18
**sworn** 5:4 121:16 122:8 124:21
**symbols** 56:23
**system** 10:5 20:10,12,16 21:16,25 22:8 22:9,17,19 23:9,9,10 33:10,14,18 42:21 43:20,21 44:10 45:15,21 45:23,23,25,25 46:5,7,12,13,17 47:4 48:24 49:19 50:13 54:20 56:14 57:23 59:11 69:21,25 70:23 71:4 72:3 78:4 83:22,24,25 84:2 85:24 106:5,9 111:24 111:25 112:9 112:10,15 113:9,10 115:14 116:15 118:15,17,18 118:20
**systems** 6:23 12:8

A-1816

**[t - together]** Page 25

**t**

t  5:2 123:5
take  3:13 9:24
  50:23 59:21
  65:12 91:7
  100:8,20
  103:13 104:25
  106:8
taken  1:23
  42:21,25 101:9
  104:9
talk  38:20 65:2
talked  45:15
  48:23 81:25
  108:16
talking  53:23
  64:17 66:21
  103:3
talks  15:23
task  25:13
tauber  2:3,6
  4:22,23 5:7
  15:6,12 16:11
  16:15,23 17:10
  17:21 18:5
  26:24 27:19,25
  29:10 34:25
  35:16 37:2,16
  38:5 50:9 51:6
  51:21,22 63:13
  64:11 72:25
  90:15,24 91:13
  91:22,25 92:7
  94:3,15 108:4
  111:7 120:10

120:14 123:3
tax  36:10 77:2
  77:3,18,18
team  96:24
  98:3,5 102:21
  106:21,23
  108:24 112:19
  113:11 117:16
  117:19 118:9
  118:16 119:2,4
  119:8
technical  9:9
  9:15 21:3
  59:20 66:15,18
  76:21 83:9
technician
  102:11
technology
  8:21
telephone  36:9
tell  31:19 33:15
  79:19 89:21
  98:24 100:11
  101:21
template  112:2
temporarily
  43:4
temporary  43:2
  43:6
tenure  97:13
testified  5:5
  58:14
testify  5:23
  37:11

testimony
  122:7,10
texas  2:11
text  73:12
  74:21
thank  5:9 6:8
  8:5 51:21 94:4
  120:21
thing  26:21
  29:8 43:2,6
  99:21 110:19
things  40:17
  99:16 102:14
  103:7
think  7:23
  16:15 20:3
  34:9 35:10
  37:13 39:17
  40:10 41:5
  56:2 57:18
  58:6 64:18
  67:7 80:15
  82:16 87:3
  90:22,24 92:9
  92:24 93:4
  94:10 102:5
  107:25 110:25
  111:11 114:17
  120:10
thought  14:11
  30:24 115:10
  119:13
thousands
  87:17

three  47:2
  58:23 61:17
  107:6,24
ticket  10:4,22
  12:15,17
tickets  10:17
tied  56:11
time  3:4 4:17
  7:12 8:8 13:11
  13:23 15:22
  18:9 26:14
  29:4 32:13,16
  34:6 42:18
  44:17 45:7,12
  49:6 51:12,17
  57:21 58:16
  61:6 70:21
  71:12 72:5
  78:7 83:16,23
  84:6 85:18,25
  91:16 92:2,5
  94:10 98:20
  108:8,11
  109:16 111:3
  118:16 120:21
  120:23
times  32:17
  56:25 71:11
title  106:8
today  4:9
today's  120:16
together  19:25
  29:21 34:12
  53:15

A-1817

**[told - united]** Page 26

**told** 46:12,13
84:19 85:23
86:9 88:21
89:4 97:23,25
102:12 105:11
114:8 117:16
**tomliu** 65:16
**took** 101:2,6
102:23 113:24
**tools** 69:2,4
**top** 35:8 106:4
**total** 61:15
**totally** 90:15
118:21
**toward** 12:3
**tracking** 54:18
**trade** 14:11,15
15:5 22:13,18
52:22 54:5,25
55:7,19,24
56:18 59:15
60:9 66:18
67:2,18,19
68:10 82:24
93:19,20
**traded** 29:3
31:10 32:6
75:11 86:11
**trader** 11:13
61:7 65:21
66:9 68:2 69:5
69:5
**traders** 86:10
**trades** 28:19,20
30:20 34:22

56:9,14 57:24
58:3,7,15,18,23
59:4,12 73:13
75:17 82:10,25
83:15 84:12,16
85:4 87:11,11
119:6
**trading** 8:24
9:3,4,6,10,17
9:19,21 10:21
11:2,4,6 12:21
16:5 22:12
23:2 30:5,9
31:19 33:24,25
34:21 39:9,11
41:14,14,19
52:16,21 56:5
59:19 60:5
65:20 67:6
70:5,6 75:3,4
80:13,18 81:21
82:18 83:8,14
85:11 87:10
92:22 111:20
111:21 114:10
115:15 116:17
117:2,3,22,25
118:18,22
119:23 120:7
**trained** 9:7
**training** 11:10
46:17
**transactions**
85:17

**transacts** 16:3
**transcript**
121:5,8 122:9
**transfer** 72:8
81:6
**transferred**
36:17 41:3
**tried** 12:10
21:18 22:6
102:7
**trouble** 10:21
13:16
**troubleshoot**
11:10
**troubleshooti...**
9:4,18 120:3
**true** 74:4,5
122:9
**try** 51:8
**trying** 41:7
56:4 105:14
**turn** 35:21
**two** 6:10 18:17
34:15 51:20
56:20,21,22
58:23 65:4,10
69:10 92:8
120:18
**type** 34:8,13,19
41:24 42:2
96:15
**typed** 17:17
**types** 20:20
88:7

**u**

**u.s.** 95:16 96:23
97:2,19 98:8
101:15 111:13
**uh** 57:13 58:21
68:7
**umbrella** 74:8
**unable** 103:16
**under** 14:18
74:7 84:2,3
**underneath**
7:10
**understand**
14:19 24:5,8
31:4,24 32:2
41:7 53:25
55:17,18 61:23
74:23
**understanding**
5:13,15 16:25
23:23 28:21
36:20 38:14
58:2,8 59:3
60:23 101:7
**understood**
110:19
**unfortunately**
50:22 54:10
**unhappy**
105:10
**unit** 3:16 51:14
51:19
**united** 1:2 3:21
4:4 95:9 96:13

[units - year] Page 27

units 120:18
unlawful 103:7
unpleasant 101:23
updated 12:6,7
upload 16:12 35:8,9 64:12
upset 79:17,22 80:6
url 44:3,4
use 16:20 37:6 42:6 46:2,8
used 6:17 43:24 45:23 53:12 119:24 120:18
user 10:5 22:21
using 9:21 43:12 45:24 60:8 111:24

**v**

v 1:6,13 5:2 124:3
various 34:22 76:11
vast 63:11
vendors 102:2
verify 47:25 48:7,8
veritext 4:11 120:19 124:2
versus 3:19 4:2
video 3:12,17 4:8
videographer 2:17 3:2 51:12

51:17 92:2,5 108:8,11 120:12,15
videotaped 1:20
view 68:19,25
vindictively 105:5
violation 99:18 99:20 103:17 103:19
virtually 3:7
voluntarily 6:5

**w**

waiting 30:22
want 50:23 56:8 59:9,16 61:8 63:24 64:16 65:12 71:11,13 91:16 108:3
wanted 13:18 15:6 65:2 72:7 80:7,8 90:16
wanting 116:11
warren 35:17 38:9
way 14:19 16:5 17:6,24 22:14 34:2 37:13 60:20 63:20,22 65:12 71:4 96:6 116:17 122:15

web 17:12
website 15:18 72:19 80:16 95:13,14,23 96:14,17
wednesday 3:5
week 107:10
weeks 106:9
went 56:14 60:2 86:14,14 87:5 96:13 100:9 113:23 116:18
whereof 122:17
whichever 14:5
wipe 100:21,22
witness 1:21 3:11 5:3 91:9 91:11 94:12 122:7,11,17 123:1
witness's 124:4
witnessed 102:9
witnesses 19:11
wondering 66:4
work 7:8 33:4 47:14 50:2 56:13 89:15 96:12 98:19 99:9,10,12,13 102:3 104:20
worked 7:10,17 8:9,14,18,20

10:16 11:16 12:23 14:20 21:14 45:23 49:6 54:8 56:5 89:17 98:16 105:22 106:16 118:8
working 8:24 9:3 46:15 76:10
works 46:17 57:23
wrong 56:9 104:19,22

**x**

x 1:4,9,10,11,16 123:1,5

**y**

yan 101:19 103:9
yaniv 101:18
yeah 8:2 27:23 55:5 71:11,17 74:7,14 75:24 84:6 89:20 90:4 93:16,21 95:4 97:20 99:24 103:22 106:14 107:11 107:22 111:13 112:18,25 116:2,4
year 34:24 109:20

**[years - zoom]**                                                                        Page 28

**years**   34:23
  54:8 89:18
  110:18
**york**   1:2,25 2:5
  2:5 3:23 4:6
  122:5
**young**   35:4,13
  35:24 123:11
**yup**   74:4 97:23

**z**

**zoom**   1:20

A-1820

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

A-1821

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

A-1822

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AVALON HOLDINGS CORP., | |
| Plaintiff, | |
| v. | No. 18-cv-7291 (DLC) (RJL) |
| GUY GENTILE and MINTBROKER INTERNATIONAL, LTD., | ECF Case |
| Defendants. | |

Related to:

| | |
|---|---|
| NEW CONCEPT ENERGY, INC. | |
| Plaintiff, | |
| v. | No. 18-cv-8896 (DLC) (RJL) |
| GUY GENTILE and MINTBROKER INTERNATIONAL, LTD., | ECF Case |
| Defendants. | |

**DEFENDANT GUY GENTILE'S POST-HEARING BRIEF**

A-1823

**TABLE OF CONTENTS**

FACTUAL AND PROCEDURAL BACKGROUND ........................................................3

   1.  MintBroker's operational structure and trading/recordkeeping systems.................3

   2.  The InteractiveBrokers records and MintBroker Records......................................3

   3.  The present inquest on damages.............................................................................3


LEGAL STANDARD AND BURDEN OF PROOF .........................................................7

ARGUMENT.....................................................................................................................8

   1.  The MintBroker Records must be admitted into evidence because they are
       necessary to accurately calculate MintBroker's short-swing profits........................8

         A.  Plaintiffs' motion *in limine* to exclude the MintBroker Records must be
             denied............................................................................................................8

         B.  The MintBroker Records reflect the vital distinction between profits from
             shares beneficially owned by MintBroker and those beneficially owned by
             clients.........................................................................................................10

   2.  Profits derived from trading in shares beneficially owned by clients must be
       excluded from the calculation of damages for which Gentile may be held liable.11

         A.  As a broker-dealer, MintBroker could not be the beneficial owner of shares
             held in its clients' accounts........................................................................11

         B.  MintBroker additionally could not be considered the beneficial owner of
             shares held in clients' accounts under any definition of beneficial ownership
             .....................................................................................................................12

   3.  Accurate calculations by two forensic accountants demonstrate that Plaintiffs
       have not established any damages and a proper amount of short-swing profits
       derived from Avalon (AWX) shares beneficially owned by MintBroker would be
       approximately $1.2 million and that MintBroker never crossed the 10% threshold
       to be deemed a statutory insider under Section 16(b) with respect to trading in
       New Concept (GBR) ..............................................................................................14

   4.  Plaintiffs' calculations, predicated on the incomplete InteractiveBrokers records,
       and Plaintiffs' disregard for the client trading distinction, are incorrect...............16

i

A-1824

## TABLE OF AUTHORITIES

*Gollust v. Mendell,*
    501 U.S. 115 (1991) ................................................................................. 11

*Gr_jfiths v. Francillon,*
    2012 WL 1341077 (E.D.N.Y. Jan. 30, 2012), *report and recommendation adopted,* 2012 WL
    1354481 (E.D.N.Y. Apr. 13, 2012) ................................................................. 8

*Lenard v. Design Studio,*
    889 F. Supp. 2d 518 (S.D.N.Y. 2012) ................................................................ 8

*Olagues v. Perceptive Advisors LLC,*
    902 F.3d 121 (2d Cir. 2018) ............................................................................. 15

*Packer v. Raging Capital Management, LLC,*
    981 F. 3d 148 (2d Cir. 2020) ........................................................................... 11

*RGI Brands LLC v. Cognac Brisset-Aurige, S.a.r.l.,*
    2013 WL 1668206 (S.D.N.Y. Apr. 18, 2013), *report and recommendation adopted,* 2013 WL
    4505255 (S.D.N.Y. Aug. 23, 2013) ................................................................... 7

*Rubenstein v. International Value Advisers, LLC,*
    959 F.3d 541 (2d. Cir. 2020) ............................................................. 11, 12, 13

A-1825

Statutes and Rules:

15 U.S.C. § 78p(b).................................................................................................11

17 C.F.R. § 240.13d-3............................................................................................13

17 C.F.R § 240.13d-3(a)(2)(i) ...............................................................................14

§ 240.13d-1(b)(1)(ii)(J).........................................................................................12

17 C.F.R. § 240.16a-1....................................................................................12, 13

Fed. R. Civ. P. 37....................................................................................................9

Rule 13d-3(b) (§ 240.13d-3(b)).............................................................................12

Rule 16a-1 (17 C.F.R. § 240.16a-1(a))...............................................................2, 11

Rule 37(c) ...............................................................................................................8

section 15 of the Act (15 U.S.C. 78o) ..................................................................12

Section 16(b) of the Securities Exchange Act of 1934.........................................11

A-1826

At the hearing on this inquest on damages, Plaintiffs did not present any witnesses, opting to rely entirely on their own calculations of over $14 million premised on incomplete trading records. Plaintiffs' reliance on those incomplete records fails to make even a prima facie showing to support their damages calculation, rendering their incorrect damages amount effectively null.

Nevertheless, Defendant Guy Gentile ("Gentile") has presented, through two expert reports from forensic accountants, alternative damages figures[1] based on an accurate calculation of MintBroker International, Ltd.'s ("MintBroker") short-swing profits during the relevant period. Plaintiffs had ample time to conduct discovery with respect to the conclusions in the expert reports, which they availed themselves of over the past year, conducting numerous depositions and obtaining significant document discovery. But at the hearing they presented zero evidence to refute the testimony of Gentile's four witnesses, who demonstrated that profits derived from trading in shares beneficially owned by *clients* of MintBroker must be excluded from the calculation of damages.

Specifically, the Court heard testimony from Gentile as well as MintBroker's former Information Technology Manager and two forensic accountants explaining the distinction between shares beneficially owned by MintBroker and those beneficially owned by clients. Under the definition of "beneficial ownership" under Sections 13(d), 16(b) and the exceptions to those definitions set forth in Rule 16a-1 (17 C.F.R. § 240.16a-1(a)), MintBroker may not be penalized under 16(b) for shares held or traded in client accounts. The Plaintiffs' purported damages calculation seeking over $14 million and relying on incomplete records to include clients' profits

---

[1] Using the Second Circuit's "highest-in, lowest-out" methodology, both experts concluded the MintBroker's short-swing profits were approximately $1.2 million. But Robert Christian additionally concluded that MintBroker's "actual profits," accounting for net losses, were approximately $177,491. Legally, however, Plaintiffs' failure to present damages calculations, evidence, or witnesses should lead to a finding of $0 in damages.

2

A-1827

is incorrect. Instead, the proper calculation of short-swing profits for which MintBroker is liable to Avalon Holding Corp. ("Avalon" or "AWX") is approximately $1.2 million. It never crossed the 10% threshold to become a statutory insider under Section 16(b) with respect to New Concept Energy, Inc. ("New Concept" or "GBR"), and therefore is not liable to New Concept for any short-swing profits.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *MintBroker's operational structure and trading/recordkeeping systems.*

In 2011, MintBroker (formerly Swiss America Securities, Ltd.) became registered and licensed under Bahamian law as a broker-dealer to provide online day trading services to its clients. (Tr. #1 at 34). It began with three employees, but the company grew to up to 80 employees at one point. (Tr. #1 at 34–35). In 2018, (the relevant time period of the trading at issue in these matters), MintBroker had three or four traders that would place trades on behalf of MintBroker in the company's proprietary trading account. (Tr. #1 at 37).

At its peak, MintBroker had as many as 50,000 customer (client) accounts. (Tr. #1 at 34). MintBroker only offered self-directed accounts, whereby its customers made their own trading decisions. (Tr. #1 at 38). It did not offer managed accounts. (*Id.*). Customer trades were submitted by customers through the web-based DAS Trader system. (Tr. #1 at 38). A customer would log onto their DAS Trader account with a username and password, search for the security they wanted to trade, choose the type of order to place and the number of shares, and enter the order. (Tr. #1 at 48). The order would then get sent to MintBroker's designated server in DAS Trader, which would then either route the order to one of the clearing firms it used (*e.g.*, InteractiveBrokers) to execute

3

A-1828

the order in the market, or it would be executed through an internal cross-trade within the DAS Trader system.[2] (Tr. #1 at 38–39).

MintBroker's omnibus account at InteractiveBrokers functioned both as a method to hold its own positions and to execute client transactions. (Tr. #1 at 82). As Gentile explained, when a foreign broker-dealer, like MintBroker, opens an account at a U.S. clearing firm, the clearing firm recognizes the broker-dealer as the account holder, but understands that it is utilizing the omnibus account to execute trades on behalf of its underlying clients. (Tr. #1 at 82). In this case, InteractiveBrokers was not provided with the names of MintBroker clients who were trading through the omnibus account and had no way of identifying whether a trade in the omnibus account was placed on behalf of MintBroker or a client. (Tr. #1 at 83) (B. Klauseger, Tr. at 7–8).

### 2. *The InteractiveBrokers records and MintBroker Records.*

On February 24, 2020, Gentile sat for a deposition in this matter and repeatedly testified that trades reflected in MintBroker's omnibus proprietary trading account executed through InteractiveBrokers included client (customer) trades. Following a question indicating that the trades in June, July, and August 2018 were "all proprietary trading" Gentile clarified:

> A. [G. Gentile]: No, because we had clients at that time also and we're not talking about what my clients were trading. We're just talking about the proprietary trades... so like whatever the clients traded is separate from whatever I traded.

(Gentile Tr. #1 pg. 44). In fact, he was specifically asked if the records presented by Plaintiffs were MintBroker proprietary trades and responded: "I don't know that for a fact" as "[t]hey could have included client transactions as well." (Gentile Tr. #1, pg. 47). Gentile emphasized multiple

---

[2] As Gentile testified at the hearing, the DAS Trader system enabled internal cross-trading as a method of efficiently executing multiple customer trades in certain circumstances (one buying, one selling the same security) because clearing firms do not allow wash trading in the market and, when trading in an omnibus account, clearing firms cannot see that the trades are on behalf of two separate beneficial owners. (Tr. #1 at 39–40).

4

A-1829

times in his first deposition that the data and records presented by the Plaintiffs may reflect trading by both MintBroker and clients. (Gentile Tr. #1, pgs. 44, 47, 55-56).

For recordkeeping purposes, MintBroker also used a system called iBoss (Internal Back Office Support System). (Tr. #1 at 44, 119). The iBoss system essentially self-populated data with information concerning executed trades received directly from the DAS system. (Tr. #1 at 119, 170). The data contained in the iBoss system *could not be altered*, as it was a "view-only system." (Tr. #1 at 46, 48, 72) (Darville Tr. pg. 21-22). Records imported directly from the iBoss system and produced to the Plaintiffs in May 2022 (the "MintBroker Records") identify account names with respect to their trading activity. In those records, MintBroker's proprietary trading account was identified as account #32810, its journal entry recordkeeping account was identified as account # 32812, and its client accounts were identified based on their account names starting with the letters "PFS" or "MBS." (Darville, Tr. at 28; Tr. #1 at 5; Tr. #2 at 47). But in the InteractiveBrokers records concerning the omnibus account, those identifiers are not present and instead, client accounts and company accounts are indistinguishable. (B. Klauseger Tr. at 7–8).

### 3. *The present inquest on damages.*

By late December 2021 Gentile had lost his challenge to MintBroker's provisional liquidation, and the company, devoid of assets or cash other than money owed to Gentile, was placed into official liquidation, which Gentile understood opened the door for him to seek company documents. But the cross-motions for summary judgment filed in August 2020 remained undecided and these matters were effectively dormant until April 8, 2022, when Plaintiffs were granted summary judgment against both Defendants[3] under Section 16(b)'s strict liability remedy

---

[3] On September 20, 2022, Gentile notified the Court of his understanding that Plaintiffs lack Article III standing with respect to MintBroker and moved to vacate the summary judgment order and dismiss Plaintiffs' claims as to MintBroker, which was denied.

5

A-1830

(the validity of which is presently before Judge Cote pending Gentile's Motion to Dismiss for Lack of Standing).

After the April 8, 2022 Order, Gentile reached out to several former MintBroker officers and learned that although MintBroker's former counsel and the Securities Commission of the Bahamas ("SCB") were the sole custodians of MintBroker's records, former MintBroker Information Technology Manager Stephen Darville ("Darville") maintained the capacity to rebuild MintBroker's iBoss trading system and import trade blotter information from DAS Trader. (Darville Tr. pgs. 32-33, 43-45). In late April or early May 2022, Darville rebuilt MintBroker's latent iBoss system, which accurately populated data from DAS Trader. (Darville Tr. at 32–33).

On May 9, 2022, Gentile's counsel notified Plaintiff via email about the MintBroker Records. That same day, Avalon moved for entry of judgment against MintBroker and Gentile (jointly and severally) in the amount of $6,235,908, plus prejudgment interest in the amount of $1,073,150, for a total award of $7,309,058 (Avalon, Dkt. 100), and New Concept moved for entry of judgment seeking the amount of $6,102,002, plus prejudgment interest in the amount of $1,077,315, for a total award of $7,179,317. (New Concept, Dkt. 89).

With respect to the MintBroker Records, Gentile engaged two independent forensic accountants to calculate short-swing profits for shares beneficially owned by MintBroker in Avalon (AWX) and New Concept (GBR). (Tr. #2 at 9). The first accountant, Robert Christian ("Christian"), met with Darville, who demonstrated the iBoss system through a videoconference "walk-through." (Tr. #2 at 10). Darville then provided Christian with credentials which gave Christian direct remote access to iBoss. (Tr. #2 at 10). Darville described the process of providing Christian with direct access to the iBoss system and further testified that Gentile did not place any limits on the types of documents Darville could share with the experts. (Darville Tr. at 42–44, 88).

6

A-1831

Through his direct remote access, Christian generated reports for AWX and GBR for the relevant time period. (Tr. #2 at 10). He used mechanisms to become comfortable with the account name distinction between client accounts and MintBroker accounts and determined that account #32810 was the "corporate trading account" relevant for purposes of determining short-swing profits. (Tr. #2 at 22, 52–53). Both Gentile and Christian testified that the #32810 account featured both company propriety trades as well as some instances of inventory trades. (Tr. #1 at 53; Tr. #2 at 22–23). Gentile explained: "If the firm, for example, had a thousand shares of a particular stock long or short, and a client placed an offsetting trade, the system, meaning the DAS system, would automatically execute against inventory first before routing out to the market." (Tr. #1 at 53). He also explained that because trades reflected in the #32810 account could have been client orders filled from MintBroker's inventory, determination of beneficial ownership requires filtration of the data to determine who initiated the transaction, MintBroker or a client. (Tr. #1 at 128–129). This is precisely what the forensic accountant, Christian, did by locating exact replicate offsetting trades in client accounts. (Tr. #2 at 22–23, 35).

Using these methodologies, Christian concluded that MintBroker did not cross the 10% beneficial ownership with respect to New Concept (GBR) and that MintBroker's short-swing profits with respect to Avalon (AWX) were approximately $1.2 million. (Tr. #2 at 45) (Defendant's Exhibit #1, Independent Accountant's Report of C. Christian). An additional forensic accountant, Brenden Beresford ("Beresford") relied on representations regarding the distinctions between client account names, the MintBroker proprietary account, and client offset inventory trades and reached the same conclusion. (Defendant's Exhibit #19, Forensic Accountant's Report of B. Beresford).

7

A-1832

Now, despite Plaintiffs' opportunity to conduct discovery regarding the MintBroker Records, they have presented no evidence rebutting the experts' calculations and still seek a total award against MintBroker and Gentile, jointly and severally, in the amount of **$14,488,375**.

## LEGAL STANDARD AND BURDEN OF PROOF

On an inquest for damages, the burden of proof falls on the plaintiff who must introduce sufficient evidence to establish the amount of damages. *RGI Brands LLC v. Cognac Brisset-Aurige, S.a.r.l.*, 2013 WL 1668206, at *6 (S.D.N.Y. Apr. 18, 2013), *report and recommendation adopted*, 2013 WL 4505255 (S.D.N.Y. Aug. 23, 2013). "Where, on a damages inquest, a plaintiff fails to demonstrate its damages to a reasonable certainty, the court should decline to award damages, even though liability has been established . . . ." *Lenard v. Design Studio*, 889 F. Supp. 2d 518, 527 (S.D.N.Y. 2012); *see also Griffiths v. Francillon*, 2012 WL 1341077, at *1 (E.D.N.Y. Jan. 30, 2012) (recommending that no damages be awarded because motion papers alone were insufficient to support an award of damages), *report and recommendation adopted*, 2012 WL 1354481, at *1 (E.D.N.Y. Apr. 13, 2012).

## ARGUMENT

1.  **The MintBroker Records must be admitted into evidence because they are necessary to accurately calculate MintBroker's short-swing profits.**

    A.  Plaintiffs' motion *in limine* to exclude the MintBroker Records must be denied.

Plaintiffs' motion *in limine* effectively asks this Court to sanction Gentile under Rule 37(c) in the amount of $15 million for his inability to obtain the MintBroker Records at an earlier date. But Plaintiffs were provided nearly a year in which to conduct broad discovery on these records and, in fact, obtained significant additional document discovery and conducted 4 depositions. These records must be admitted and considered, since they are the only records that permit accurate

8

calculation of short-swing profits, and Plaintiffs have failed present evidence or testimony to rebut them.

As described above, MintBroker customer trades were submitted by customers through the web-based DAS Trader system, which functioned as the trading platform. (Tr. #1 at 38–39, 119). Gentile and Darville (the custodian of the MintBroker records) described how the data was automatically transmitted from DAS Trader into the iBoss system and affirmed that it could not have been altered. (Darville Tr. pg. 20–22; Tr. #1 at 46, 48, 72, 119, 170). Darville also testified that he understood that when he rebuilt the iBoss system, the data populated correctly. (Darville Tr. at 32–33). With respect to the completeness of the records, Darville also testified: "as far as I know, that would have been all of the records present in the system at that time." (Darville Tr. at 83). Christian then generated his reports based on data extracted directly from the iBoss system. (Tr. #2 at 10).

Gentile's production of the MintBroker Records in May 2022 was both *justified* and *harmless* to the Plaintiffs. *See* Fed. R. Civ. P. 37. As described in detail in Gentile's opposition to their motion *in limine* and at the hearing, Gentile had a good faith reason for the timing of his production of the MintBroker Records because he lost access to company records when MintBroker was shutting down prior to the time his discovery responses in these matters were due and remained unable to obtain company documents during the pendency of his challenge to its court-supervised provisional liquidation. In fact, Gentile testified that he tried to obtain company records from MintBroker's attorneys in late 2019, but they refused to provide him with access because he had already surrendered his broker-dealer license. (Tr. #1 at 73–74).

And, critically, Plaintiffs were not prejudiced by the production of the MintBroker Records in May 2022. As of early 2020, they were aware that the InteractiveBrokers records they rely on

9

**A-1834**

reflect trading of shares beneficially owned by MintBroker's clients, but that the InteractiveBrokers records do not feature identifiers which would distinguish those accounts. As of 2020, Plaintiffs had the opportunity to conduct discovery on this precise issue but declined. They did not attempt to obtain MintBroker's records through the proper channels (the letters rogatory process) despite their understanding, as represented to the Court at the hearing, that *five sources in the Bahamas other than Gentile* had possession of the records. (Tr. #1 at 6–7). When asked for clarification regarding the "five different people or entities" in "possession" of the documents, Plaintiffs' counsel affirmed their understanding that only those five sources had possession of the documents and did not mention Gentile. (Tr. #1 at 7).

Plaintiffs chose to disregard the significance of the client trading distinction presented by the MintBroker Records until forced to confront it in this inquest on damages. In the past year, Plaintiffs deposed Gentile, both expert witnesses, and the custodian of the documents. They requested and obtained additional documents and had the opportunity to engage additional experts to challenge the MintBroker Records but chose not to. Consideration of the MintBroker Records is necessary to accurately calculate MintBroker's short-swing profits and Plaintiffs' motion to exclude them must be denied.

      B. <u>The MintBroker Records reflect the vital distinction between profits from shares beneficially owned by MintBroker and those beneficially owned by clients.</u>

Plaintiffs have presented no evidence to rebut the clear distinction between client trades and company trades. Gentile, Darville, and Christian all repeatedly testified that account names beginning with letters (specifically, "PFS" or "MBS") represent individual client accounts. (Tr. #1 at 50, 52; Tr. #2 at 47, 104; Darville Tr. at 28). The identifiable account names, which reflect the distinction between shares beneficially owned by clients and those owned by MintBroker, are

A-1835

reflected in the MintBroker Records but not in the InteractiveBrokers statements relied on by Plaintiffs, as explained by InteractiveBrokers. (Klauseger Tr. at 7–8).

In July 2018, thousands of trades were placed in AWX on behalf of clients with lettered account names. (Tr. #1 at 55–57). In fact, the data reflected in the MintBroker Records, organized in Defendant's Exhibit #8, shows that approximately 700 and 900 individual client accounts traded AWX and GBR, respectively, during the specified timeframe in the records. (Tr. #1 at 163). And we know that each were separate individual clients because MintBroker had a policy that did not allow clients to hold multiple accounts. (Tr. #1 at 163) (Darville Tr. at 62). Because the MintBroker Records reflecting trades of shares beneficially owned by clients speak directly to the issue of MintBroker's liability for its own short-swing profits, they are necessary to accurately calculate damages.

2. **Profits derived from trading in shares beneficially owned by clients must be excluded from the calculation of damages for which Gentile may be held liable.**

    A. <u>As a broker-dealer, MintBroker could not be the beneficial owner of shares held in its clients' accounts</u>.

"To prevent insiders of a securities issuer from trading on material non-public information, Section 16(b) of the Securities Exchange Act of 1934 imposes strict liability on certain insiders of an issuer, requiring them to disgorge to the issuer any profits they realize from short-swing trading in the issuer's securities." *Rubenstein v. International Value Advisers, LLC*, 959 F.3d 541, 543 (2d. Cir. 2020). This is known as the "short-swing profit rule." *Id.* at 544. "Among the insiders subject to the rule are directors and officers of the issuer, as well as '[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security.'" *Id.* at 543–43 (quoting 15 U.S.C. § 78p(b)). But because it "imposes a form of strict liability," courts have been "reluctant to exceed a literal, 'mechanical' application of the statutory text in

11

A-1836

determining who may be subject to liability." *Packer v. Raging Capital Management, LLC*, 981 F. 3d 148, 154 (2d Cir. 2020) (citing *Olagues v. Perceptive Advisors LLC*, 902 F.3d 121, 126 (2d Cir. 2018) (quoting *Gollust v. Mendell*, 501 U.S. 115, 122 (1991))).

Section 16's scope is further limited by exemptions set forth in Rule 16a-1 (17 C.F.R. § 240.16a-1), which provides:

> (a) The term beneficial owner shall have the following applications:
>
> (1) Solely for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities registered pursuant to section 12 of the Act, the term "beneficial owner" shall mean any person who is deemed a beneficial owner pursuant to section 13(d) of the Act and the rules thereunder; provided, however, that **the following institutions or persons shall not be deemed the beneficial owner of securities of such class held for the benefit of third parties or in customer or fiduciary accounts in the ordinary course of business** . . . as long as such shares are acquired by such institutions or persons without the purpose or effect of changing or influencing control of the issuer or engaging in any arrangement subject to Rule 13d-3(b) (§ 240.13d-3(b)):
>
> (i) A broker or dealer registered under section 15 of the Act (15 U.S.C. 78o);
>
> ***
> (x) A non-U.S. institution that is the functional equivalent of any of the institutions listed in paragraphs (a)(1)(i) through (ix) of this section, so long as the non-U.S. institution is subject to a regulatory scheme that is substantially comparable to the regulatory scheme applicable to the equivalent U.S. institution and the non-U.S. institution is eligible to file a Schedule 13G pursuant to § 240.13d-1(b)(1)(ii)(J).[4]

(17 C.F.R. § 240.16a-1). This is understood to mean a covered institution's "customers' holdings do not count towards its own holdings." *Rubenstein*, 959 F.3d at 548. Thus, Rule 16a-1's exemption makes clear that MintBroker was not the beneficial owner of shares reflected in its omnibus account at InteractiveBrokers for which it was simply acting as a custodian for shares beneficially owned by its customers.

---

[4] As a Bahamian broker-dealer, MintBroker was properly registered and licensed in the Bahamas and was subject to a regulatory scheme that is substantially comparable to the regulatory scheme applicable to U.S. broker-dealers. For example, like in the U.S., MintBroker and Gentile were required to hold specific regulatory licenses to conduct business as a broker-dealer. (Tr. #1 at 74).

12

A-1837

B. **MintBroker additionally could not be considered the beneficial owner of shares held in clients' accounts under any definition of beneficial ownership.**

The fact that MintBroker, as a broker-dealer acting as the custodian for shares beneficially owned by clients, is a covered institution excluded from the definition of "beneficial ownership" under Rule 16a-1 is alone sufficient to conclude that Plaintiffs' calculations, including client profits, are incorrect. Nevertheless, MintBroker cannot be considered the beneficial owner of the shares reflected in the clients' accounts under any definition of beneficial ownership.

Notwithstanding the exemption of covered institutions, which does apply to MintBroker, Rule 16a-1 also explains that, generally "for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities registered pursuant to section 12 of the Act, the term 'beneficial owner' shall mean any person who is deemed a beneficial owner pursuant to section 13(d) of the Act . . ." 17 C.F.R. § 240.16a-1.

Rule 13(d)-3, titled "Determination of beneficial owner," provides:

a) For the purposes of sections 13(d) and 13(g) of the Act a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:

> (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or,
>
> (2) Investment power which includes the power to dispose, or to direct the disposition of, such security.

17 C.F.R. § 240.13d-3. In this case, Plaintiffs have presented no evidence that MintBroker had voting power or investment power with respect to shares traded by its clients. In fact, all evidence presented reflects the contrary.

At the hearing, this Court heard that Plaintiffs deposed a corporate representative of InteractiveBrokers, Brad Klauseger, in May 2020. (Tr. #1 at 17). With respect to voting rights of shares in the InteractiveBrokers omnibus account, Klauseger testified: "I believe that you only

13

**A-1838**

have the proxy voting rights if you hold the long position, And that would be the *underlying customer* of the Omnibus structure." (B. Klauseger Tr. at 113–114) (emphasis added). Gentile similarly testified that for client purchases of shares through MintBroker as a broker-dealer, the client would have the voting rights with respect to those shares. (Tr. #1 at 81). And, with respect to the capability to dispose of a share that a client purchased through MintBroker, Gentile explained that MintBroker was unable to do so "without the permission of the client, or subject to a margin liquidation." (Tr. #1 at 81–82).

Finally, Rule 16a-1(a)(2)[5] describes yet another definition of beneficial ownership which the Second Circuit has suggested "narrows the class of transactions subject to [Section 16] by defining 'beneficial owner' as 'any person who, directly or indirectly . . . has or shares direct or indirect pecuniary interest in the equity securities.'" *Rubenstein*, 959 F.3d at 548, n.1. "A pecuniary interest is an 'opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities.'" *Id.* (quoting 17 C.F.R § 240.13d-3(a)(2)(i)). As Gentile described at the hearing, MintBroker facilitated "riskless principal trading" whereby the company did not have any risk or interest in the outcome of the transaction passing through its inventory account and did not profit from those transactions. (Tr. #1 at 93, 182). Thus, MintBroker did not profit from short-swing profits realized in its clients' accounts, including those trades that passed through its inventory account.

For these reasons, under every possible definition of beneficial ownership for purposes of calculating short-swing profits under Section 16(b), the clients were the beneficial owners of their

---

[5] It is unclear whether Rule 16a-1(a)(2)'s reference to a "pecuniary interest" even applies, given it seems to exclude such inquiry "for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities registered under Section 12 of the Act," 17 C.F.R. § 240.13d-3, but in any event, MintBroker did not have a pecuniary interest in its clients' shares.

14

A-1839

shares and MintBroker was merely a custodian which cannot be held liable for its clients' short-swing profits.

3. **Accurate calculations by two forensic accountants demonstrate that Plaintiffs have not established any damages and a proper amount of short-swing profits derived from Avalon (AWX) shares beneficially owned by MintBroker would be approximately $1.2 million and that MintBroker never crossed the 10% threshold to be deemed a statutory insider under Section 16(b) with respect to trading in New Concept (GBR).**

Because MintBroker was not the beneficial owner of trades of shares beneficially owned by its clients, as identified by their account names beginning with letters reflected in the MintBroker Records, those transactions were properly excluded by the forensic accountants in their calculations of MintBroker's short-swing profits. Additionally, entries reflected in account #32812 were also properly excluded because they reflect journal entry recordkeeping, not actual trading activity. (Tr. #1 at 48, 51; Tr. #2 at 18–19) (Christian testified: "32812 . . . without question is a recordkeeping account").

What remains then, with respect to MintBroker's short-swing profits analysis, is the activity reflected in MintBroker's propriety trading account, #32810. (Tr. #1 at 53). Because the #32810 account featured both company propriety trades as well as some instances of client trades facilitated through MintBroker's inventory, it is not possible to determine on the face of the entries in that account who the beneficial owner of the shares was. (Tr. #1 at 53, 57–58). Instead, the data for the #32810 account needs to be filtered to determine who initiated the transaction, MintBroker or a client. (Tr. #1 at 58, 128–129). This is precisely what the forensic accountant, Christian, did by locating exact replicate offsetting trades in client accounts. (Tr. #2 at 22–23, 35). Specifically, Christian testified that he was able to "isolate . . . the true corporate trades" of MintBroker from those client trades executed through inventory by locating "offsetting" #32810 trades "at the exact same time as a client trade." (Tr. #2 at 23, 35). And in his testimony, Gentile clarified that

15

A-1840

MintBroker's initial acquisition of those shares into inventory, purchased through its proprietary account, were counted as part of the experts' calculations of MintBroker's short-swing profits. (Tr. #1 at 58–59).

Upon proper exclusion of the account #32812 journal entries and trades of shares beneficially owned by clients, both experts concluded that MintBroker never crossed the 10% threshold to be deemed a statutory insider under Section 16(b) with respect to trading in New Concept (GBR) and that its short-swing profits of shares of Avalon (AWX) beneficially owned by MintBroker totaled approximately $1.2 million. Plaintiffs have presented no evidence to refute or rebut the accuracy of the experts' reports or calculations. Nor have Plaintiffs presented any evidence to support a finding of any damages award.

### 4. Plaintiffs' calculations, predicated on the incomplete InteractiveBrokers records, and Plaintiffs' disregard for the client trading distinction, are incorrect.

As Plaintiffs' counsel observed in opening argument: "if you ignore the way the business is being conducted, you come up with some curious results." (Tr. #1 at 8). This is the precise problem with Plaintiffs' calculations. Relying on InteractiveBrokers records, which reflect omnibus trading and do not distinguish between trades placed by MintBroker and trades placed by its clients, Plaintiffs seek to disregard the fundamental inquiry before this Court: whether Gentile may be held liable for short-swing profits derived from trading *by its clients*. Not only have the Plaintiffs presented *no evidence* in support of their positions, but after nearly a year of discovery with respect to the MintBroker Records, Plaintiffs have presented nothing to rebut their authenticity, completeness, accuracy, and reliability—instead relying on their incendiary attacks on Gentile's credibility in hopes that this Court would never consider the records. They did not engage an expert to challenge the documents themselves nor the calculations presented by

16

A-1841

Gentile's two independent forensic accountants. Their overstated calculations, relying on the InteractiveBrokers records alone, are incorrect.

To be clear, every trade reflected in the InteractiveBrokers records is also reflected in the MintBroker Records. The data that Christian pulled directly from the iBoss system includes entries for all of those trades executed through InteractiveBrokers (as well as other execution firms) and those entries match up to the InteractiveBrokers records Plaintiffs rely on. So, there is no doubt the MintBroker Records are complete from that perspective. The difference, however, is that the MintBroker Records include identification of the account placing each trade—which is fundamental to determination of whether short-swing profits were derived from shares beneficially owned by MintBroker's clients, as opposed to the Company.

At the hearing, this Court heard that Plaintiffs deposed a corporate representative of InteractiveBrokers, Brad Klauseger, on May 27, 2020—three months after Gentile alerted Plaintiffs to the fact that client trades were reflected in the omnibus account. (Tr. #1 at 17). Klauseger testified:

> A. [B. Klauseger]: With an Omnibus Account, Interactive Brokers is unable to see the number of customers that hold any particular position behind the US or UL account.
>
> ***
>
> Q. [M. Tauber]: So it would be sort of grouped in with the any customer trading and there is no way from your end to separate it out?
>
> A. Correct.

(Klauseger Tr. at 7–8). Thus, Klauseger affirmed that through the InteractiveBrokers records alone one cannot determine which trades were placed for shares beneficially owned by MintBroker versus those beneficially owned by its clients. And from the time of his deposition in May 2020, Plaintiffs knew the records they relied on were from MintBroker's InteractiveBrokers omnibus

A-1842

account, that there were clients trading in that account, that it was segregated into long and short sub-accounts to accommodate client trading, and that it was the clients that had the right to vote or dispose of those shares. (Klauseger Tr. at 7–8, 113–114).

So, as of early 2020, Plaintiffs were alerted to the client trading distinction and had the opportunity to conduct discovery on this precise issue but declined. They did not attempt to obtain MintBroker's records through the proper channels (the letters rogatory process) despite their understanding, as represented to the Court at the hearing, that *five sources in the Bahamas* had possession of the records. (Tr. #1 at 6–7).

Instead, Plaintiffs chose to disregard the client trading distinction until forced to confront it upon Gentile's production of the MintBroker Records in May 2022. Once faced with MintBroker's accurate trading records, imported directly from the DAS Trader system, Plaintiffs surely realized the significance of the client trading distinction, but dug their heels into their original miscalculation of approximately $15 million in damages based on the incomplete InteractiveBrokers Records. They did not review their calculations in light of the MintBroker Records, nor did they engage experts to investigate or challenge the records themselves, the client trading distinction, or to conduct calculations for comparison to the InteractiveBrokers records. Plaintiffs' calculations, relying on the incomplete InteractiveBrokers records and ignoring the fact that client shares traded in the omnibus account undoubtedly were *beneficially owned by clients*, are not only grossly overstated, but incorrect. Plaintiffs have failed to satisfy their burden.

Dated: April 19, 2023                               FORD O'BRIEN LANDY LLP


_____
Matthew A. Ford
Cara J. Filippelli (*pro hac vice*)
275 Madison Avenue, Fl.24
New York, NY 10016

A-1843

mford@fordobrien.com
cfilippelli@fordobrien.com
212.858.0040

*Attorneys for Defendant Guy Gentile*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 19th day of April 2023 via CM-ECF on all counsel.

By:    **Matthew A. Ford /s/**
Matthew A. Ford

19

A-1844

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AVALON HOLDINGS CORP.,<br><br>       Plaintiff,<br><br>       v.<br><br>GUY GENTILE and<br>MINTBROKER INTERNATIONAL, LTD.,<br><br>       Defendants. | No. 18-cv-7291<br><br>ECF Case |

Related to:

| | |
|---|---|
| NEW CONCEPT ENERGY, INC.<br><br>       Plaintiff,<br><br>       v.<br><br>GUY GENTILE and<br>MINTBROKER INTERNATIONAL, LTD.,<br><br>       Defendants. | No. 18-cv-8896<br><br>ECF Case |

**PLAINTIFFS' POST-HEARING BRIEF**

David Lopez (DL-6779)
LAW OFFICES OF DAVID LOPEZ
171 Edge of Woods Road | P.O. Box 323
Southampton NY 11969-0323
(631) 287-5520 | DavidLopezEsq@aol.com

Miriam Tauber (MT-1979)
MIRIAM TAUBER LAW PLLC
885 Park Ave. # 2A
New York NY 10075
(323) 790-4881| MiriamTauberLaw@gmail.com

*Attorneys for Plaintiffs*

A-1845

## TABLE OF CONTENTS

| | |
|---|---|
| TABLE OF AUTHORITIES | ii. |
| OVERVIEW | 1 |
| POINT I. THE BURDEN OF SHOWING DAMAGES IS INITIALLY PLAINTIFFS'. UPON A PRIMA FACIE SHOWING OF MAXIMUM DAMAGES, THE BURDEN SHIFTS TO THE DEFENSE TO MITIGATE OR TO SHOW THERE ARE NONE. | 2 |
| POINT II. PLAINTIFFS MADE A PRIMA FACIE SHOWING OF DAMAGES PRIOR TO THE INQUEST BY CALCULATING DAMAGES BASED ON TRANSACTIONS THAT PLAINTIFFS CONFIRMED WERE EXECUTED BY DEFENDANTS ON THE MARKET THROUGH THEIR INTERACTIVE BROKERS OMNIBUS ACCOUNT. | 4 |
|    A. The Evidence Considered by the Court on Summary Judgment | 4 |
|    B. The Court's Findings and Summary Judgment Order | 7 |
|    C. Plaintiffs' Calculations | 7 |
| POINT III. THE METHODOLOGY CREATED BY THE DEFENSE TO IDENTIFY THE SHORT-SWING PERIOD IS INDEFENSIBLE. | 8 |
| POINT IV. THE DEFENDANTS' POST-DISCOVERY EVIDENCE, IF ADMITTED, IS OF LITLE OR NO PROBATIVE VALUE. | 11 |
|    A. The Post-Discovery Evidence Reviewed by Defendants' Experts | 11 |
|    B. The Experts Did Not Verify any Transactions Recorded on the "Suretrader" System or the Existence of any Non-Affiliated "Customer" Accounts | 11 |
|    C. The Experts Excluded Trades Executed by Mintbroker on the Public Market as Duplicative of "Client" Transactions Recorded Internally by "Suretrader" | 13 |
|    D. The Experts Did Not Apply the Correct Standard of Beneficial Ownership (or any Standard of Beneficial Ownership) in Excluding "Client" Transactions | 16 |
|    E. Both Expert Reports Incorporate a Nonsensical Concept of "Negative" Beneficial Ownership That Neither Expert Could Explain | 18 |
|    F. Account MBS010067 Was Inadequately Addressed by Defendants or Their Experts and Should Be Included Within Defendants' Beneficial Ownership | 20 |
| POINT V. DEFENDANTS' BENEFICIAL OWNERSHIP OF AND PECUNIARY INTEREST IN SHARES SOLD THROUGH THEIR INTERACTIVE BROKERS ACCOUNT IS NOT REDUCED BY ANY INTEREST HELD BY MINTBROKER'S CLIENTS. | 24 |
| CONCLUSION | 25 |

A-1846

## TABLE OF AUTHORITIES

### Cases

*Avalon Holdings Corp. v. Mintbroker International, Ltd.*,
597 F. Supp. 3d 640 (2022).................................................................... passim

*Gratz v. Claughton*,
187 F. 2d 46 (2d Cir. 1951).................................................................... 2

*Reliance Electric Co. v. Emerson Electric Co.*,
404 U.S. 418 (1972).................................................................... 2

*Schur v. Salzman*,
365 F. Supp. 725 (S.D.N.Y. 1973) .................................................................... 3

*Smolowe v. Delendo Corp.*,
136 F. 2d 231 (2d Cir. 1943).................................................................... 2

*Stella v. Graham-Paige Motors Corp.*,
232 F. 2d 299 (2d Cir. 1956).................................................................... 3

### Statutes

15 U.S.C § 78p.................................................................... passim

15 U.S.C § 78ff.................................................................... 5

18 U.S.C. § 1001.................................................................... 5

### Rules

17 C.F.R. § 240.15c-3 .................................................................... 16

17 C.F.R. § 240.13d-3 .................................................................... 10

17 C.F.R. § 240.l6a-1 .................................................................... 10

### Treatises

Peter J. Romeo & Alan L. Dye,
*Section 16 Treatise & Reporting Guide* (5th ed.).................................................................... 3

ii

## OVERVIEW

An inquest on damages was held by the Court on February 1 and 2, 2023. This Post-Hearing Brief is intended to address questions raised by the Court at the conclusion of the hearing and to act as Plaintiffs' summation of the import of evidence adduced.

First and foremost, we highlight the Defendants' brazen disregard for the object of the inquest—to determine when the Defendants were more-than-10% beneficial owners of Plaintiffs' common stock and to establish the profits they realized while statutory insiders under Securities Exchange Act §16(b), 15 U.S.C. §78p(b). *See* Summary Judgment Order & Referral at *Avalon* Dkt #97, *New Concept* Dkt #86, published as *Avalon Holdings Corp. v. Mintbroker Internatl, Ltd.*, 597 F. Supp. 3d 640, 656-57 (2022) ("SJ Order"). "Beneficial ownership" is a defined term for purposes of determining §16(b) insider status. As Judge Broderick instructed, 10% "beneficial ownership" is defined by investment power or voting power over shares. Either is sufficient to require including the shares within a shareholder's "beneficial ownership." SJ Order, 597 F. Supp. 3d at 654-56 (citing SEC Rules 13d-3, 16a-1, 17 C.F.R. §§240.13d-3, 240.16a-1).

The Defendants' experts were engaged to identify the times during which Defendants were 10% "beneficial owners" of AWX (Avalon) or GBR (New Concept) common stock. (Hearing Tr. pp.238-39.) Yet they chose in their studies not to touch upon the controlling factors of investment or voting control. Their efforts are thereby of no assistance to the Court as a matter of law. To use one of Mr. Christian's favorite locutions, the expert testimonies in their entireties are "not relevant" to the decisions to be made by the Court on inquest. (*See, e.g.,* Hearing Tr. 248:21-250:25) (testifying that reviewing account agreements, brokerage records, and financial

1

A-1848

statements to determine who directed and profited from the trading they analyzed was "not relevant" and "not required" as part of his engagement). Their testimonies should be stricken.

It is remarkable that an issue that was briefed, considered, and decided on summary judgment—what constitutes 10% "beneficial ownership"—was not within the ken of the experts' understanding or their analyses for this proceeding, and that they had not been instructed by Defendants' counsel as to the regulatory definition they were hired to apply. Equally so that they did not trouble to read Judge Broderick's instructive summary judgment order. (Hearing Tr. 269:5-9.)

### *POINT I.*
### THE BURDEN OF SHOWING DAMAGES IS INITIALLY PLAINTIFFS'. UPON A *PRIMA FACIE* SHOWING OF MAXIMUM DAMAGES, THE BURDEN SHIFTS TO THE DEFENSE TO MITIGATE OR TO SHOW THERE ARE NONE.

Plaintiffs have the burden of establishing that the Defendants traded in violation of the statute—i.e., that they were "more-than-10% beneficial owners of the companies" and that they "purchased and sold" stock within a period of less than six months. The Court held that Plaintiffs have met their burden of proving these "elements" of their §16(b) claims. *See* MSJ Order, 597 F. Supp. 3d at 649-650. As the Court stated, once a violation has been proven, "§16(b) imposes strict liability" requiring Defendants to "disgorge their profits." Id. at 649.

The burden of proof of the existence and the quantum of damages—i.e., the realization of short swing trading profits—is also initially the Plaintiffs'. Plaintiffs are required to identify higher-priced sales that can be matched against lower-priced purchases, in accordance with the lowest-in/highest-out method prescribed by the Second Circuit in *Smolowe v. Delendo Corp.*, 136 F. 2d 231 (2d Cir. 1943). *See also Gratz v. Claughton*, 187 F. 2d 46, 50-51 (2d Cir. 1951). Although somewhat hoary, Justice Douglas, in dissent in *Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. 418, 437-38 (1972), expressed the view that "the broad sweep of §16(b)

2

A-1849

requires that a minimal burden be placed on putative plaintiffs. ... Whatever 'mechanical quality' the statute possesses, it was intended to ease the plaintiff's burden, not to insulate the insider's profits."

Upon the plaintiffs' *prima facie* showing the maximum amount of profit calculated under the statute, the burden shifts to the defendant to establish that profits were non-existent or less than the amount claimed by the plaintiff. *See Stella v. Graham-Paige Motors Corp.*, 232 F. 2d 299, 302 (2d Cir. 1956). In *Stella,* the Second Circuit reversed the lower court's refusal to enter judgment for a plaintiff who had made a *prima facie* case for §16(b) liability, holding:

> ". . . the judge apparently assumed that plaintiff, despite his *prima facie* case, continued to bear the burden of proving that there were profits and in what amount: therefore, as defendant's proof left the judge uncertain in this respect, he decided for the defendant. ...
>
> If so, we think the judge erred. **In *Gratz v. Claughton*, we held that, under §16(b), a 'beneficial owner' who buys and sells within the statutory period is to be regarded as a fiduciary who breaches his duty of loyalty (i.e., his duty not to engage in self-dealing) and who, in such circumstances, must account for his profits. Elsewhere we have held that, once a *cestui* shows a breach of such a duty and *prima facie* proof of a maximum amount of profits made by the fiduciary, then the fiduciary has the burden of proving to what extent the profits were less than the maximum**—especially where the fiduciary breach is responsible for the difficulty or impossibility of proving the amount with certainty—and that consequently, **if the fiduciary's proof leaves the amount uncertain, judgment goes against him for the maximum figure.** (Emphasis added).

*See also Schur v. Salzman*, 365 F. Supp. 725, 734 (S.D.N.Y. 1973) ("the burden of proof is upon the defendant, a fiduciary, to establish that his profits are less than those claimed by the plaintiff, particularly where difficulty in ascertaining the precise damages is due to the insider's conduct.")

Defendants are required to meet their burden of establishing a reduction from the *prima facie* amount of liability calculated by the Plaintiffs by a preponderance of the evidence. *See generally* Peter J. Romeo & Alan L. Dye, *Sec.16 Treatise & Reporting Guide* (5th ed.) §9.03[8]

3

A-1850

p.938. The court in *Schur* found that the defendants "failed to carry that burden" absent any proof that any portion of their established sale price was "segregated" or otherwise not received from their sales of stock. *Schur*, 365 F. Supp. at 734. Here too, Judge Broderick concluded: "the trading records demonstrate that Defendants successfully sold thousands of shares that they bought at a much lower price, and Defendants have failed to create a genuine dispute that they have not reaped the profits between the purchase and sale price." SJ Order, 597 F. Supp. 3d at 656.

A year later, Defendants have still failed to create a genuine dispute that they had beneficial ownership over, i.e., the right to sell, the shares in their Interactive Brokers omnibus account; that they actually did sell these shares at the prices indicated on their Interactive Brokers statements; or that they withdrew the entirety of the cash balance on their account, which included these trading proceeds, when Interactive Brokers forced the closure of their omnibus account. (*See* Pl. Ex. #11, 12.) Plaintiffs have made their *prima facie* case by calculating damages based on these confirmed transactions. Defendants fail to prove that any of the shares should be excluded from their beneficial ownership or that any portion of their trading proceeds should be excluded from their profits subject to disgorgement.

### *POINT II.*
**PLAINTIFFS MADE A *PRIMA FACIE* SHOWING OF DAMAGES PRIOR TO THE INQUEST BY CALCULATING DAMAGES BASED ON TRANSACTIONS THAT PLAINTIFFS CONFIRMED WERE EXECUTED BY DEFENDANTS ON THE MARKET THROUGH THEIR INTERACTIVE BROKERS OMNIBUS ACCOUNT.**

#### A. The Evidence Considered by the Court on Summary Judgment

In response to the filing of these lawsuits by Plaintiffs, Defendants filed required Schedule 13D reports detailing their trading history within 60 days prior to their crossing the 5% "beneficial ownership" threshold, as defined for purposes of both §13(d) and §16(a) of the Securities Exchange Act, *see* SJ Order, 597 F. Supp. 3d at 654-56.

4

A-1851

- **Defendants' Schedule 13D for Avalon reported trades in "Account 32810.** Gentile now identifies this as Mintbroker's so-called "inventory" and/or "proprietary trading" account.

- **Defendants' New Concept 13D reported trades in "Account MBS010067."** Gentile's new evidentiary submissions purport to identify this as a "client" account beginning with a letter-prefix "MBS," although Gentile did not mention this when reviewing the 13D at his deposition during discovery. Transactions in this specific "client" account comprised the overwhelming majority of "client" account transactions and is further discussed at Point IV.F.

Both Schedule 13D filings reported thousands of transactions in each of the Plaintiff's stocks. Both Schedule 13D filings stated:

> **Item 3. Source and Amount of Funds or Other Consideration.**
> The source of funding for the purchase of the Shares was the general working capital of Mintbroker together with margin borrowing."

> **Item 4. Purpose of Transaction.**
> The reporting persons acquired their position in an attempt to gain control over the Issuer and replace the board of directors with the near-term goal of selling the assets of the Issuer.

(*See* Sched. 13D filings at Pl. Ex. #6 & #6A). Intentional misstatements or omissions of facts on a Schedule 13D constitute Federal Criminal Violations. *See* 18 U.S.C. §1001; 15 U.S.C §78ff(a).

The Court may note that these disclosures, made under penalty of perjury and at times when the Defendants did not appreciate the possible damaging consequences of truthfulness, are irreconcilable with their disclaimers of beneficial ownership and assertions that these were mostly customer transactions. If Defendants borrowed funds, e.g., from margin accounts, to buy these stocks at Defendants' discretion, and for Defendants' control purposes, that ends the inquiry and proves that Defendants had investment control over the stocks they bought. Neither of Defendants' expert witnesses have anything to say about their disclosures describing their escapades as would-be corporate raiders. Neither expert even troubled to examine the Schedule 13D filings.

5

A-1852

Notwithstanding Defendants' stated control purpose (which they also repeated in response to the compliance review initiated by Interactive Brokers concerning the Defendants' trading of these stocks, *see* Pl. Ex. #20, #21, #25, #27), Defendants' argument on the parties' cross-motions for summary judgment was that the trades they reported did not reflect actual purchases and sales of stock but were merely "book entries" or orders that "failed to clear." SJ Order, 597 F. Supp. 3d at 651.

Given Defendants' assertion that the transactions reported in their 13D filings and their discovery production were not trades but internal "book entries," Plaintiffs obtained extensive third-party discovery, including thousands of pages of account statements, correspondence, and other account records from Interactive Brokers, which were verified and explained by the deposition of an Interactive Brokers F.R.C.P. 30(b)(6) representative. *See* SJ Order, 597 F. Supp. 3d at 654 (citing Interactive Brokers testimony that none of the trades executed in Defendants' account failed to clear). Plaintiffs also obtained extensive trading data from stock exchanges, market makers, transfer agents, and clearing companies, which linked Defendants' trading to the trading publicly reported to the market. (*See, e.g.,* Pl. Ex. #23, #33; additional responses too voluminous to include in Plaintiffs' Exhibits received from, *e.g.,* CBOE, NASDAQ, Citadel, AMEX, DTCC, and other third parties; *see generally* R. Ricco article, Pl. Ex. #10 (describing how Defendants' trading could be lined up with available granular market data). This discovery also revealed that Defendants' trading triggered compliance reviews at Interactive Brokers and other institutions involved with the execution or reporting of their trades. (*See, e.g.,* Pl. Ex. #20, #23, #27, #33.) None of this evidence was reviewed by either of Defendants' experts. (Hearing Tr. 249:6-250:25.)

6

A-1853

The attached **Appendix** attached shows a comparison of the trading reported by the Defendants in AWX and GBR during a single minute of trading in: (1) Defendants' 13D filings; (2) Defendants' original production; and (3) the Interactive Brokers statements (which are included in Plaintiffs' computations); along with: (4) the transactions reflected in Defendants' post-discovery production; and (5) the select transactions counted by the Defendants' experts in their proposed computations.

### B. The Court's Findings and Summary Judgment Order

In granting Plaintiffs' summary judgment motion and denying Defendants' cross-motion, the Court found that the evidence submitted by Plaintiffs established that: (1) the Defendants were "beneficial owners" of the shares held in their Interactive Brokers account, because they had investment/dispositive authority over those shares, i.e., the right to sell the shares on the public market; (2) Defendants did, in fact, sell all of the shares of stock at the prices reflected on their Interactive Brokers account statements in market transactions that were "completed" and did not "fail to clear;" and (3) Defendants "made money" from these trades. *See* MSJ Order, 597 F. Supp. 3d at 651-54.

### C. Plaintiffs' Calculations

Plaintiffs' calculations are based on the trades executed by the Defendants in their Interactive Brokers omnibus account. (Pl. Ex. #8, 8A.) As the Court held, Defendants were beneficial owners of the shares held in their Interactive Brokers account, because Defendants had the right to sell, and in fact did sell, all of the shares. MSJ order.

As the attached **Appendix** reflects, Defendants' records—i.e., their Schedule 13D filings (*Chart 1*); their original production (*Chart 2*); and their expanded post-discovery production (Chart 4), include transactions *additional to or duplicative* of the trades reflected in the Interactive

7

A-1854

Brokers statements (*Chart 3*)— the only trades that Plaintiffs include in computing Defendants' §16(b) beneficial ownership and profits. The additional or duplicative "Suretrader" transactions are unverified, and Plaintiffs exclude them from their computations.

*POINT III.*
**THE METHODOLOGY CREATED BY THE DEFENSE
TO IDENTIFY THE SHORT-SWING PERIODS IS INDEFENSIBLE.**

All that the Defendants have produced either during or after discovery are spreadsheets reflecting that some of the trading executed by the Defendants through their Interactive Brokers account correspond to transactions that were separately entered for various accounts on Defendants' internal "Suretrader" system. (*Compare* **Appendix** Chart 3, Chart 4). These internal records were relied on by Defendants' experts to exclude trades that Defendants executed through their Interactive Brokers account whenever a corresponding transaction was recorded by the Defendants as "executed" for a "client account" on "Suretrader." (*See* **Appendix** at Charts 4, 5, and Point IV., below).

All of the evidence in this case, including the evidence introduced at the inquest, establish that "Suretrader" transactions did not represent market trades, but off-market transactions between Mintbroker and Mintbroker's customers. As Mintbroker advised anyone visiting its website in a prominent disclaimer: "Mintbroker's clients do not have direct market access. All trades are executed against Mintbroker in a principal capacity." (Pl. Ex. #18.) Gentile testified that he alone controlled whether to execute trades on the market in Mintbroker's Interactive Brokers account, and that customer transactions that were otherwise reconciled internally or "executed" by Mintbroker (*a/k/a* "Suretrader") were not reported to the market, and did not represent market trades. (Hearing Tr. pp.40-41, 48.) This is also consistent with Mintbroker's business practices described by Christina Rolle, Executive Director of the Bahamas Securities Commission, in

8

A-1855

particular her determination that: "The purchase of securities by SASL's [a/k/a Mintbroker's] clients do not result in those clients having the securities they believe they have purchased" and Mintbroker's clients "do not own shares but are of the belief that they own the shares." (Pl. Ex. #37 Rolle Aff. p.4, pp. 7-8 ¶¶15-18; *see also* Pl. Ex. #37.)

Defendants' experts considered none of this. Mr. Christian testified that reviewing the SEC Bahamas Executive Director's findings or the winding-up proceedings in which her Affidavit was filed was outside the scope of his investigation. (Hearing Tr. pp.254-55, p.300.) Nonetheless, the experts removed shares that the Defendants sold through their Interactive Broke from their "beneficial ownership" analysis by "netting" out any trades for which there was a corresponding "client account" transaction. Mr. Christian testified that this methodology—which amounts to nothing more than tallying data entries—was tailor-made for this engagement. There was no testimony as to peer review by unaffiliated accounting professionals, publication, or general acceptance by the profession as a standard of practice.

More importantly, the experts did not evaluate any relevant criteria of beneficial ownership for purposes of §16(b) as instructed by Judge Broderick. They simply "netted" and then removed so-called "customer account" transactions—without reviewing Defendants' 13D filings or any of the trading records elicited in discovery, and without interviewing a single Mintbroker customer, or reviewing a single account agreement or account statement to confirm whether any of the shares in the Defendants' Interactive Brokers account were in fact within the Defendants' investment control or shared investment control, and could be sold by the Defendants at their discretion. (*See* Hearing Tr. 296:6-11, pp. 267-68.)

The simple fact is that Mr. Christian, the senior of Defendants' witnesses, did not conduct the sort of inquiry necessary to determine whether shares allocated to unverified customer

9

A-1856

accounts in Mintbroker's records were "beneficially owned" by Mintbroker under SEC Rules 13d-3 and 16a-(l)(a)(l), as required by Judge Broderick's order. *See* SJ Order, 597 F. Supp. 3d at 654. For all his accounting credentials, Mr. Christian was not aware of the relevant definition of "beneficial ownership" for the purpose of determining §16(b) insider status. (*See* Hearing Tr. pp. 247-250.) Inquiring as to the terms of Mintbroker's customer agreements—in particular, whether they conferred Mintbroker with investment or voting authority over customer accounts—was beyond the scope of Mr. Christian's retainer, but it is the central inquiry before the Court.

The nub of the problem is that Mr. Christian is qualified as an accountant and an auditor, but Mr. Christian stated that he did not follow accounting or auditing procedures in conducting his analysis. (Hearing Tr. pp.243-44.) Mr. Christian is not an expert in securities law nor competent in the workings of Section 16 of the Exchange Act. In fact, Mr. Christian testified to never previously having dealt with a Section 16 matter. (Hearing Tr. p.266.) Mr. Christian did not know the law or apply it to the facts of this case.

The other expert witness, Mr. Brendan Beresford, was engaged solely to perform the lowest-in/highest-out profit computation on the transactions that Mr. Christian determined should be included. Mr. Beresford took Mr. Christian's report as given to him and made no independent verification of underlying facts whatsoever. (Hearing Tr. pp. 287-290, 292-93.) Whatever errors of fact or law Mr. Christian might have made were carried over and were the basis for Mr. Beresford's testimony. We renew our objection that Mr. Beresford's testimony is hearsay, and his calculations are baseless.

10

A-1857

### POINT IV.
### THE DEFENDANTS' POST-DISCOVERY EVIDENCE,
### IF ADMITTED, IS OF LITTLE OR NO PROBATIVE VALUE

#### A. The Post-Discovery Evidence Reviewed by Defendants' Experts

Following the Court's summary judgment Order entered on April 8, 2022—two years after discovery closed and the parties submitted their cross-motions for summary judgment based on the evidence elicited—Defendants informed Plaintiffs that they had suddenly located "additional trades" in Plaintiffs' stocks and suggested postponing the damages briefing schedule so that these additional trades could be considered. Defendants' new documents reflecting these "additional trades" consisted of two additional spreadsheets, one representing trading in Avalon and the other in New Concept stock, which Gentile testified he believed was generated by Mintbroker's "DAS Trader" and "iBoss" system. (*See, e.g.,* Hearing Tr. p.15.) These spreadsheets included entries corresponding to the trading reflected in the Interactive Brokers statements, the additional trading reflected in Defendants' 13D filing, and other transactions that were not reported in any previous report or production. (*See, e.g.,* **Appendix** Charts 1, 2, 3, 4.)

#### B. The Experts Did Not Verify any Transactions Recorded on the "Suretrader" System or the Existence of any Non-Affiliated "Customer" Accounts.

The post-discovery spreadsheets produced by the Defendants (*see* example at **Appendix** Chart 4) were the only documents reviewed by the experts. The experts did not review or request, to review any trade confirmations, brokerage account or financial statements to confirm any of the transactions purportedly reflected in these spreadsheets. The experts did not review the Interactive Brokers account statements cited by the Court in granting Plaintiffs' motions for summary judgment, and on which Plaintiffs' base their computations—or any of the extensive discovery produced in this case. Plaintiffs elicited that discovery to establish that transactions recorded by the Defendants were in fact executed and resulted in cash proceeds paid out to the

11

A-1858

Defendants. Defendants' experts did not make any similar effort to corroborate the supposed transactions reflected on Defendants' spreadsheets. (*See* Hearing Tr. p.49.)

The experts' analysis begins with the premise that certain accounts are client accounts, and certain accounts are Mintbroker's "corporate" or "inventory" accounts. As Mr. Christian testified, Gentile told him that all accounts beginning with a letter prefix "MBS" or "PFS" were client accounts, and numeric-only accounts were Mintbroker accounts. (Hearing Tr. pp. 232-34.)

The extent of Mr. Christian's efforts to verify this information, which he then applied to exclude thousands of transactions in hundreds of accounts (*see* Hearing Tr. p. 240) was as follows:

- Mr. Christian "confirmed" Mr. Gentile's representation that the accounts Mr. Gentile identified as corporate accounts, Account 32812 and Account 32810, had either the name Mintbroker or Mr. Gentile or a similar name as the account owner. (Hearing Tr. p.240.)

- Mr. Christian confirmed Mr. Gentile's representation that accounts beginning with MBS or PFS were "client accounts" by looking at a sample of these accounts ("10 to 20 percent," but could not specifically say what percentage) and confirming that the name of the account owner was a name other than Mr. Gentile or Mintbroker. (Hearing Tr. pp.237-38, p.240.)

- Mr. Christian testified that even if the name of an account owner was similar to Defendants, he would not assume the owner was a related party and would not inquire further. Mr. Christian did not ask for a list of corporate affiliates or aliases to compare the sample account names to. (Hearing Tr. pp.240-41.)

- Mr. Christian could not confirm that he included Account MBS010067 when sampling account owner names. (Hearing Tr. pp.234-37.) This particular Account was reported in Defendants' New Concept 13D, and accounts for the substantial majority of all "client account" transactions in both Plaintiffs' stocks. Mr. Christian himself estimated that this Account generated approximately $2,221,090 in profits from Avalon transactions (DX-7 p.2), and $5,762,336 from New Concept transactions (DX-6 p.2). (*See* further discussion of this Account at Point IV.F, below.)

12

- Mr. Christian confirmed Gentile's representation that Account 32812 was a "record keeping" account used to designate "the exchange" where transactions were routed by noting that each Account 32812 entry was "duplicative" of another entry recorded as executed on the "Suretrader" system, in either a "client" account or in Mintbroker's "proprietary" or "inventory" Account 32810). (Hearing Tr. p.282; *see also* Hearing Tr. pp.218-221.)

Again, Christian did not look at any brokerage statements or trade confirmations to verify the ownership of the accounts in which trades were executed. Instead, as further discussed below, Christian removed all of the trades that Defendants executed through Interactive Brokers as "duplicative," and proceeded to analyze only the transactions indicated as "executed" on Defendants' Suretrader system. (*See* **Appendix** Charts 3, 4, 5). Christian did not verify and did not consider the extent to which these "Suretrader" transactions transferred beneficial ownership of any shares from Mintbroker to a client, or whether the shares instead remained in Mintbroker's Interactive Brokers omnibus account within Defendants' dispositive control. (Hearing Tr. pp.256-58.)

## C. The Experts Excluded Trades Executed by Mintbroker on the Public Market as Duplicative of "Client" Transactions Recorded Internally by "Suretrader"

As discussed above, Mr. Christian "confirmed" that two accounts, Account 32810 and Account 32812, were Mintbroker's "corporate" accounts. He also "confirmed" Mr. Gentile's representation that Account 32812 was a "record-keeping" account that existed solely to note where transactions "routed" by noting that every Account 32812 entry was duplicated by another entry in a "client" account or in the other "corporate" account, Account 32810. Mr. Christian then excluded all Account 32812 transactions from his analysis and considered Account 32810 as the only relevant corporate account. (Hearing Tr. pp.215-218.)

But as Plaintiffs' counsel pointed out to Mr. Christian during his testimony, Account 32812 transactions are the only transactions that Defendants' records indicate were executed in the

13

A-1860

Interactive Brokers ("IB") account or on any market execution platform (e.g., "EDGX" or "DIRECTEDGE") or exchange ("AMEX") (see **Appendix** Chart 4). All other transactions, including all "client account" transactions and all Account 32810 transactions, are indicated as "executed" on Suretrader, which is neither a registered broker nor an exchange and did not provide customers with "direct market access." Unlike the trades reflected on the Interactive Brokers statements, Mr. Gentile testified that "Suretrader" transactions did not necessarily represent actual market trades. (Hearing Tr. pp.40-41, 48.)

After removing Account 32812 transactions, the data analyzed by the experts consisted solely of transactions entered on the "Suretrader" system, in Account 32810 or in so-called "client accounts" beginning with MBS or PFS. The experts then "netted" Account 32810 transactions—including transactions duplicated by Mintbroker in trades executed on an exchange through the Interactive Brokers Account—against "client" transactions entered on Mintbroker's Suretrader system at the same time (or roughly the same time) and the same price (or roughly the same price). Only the Account 32810 transactions that could not be "netted" in this manner were counted by the Defendants' experts. (*See, e.g.,* Hearing Tr. p.279; *see* **Appendix** Charts 3, 4.)

The process applied by the experts was exactly backwards. The experts should have isolated the entries that represented actual exchange executed transactions—not excised them—and then looked, as Plaintiffs did, for the underlying execution confirmations and account statements to identify the beneficial owner of the shares, i.e., the individuals or entities authorized to vote or dispose of the shares in the relevant accounts. Defendants' experts only had to look at the Interactive Brokers statements elicited by the Plaintiffs in discovery and relied on by the Court in granting summary judgment, and by the Plaintiffs in calculating Defendants' liability, and which were readily available on the public docket of these cases.

14

A-1861

The "netting" process applied by the Defendants has no basis in fact and no relevance to the "beneficial ownership" inquiry. The experts did not confirm whether any segregated client accounts existed, and if transactions they excluded from their calculation of Mintbroker's "beneficial ownership" as "duplicated" by and "netted against" so-called "client account" in fact removed any shares from the Defendants' dispositive or voting authority, which is the crux of the beneficial ownership inquiry. If Defendants' experts had reviewed the Interactive Brokers statements, they would have determined that shares they ascribed to "clients" in fact remained in Mintbroker's Interactive Brokers omnibus account and could be (and were) sold on the market by Mintbroker at Gentile's discretion.

Effectively, Defendants' experts exclude the trades that Mr. Gentile described as "riskless principal" or "hedged" transactions—i.e., trades executed by Mintbroker that correspond to (or "hedge") an off-market transaction between Mintbroker and one of Mintbroker's clients. (Hearing Tr. pp.130-32.) But regardless of the purpose of these transactions, or whether Mr. Gentile perceived them as "riskless," the shares traded remained within Mintbroker's omnibus account and within Defendants' dispositive authority and beneficial ownership. None of Mintbroker's "client" transactions transferred, reduced or "netted" against Defendants' beneficial ownership of the shares held in their Interactive Brokers account.

As the Court noted, Defendants' experts acknowledged that they did not follow accepted audit or accounting procedures in reviewing the data and information given to them by the Defendants. Those procedures would have required Defendants to verify the transactions by looking at underlying account statements. Moreover, audit procedures specifically caution that heightened scrutiny is warranted when determining ultimate beneficial owners of omnibus accounts. The commingling of client or client "inventory" and proprietary shares in the same

15

A-1862

account is discouraged and specifically identified as raising "red flags." *See* SEC Rule 15c3-3, 17 C.F.R.§240.15c3 (*see also* Pl. Ex. #39.) These flags were raised in Interactive Broker's compliance review, and by the SEC Bahamas Executive Director. (*See* Pl. Ex. #20, #25, #27.)

But none of that bothered Defendants' experts, who followed none of the recommended procedures for a basic audit, let alone the audit of an account subject to heightened scrutiny, owned by a day trader under investigation by U.S. and Bahamas regulators. According to Mr. Christian, applying the basic standards of his profession was outside the scope of his engagement. (Hearing Tr. pp.247-250.) More importantly, the experts did not consider any factors relevant to the "beneficial ownership" inquiry under §16(b)—which was the very purpose and subject of their reports, as further discussed below.

### D. The Experts Did Not Apply the Correct Standard of Beneficial Ownership (or any Standard of Beneficial Ownership) in Excluding "Client" Transactions

Defendants' experts applied a "netting" process, which assumed that if a trade was executed by Mintbroker at the same time as a client order, the shares traded were "beneficially owned" by the client, and not by Mintbroker. (Hearing Tr. pp.215-221.) This type of magical thinking does not comport with the applicable definition of beneficial ownership or with any definition of beneficial ownership. The Court held that Defendants' dispositive power over all shares in their Interactive Brokers account was established and their beneficial ownership proven by Mintbroker's sale of the shares in market transactions. *See* SJ Order, 597 F. Supp. 3d at 655-56 (finding that "Defendants had 'investment power' over these shares ... as admitted by Gentile himself, and as shown by the fact that they successfully sold these shares on the market").

Even if Mintbroker's clients did beneficially own the shares recorded in the client accounts, which has not been proven, the experts wrongly presumed that if any shares were owned by Mintbroker's clients, the shares were not also beneficially owned by Mintbroker. The experts

16

A-1863

did not review any client account agreements or otherwise inquire into whether Mintbroker had discretionary authority to trade the client accounts. In fact, Mr. Christian understood that Mintbroker's client accounts were *discretionary* managed accounts, over which Mintbroker exercised investment authority (or shared investment authority)—which would *necessarily* confer Defendants with beneficial ownership (or shared beneficial ownership) over the client accounts. (*See* Hearing Tr. 273:21-25) ("if you're an investment manager, buying stock on behalf of the client, you're holding it, and then you're selling it, either to the client or, depending on the nature of your transaction, on behalf of the client. So they are the custodian. They operate as the fiduciary").

As another example, Mr. Gentile testified that he had the authority to close out client positions and cancel client orders. (*See, e.g.,* Hearing Tr. p.176-180.) Mr. Gentile also testified that the Suretrader system that generated the records reviewed by the experts was updated at midnight after each trading day, and reflected "fulfillments" of client orders, with no way to discern the extent to which the "fulfilled" order differed from the order entered by the client. (Hearing Tr. pp.46, 173.) Mr. Christian did not examine whether any of the transactions excluded from his calculations represented these discretionary "fulfillments," or transactions forced on Mintbroker's clients at prices determined by Mintbroker. (Hearing Tr. p.277.)

Mr. Christian also acknowledged he did not inquire as to any other criteria of beneficial ownership; for example, whether Mintbroker was authorized to vote shares ascribed to client accounts, which would provide an alternate basis for conferring Defendants with beneficial ownership of those shares. The experts also did not evaluate whether Mintbroker had any agreements, arrangements, or understandings with any clients with respect to the voting or trading of Plaintiffs' stock—such as an agreement to engage in coordinated trading. Mr. Christian

17

A-1864

acknowledged that it would be possible to evaluate coordinated trading patterns from the type of data he reviewed for the Defendants but testified that he did not believe that inquiry was relevant to this investigation. In any case, it was (of course) not within the scope of his engagement. (Hearing Tr. pp.247-250.)

Mr. Christian also did not adequately consider whether any so-called clients were affiliates of Defendants, and that he did not find it suspicious if one of the "10-20%" of client accounts he sampled had a similar name to Defendants or their many known aliases. Incredibly, Christian testified that he would even have applied this same level of scrutiny to Account MBS010067 (although he could not say for sure whether he even looked at this Account as part of his "sample"). (Hearing Tr. pp.237-241.) This the account in which the most client trades were executed, and in which Mr. Christian calculates profits of $2,221,090 realized from Avalon transactions (DX-7 p.2); and $5,762,336 from New Concept transactions (DX-6 p.2). This Account is also reported on Defendants' New Concept Schedule 13D, in which Defendants admitted beneficial ownership and a control purpose with respect to their reported transactions. (*See* Pl. Ex. #6A.) There is no basis for overcoming these admissions and excluding this Account from Defendants' beneficial ownership (as further discussed at Point IV.F.)

### E. Both Expert Reports Incorporate a Nonsensical Concept of "Negative" Beneficial Ownership That Neither Expert Could Explain

As discussed above, the experts exclude trades executed by Defendants through their Interactive Brokers account where there was a corresponding transaction recorded as "executed" for a "client account" on Suretrader. This means that despite Mintbroker's acquisition of stock in the Interactive Brokers account within Mintbroker's control, the experts disregard these acquisitions as having no effect on Defendants' beneficial ownership if there is a corresponding "client" Suretrader transaction.

18

A-1865

The experts' exclusion of Defendants' trades in this manner leads to bizarre and nonsensical results, which illustrate the wrongness of their approach. As Plaintiffs' counsel pointed out at the hearing, Defendants' experts begin to calculate a negative beneficial ownership for Mintbroker due to their exclusion of more purchases than sales. (*See* Hearing Tr. pp.263-270; 294-95.) This is reminiscent of Defendants' argument on summary judgment that they did not buy the shares they sold, which the Court rejected out of hand as utterly illogical. *See* SJ Order, 597 F. Supp. 3d at 651-52:

> "Despite the trading records that display thousands of trades by Mintbroker in the Avalon and New Concept shares during the Short Swing Periods, Defendants still argue that Plaintiffs have failed to produce sufficient evidence that Mintbroker actually "purchased" these shares because those trades … do not represent shares Mintbroker actually possessed. … **These arguments are fatally flawed and contrary to the law.** …
>
> **Not only is Defendants' position unsupported by the law, it also makes no sense.** The evidence demonstrates that Defendants were able to complete transactions in the shares of Avalon and New Concept such that it made money. Defendants do not explain how they were able to complete transactions and make money without possessing any shares."

Defendants' Interactive Brokers account statements reflects a positive balance of shares held in the account throughout the period of Defendants' trading. And as the Court found, the Interactive Brokers records and testimony demonstrated that "in all of Mintbroker's transactions, the shares were ultimately delivered." SJ Order, 597 F. Supp. 3d at 654.

Neither of the experts could even explain what they meant by indicating a negative beneficial ownership on their reports under the facts of this case. (Hearing Tr. pp.262-270; 302-303.) The implication is that Mintbroker was selling shares that Mintbroker claims not to own because Mintbroker had assigned owed those shares to clients. As the Court held, Mintbroker's ability to sell these shares only demonstrates Mintbroker's dispositive authority and beneficial ownership of them, regardless of whether the shares sold were also promised to clients.

19

A-1866

Negative beneficial ownership is simply not a concept that exists under the securities laws in any case. Whether Mintbroker "shorted" shares to clients or "shorted" shares to the market, in either case by selling shares that Mintbroker did not own, short positions cannot and do not reduce beneficial ownership below—or even to—zero. Short positions also entail an obligation to acquire and deliver the shares that are shorted (*see generally,* Reg. SHO, Pl. Ex. #15; *see also* Pl. Ex. #16), so that any sale of shares not already held by the seller is required to be accompanied by an agreement to purchase the shares for delivery—which would require the inclusion of the shares within the seller's beneficial ownership.

The Court noted that "Defendants have completely failed to address this point," but in any event had not demonstrated that they shorted any shares at all. SJ Order, 597 F. Supp. 3d at 654 n.24. If Defendants purport to demonstrate that now, they still fail to address the applicable law. It is not possible for Defendants to have sold thousands shares they did not control and thus beneficially own. Therefore, even putting aside all other flaws and deficiencies in the experts' analysis, all negative beneficial ownership values calculated by either of the experts should instead be positive values. The experts' determination of when Defendants crossed the 10% beneficial ownership threshold is thus wholly incorrect and unreliable.

## F. Account MBS0100067 Was Inadequately Addressed by Defendants or Their Experts and Should Be Included Within Defendants' Beneficial Ownership

The Schedule 13D that Defendants filed for New Concept reports trading in Account MBS010067. Under penalty of perjury, Defendants admitted their "beneficial ownership" of the shares in that Account, which they further admitted they traded with a "control purpose." The experts did not review or request to review the Defendants' SEC filings and did not address these admissions. (*See* Point II above.)

20

A-1867

Mr. Christian also independently prepared a summary of client trading by account at DX-6 and DX-7. The Defendants withheld this analysis from Plaintiffs until the day the hearing began. This analysis reflects the calculation of profits realized from transactions entered in this Account at $2,221,090 from Avalon and $5,762,336 from New Concept transactions. (*See* DX-6 and DX-7 at p.2.) None of the other client accounts are calculated to have realized profits approaching $50,000 in either AWX or GBR.

The transactions in Account MBS010067 not only resulted in the most profits realized in any account by far (and more profits realized than in all other client accounts combined), the sheer number of transactions in Account MBS010067 also surpassed all other client accounts. Plaintiffs count the number of transactions entered for Account MBS010067 at 3,001 Avalon transactions; and 7,792 transactions in New Concept. The accounts with the second highest number of transactions had 66 Avalon transactions and 161 New Concept transactions. Most of the client accounts recorded only two transactions in either AWX or GBR.

The Defendants and their experts were unable to deny the volume of trading in this client account. Defendants' counsel admitted to the Court that "there's no other client of that magnitude." (Hearing Tr. 217:18.) No other client even comes close.

Including the transactions ascribed to this client account within Mintbroker's beneficial ownership would significantly expand the time frame during which Defendants were subject to §16(b) and their liability for trades during that period, even if all other client transactions were excluded and "netted out" against corresponding Account 32810 transactions in the manner the experts recommend. (Hearing Tr. p.237.)

Nonetheless, the experts did not inquire into whether Mintbroker had or shared beneficial ownership—voting or investment power—over this Account. Christian testified that he

21

A-1868

would have pulled up the name of this Account owner to confirm that it was something other than an exact match of Defendants' names, but he could not even confirm or "recall" whether he had in fact included this Account in his "sample." He also testified that, as with any other account he sampled, he would not have been bothered if the name on this Account was similar to Defendants, and he did not ask for a list of Defendants' affiliates and aliases to cross-reference against the name of any Account he "sampled," including Account MBS010067, if he sampled that Account at all. (Hearing Tr. pp.238-242.)

The experts also did not inquire into any other indicia of beneficial ownership with respect to this Account (or any other so-called "client account"), including whether Mintbroker was authorized to vote or sell shares held in the Account, and did not ask to review this client account agreement or any others. The experts also did not evaluate whether there were any agreements, arrangements, or understandings between the Defendants and the purported owner of this account with respect to the voting or trading of Plaintiff's stocks, including whether the trading records they reviewed reflected coordinated trading between the Defendants' and the owner of this account. (Hearing Tr. pp.248-250.)

When introducing the experts account-by-account summary to the Court for a different purpose, the Defendants attempted to scroll past the entry for Account MBS010067, the elephant in the "trading room" operated by the Defendants. (Hearing Tr. pp.215-217) (THE COURT: "And can you find the account on here that is the 067 account that we were looking at yesterday"). If Defendants' Interactive Brokers trades included the significant number of transactions recorded for this Account, as the experts contend, the experts would be required to identify his client if they were following guidance for auditing omnibus accounts, as Interactive Brokers attempted to do when conducting a review of Defendants' trading in these stocks and

22

inquiring whether the trading was for Defendant and for a client. (Pl. Ex. #39; *see also* Hearing Tr. p.239.)

Moreover, as Defendants are aware, they themselves are required to identify this client if they now disclaim beneficial ownership of this Account. At the conclusion of the hearing, Defendants brought up the *Microbot* §16(b) case also overseen by Magistrate Judge Lehrburger, in which the parties are represented by the same counsel for the parties in these cases. (Hearing Tr. p.322). Defendants cited this case as providing another example of a foreign broker, in that case Alliance Investment Management, based in Jamaica, that used the DAS Trader and iBoss software that Defendants assert generated the "fulfillments" indicated on the transaction reports they claim to have uncovered only after the Court granted summary judgment for the Plaintiffs and right before briefs on damages were to be submitted. As Plaintiffs pointed out, DAS Trader is a company owned by Mr. Gentile's ex-wife, and formerly co-owned by Mr. Gentile. (Hearing Tr. pp.118-19.) That a foreign broker would use this software to facilitate high-volume day trading, as established in Microbot, is very on brand.

More to the point is that when the broker in *Microbot* disclaimed beneficial ownership of shares that the broker had previously reported in SEC filings, the broker was required to identify the owner of the customer account in which the broker contended the trading had occurred. The client was named as a party to that lawsuit, and only then was the broker's disclaimer of beneficial ownership accepted as a defense to liability.

The same goes for Mintbroker's new defense to liability in this case. Defendants' assertion that Account MBS010067, previously reported within their beneficial ownership, is a "client account" is not established until the owner of that Account is identified and required to file Section 13(d) and 16(a) reports, and disgorge short swing profits realized in violation of §16(b).

23

A-1870

***POINT V.***

**DEFENDANTS' BENEFICIAL OWNERSHIP OF AND PECUNIARY INTEREST
IN SHARES SOLD THROUGH THEIR INTERACTIVE BROKERS ACCOUNT
<u>IS NOT REDUCED BY ANY INTEREST HELD BY MINTBROKER'S CLIENTS</u>**

Defendants have introduced no account agreements reflecting any limitations on their dispositive or voting authority over the shares they sold through their Interactive Brokers omnibus account, and no financial records showing that anyone other than the Defendants received the proceeds of the cash withdrawn from the Interactive Brokers account and transferred to a bank account held by Mintbroker. (*See* <u>Pl. Ex.</u> #11, 12.) Defendants have failed to establish hat any portion of these shares or trading proceeds were not within their beneficial ownership or pecuniary interest and have not met their burden of proving any reduction from Plaintiffs' calculation of their *prima facie* liability.

What Defendants have established is that Mintbroker's records reflect transactions entered for various Mintbroker accounts, some of which correspond to trades executed by Mintbroker through Interactive Brokers. Even to the extent that the Court accepts that any Mintbroker clients had investment authority over any portion of the shares traded by the Defendants through Interactive Brokers, Mintbroker also indisputably had full investment authority over all their Interactive Brokers account, and was also a beneficial owner of all shares in the omnibus account. As Judge Broderick held, "§16(b) [] obviously contemplates situations where the same shares might be deemed 'beneficially owned' by more than one investor." *See* <u>SJ Order</u>, 597 F. Supp. 3d at 655.

Moreover, the Court held that "Defendants had pecuniary interests in these shares because they had the opportunity to and did profit from them." <u>SJ Order</u>, 597 F. Supp. 3d at 656. Even if any Mintbroker clients also had a "pecuniary interest" in any portion of the shares traded by the Defendants through Interactive Brokers, that does not reduce Defendants' pecuniary interest

24

A-1871

in those trades or their §16(b) liability. Mintbroker's clients might have a pecuniary interest in shares of stocks traded by Mintbroker if their agreements provided the right to demand payment equal to the value of the stock assigned to their accounts—similar to the pecuniary interest acquired by the purchase of a call option. Defendants may have promised or intended to make these payments with a portion of their Interactive Brokers trading proceeds. But Defendants' future obligation to deliver shares or their value to any clients does not reduce Defendants' pecuniary interest in shares that they also had the present opportunity to sell—and did sell—at an enormous profit.

What the terms of the Mintbroker client agreements provided and whether any stock or payments were owed to any Mintbroker clients, we may never know – as Defendants have refused to produce them. What we do know is that Mintbroker acquired and retained investment (and voting) control over all the shares in their Interactive Brokers omnibus account, all of which were sold at Defendants' discretion in executed trades from which the Defendants received the full cash proceeds. That is all we need to know to determine the Defendants' §16(b) insider status and the amount of their short swing trading liability.

## CONCLUSION

Judgment for Plaintiffs should be entered in the amount of $6,235,908 (Avalon), and $6,102,002 (New Concept) (Pl. Ex. #13, 13A), plus pre-judgment interest.

Dated:   New York NY
         April 19, 2023


/s/ David Lopez                          /s/ Miriam Tauber
David Lopez (DL-6779)                    Miriam Tauber (MT-1979)

*Attorneys for Plaintiffs*

25

A-1872

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AVALON HOLDINGS CORP.,<br><br>Plaintiff,<br>v.<br><br>GUY GENTILE and<br>MINTBROKER INTERNATIONAL, LTD.,<br><br>Defendants. | No. 18-cv-7291 (DLC) (RJL)<br><br><br>ECF Case |

Related to:

| | |
|---|---|
| NEW CONCEPT ENERGY, INC.<br><br>Plaintiff,<br>v.<br><br>GUY GENTILE and<br>MINTBROKER INTERNATIONAL, LTD.,<br><br>Defendants. | No. 18-cv-8896 (DLC) (RJL)<br><br><br>ECF Case |

**DEFENDANT GUY GENTILE'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' POST-HEARING BRIEF**

1. **Plaintiffs did not make a prima facie showing to support their calculations since they solely rely on records that do not accurately reflect MintBroker's beneficial ownership of shares traded in an omnibus account also containing customer trades.**

Plaintiffs do not dispute that they bear the burden of introducing sufficient evidence to establish the amount of damages. *See* [Avalon, ECF 225 at 2; New Concept, ECF 208 at 2]; *see also RGI Brands LLC v. Cognac Brisset-Aurige, S.a.r.l.*, 2013 WL 1668206, at *6 (S.D.N.Y. Apr. 18, 2013), *report and recommendation adopted*, 2013 WL 4505255 (S.D.N.Y. Aug. 23, 2013). Still, they argue they have met this burden, citing damages calculations based on MintBroker transactions executed through an omnibus account held at InteractiveBrokers (the

"InteractiveBrokers Records"). [Avalon, ECF 225 at 4; New Concept, ECF 208 at 4]. But those InteractiveBrokers Records do not contain information sufficient to distinguish shares beneficially owned by MintBroker from those beneficially owned by its customers.

In their opposition, they argue that "10% 'beneficial ownership' is defined by investment power or voting power over shares." [Avalon, ECF 225 at 1; New Concept, ECF 208 at 1]. This definition tells only part of the story. *See* 17 C.F.R. § 240.16a-1 (explaining that broker-dealers acting as a custodian for securities held for the benefit of its customers are not beneficial owners of those shares); *see also* (Tr. #1 at 139) (Gentile testified: "We were a custodian for clients"). But even accepting this definition of beneficial ownership and assuming the Rule 16a-1 exception does not apply, Plaintiffs failed to present evidence at the damages inquest that MintBroker had the power to direct disposition of shares purchased by its customers or voting power with respect to those shares.

According to Plaintiffs, one could identify "the individuals or entities authorized to vote or dispose of the shares in the relevant accounts" by looking solely at the InteractiveBrokers Records. [Avalon, ECF 225 at 14; New Concept, ECF 208 at 14]. Not only have Plaintiffs presented no evidence to support this position, but the testimony of a representative of InteractiveBrokers, Brad Klauseger, confirmed the opposite. In May 2020, Klauseger made clear that the InteractiveBrokers Records do not contain identifiers distinguishing company accounts and customer accounts and acknowledged that the Omnibus account contained information for multiple underlying customers of MintBroker, as the "introducing broker." (Klauseger Tr. at 6–8). He testified: "With an Omnibus Account, *Interactive Brokers is unable to see the number of customers* that hold any particular position *behind* the US or UL account." (*Id.*) (emphasis added). And, with respect to one of Plaintiffs' key concerns regarding the definition of beneficial ownership, voting power, Klauseger

2

affirmed that it was the "underlying customer" that had the right to vote or dispose of those shares. (Klauseger Tr. 113–14). Additionally, Klauseger had the following exchange with Plaintiffs' counsel:

> Q. [M. Tauber]: Okay. So what is the procedure for exercising the right to vote shares?
>
>        \*\*\*
>
> A. [B. Klauseger]: I believe that we would have some automated system set up to identify the holding of any particular position and inform them that they have the – have proxy voting rights, with respect to some type of voting event.
>
> Q. And so for a broker who holds customer account [*sic*], like assuming, **let's assume for a second that MintBroker had some customers trades in these statements, would Interactive have the record of the customer names, in order to send that information to them?**
>
> A. **No, we would not, due to the Omnibus structure.**

(Klauseger Tr. at 116–17) (emphasis added). That is, as of May 2020, Plaintiffs knew that the InteractiveBrokers Records contained transactions representing customer trades, that they did not distinguish between company trades and customers trades, that they did not contain customer identifying information, and, notably, that it was InteractiveBrokers' understanding that the *underlying customer within the omnibus structure* had the right to vote the shares. Accordingly, Plaintiffs contention that "to identify the beneficial owner of the shares . . . Defendants' experts only had to look at the InteractiveBrokers statements . . . " is wrong and Plaintiffs have known that for the last three years. [Avalon, ECF 225 at 14; New Concept, ECF 208 at 14]. Plaintiffs calculations, relying on the InteractiveBrokers Records which do not show the beneficial owner of the shares executed through the omnibus account, fail to demonstrate even a prima facie showing of damages and must be rejected.

3

A-1875

**2. Gentile presented unrebutted evidence that the expert reports properly exclude profits from trading in shares beneficially owned by MintBroker customers.**

*A. Evidence presented at the hearing confirmed that neither MintBroker nor Gentile had the authority to vote or dispose of customer shares.*

Unrebutted testimony from Gentile, Robert Christian, and Stephen Darville confirmed that accounts that start with letters represent customer accounts, including all accounts beginning with the letters PFS and MBS. (Tr. #1 at 50, 52; Tr. #2 at 203, 233–34; Darville Tr. at 28).[1] And notwithstanding Plaintiffs' failure to carry their initial burden, Gentile did produce evidence that the company did not have voting nor disposition authority with respect to its customers' shares. Specifically, Gentile testified to the following:

> Q. [M. Ford]: . . . Who would have the right to vote a share that was purchased by a client?
>
> A. [G. Gentile]: The client.
>
> Q. Would MintBroker have the capability to dispose of a share that a client purchased through MintBroker?
>
> A. Not without the permission of the client . . .

(Tr. #1 at 81–82). And, as described above, InteractiveBrokers understood that the "underlying customer" would have voting authority with respect to their shares executed through the InteractiveBrokers omnibus trading account. (Klauseger Tr. at 113–14). Also, an example of a MintBroker Client Agreement[2] was included as Defendant's Exhibit #37 at the damages inquest, which featured the following language:

---

[1] Plaintiffs misleadingly suggest that "Defendants admitted their 'beneficial ownership' of shares" through Schedule 13D filings. [Avalon, ECF 225 at 18, 20; New Concept, ECF 208 at 18, 20]. But that document instead provided: "(a) The Reporting Persons beneficially own No Shares. (b) Neither of the Reporting Persons have sole power to vote or to direct the vote, any shared power to vote or to direct the vote, any sole power to dispose or to direct the disposition of, and any shared power to dispose or to direct the disposition of, the Shares." (Pl. Ex. #6A).

[2] Plaintiffs' opposition incorrectly claims that Gentile has "refused to produce" MintBroker client agreements. Throughout discovery, it was made clear to Plaintiffs that signed copies of Client Agreements could not be produced because Gentile lacked access to MintBroker records and that, even if he had access to them, production would constitute a violation of Bahamian privacy laws. Similarly, Plaintiffs accusation that Gentile "withheld" the

4

A-1876

25. CUSTODY OF CUSTOMER ASSETS . . . Subject to the margin provisions of this Agreement (if applicable) and the rights of lien which may arise in favor of Swiss America under this Agreement, **Swiss America declares that the Customer will enjoy a beneficial ownership in (a) securities purchased on its behalf** and (b) any free cash balances held by Swiss America for the account of the Customer and these assets are not to be treated as general assets of Swiss America.

\*\*\*

FOREIGN SECURITIES. If my account contains securities issued by a foreign issuer (foreign to the Commonwealth of The Bahamas)[3], **I acknowledge that Swiss America is acting solely as custodian with respect to such securities** and has no obligation to provide me any proxies, annual statements or other disclosures from the issuer or to facilitate my participation in any rights offer or other transaction that the issuer conducts with or offers to holders of its securities.

(DX-37 MintBroker Client Agreement). Thus, the evidence presented at the damages inquest demonstrates that neither MintBroker nor Gentile had the authority to vote or dispose of customer shares. Plaintiffs presented no rebuttal evidence.

> B. *Plaintiffs' lawyer arguments as to the reliability of the experts' methodology and calculations are meritless.*

Plaintiffs assert that their calculations exclude "additional or duplicative 'Suretrader' transactions" reflected in the MintBroker Records while arguing that the MintBroker Records relied on by Gentile's experts "exclude trades that Defendants executed through their Interactive Brokers account whenever a corresponding transaction was recorded by the Defendants as 'executed' for a 'client account' on 'Suretrader.'" [Avalon, ECF 225 at 8; New Concept, ECF 208 at 8]. They similarly argue: "The process applied by the experts was exactly backwards. The

---

attachments to Robert Christian's report at DX-6 and DX-7 is unequivocally false. Those summaries were included as Exhibit E and Exhibit F to Robert Christian's report, were produced to Plaintiffs at the same time as production of the rest of the report and attachments, are featured on the docket at Avalon, ECF 107-6; New Concept ECF 96-6; and, remarkably, were used by the Plaintiffs in their questioning of Robert Christian. (Tr. #2 at 275).

[3] This would include securities traded in US markets, including AWX and GBR in this case.

5

experts should have isolated the entries that represented actual exchange executed transactions—not excised them . . ." [*Id.* at 14]. These notions contradict all testimony presented at the hearing. Every trade executed through the InteractiveBrokers omnibus account is also included in the MintBroker Records and was factored into the experts' analysis. (*See* Tr. #2 at 206) (Christian explaining "all accounts" were included in his report). The only trades "excluded" in the experts' *calculations* were transactions initiated by MintBroker customers who beneficially owned the shares.

They also argue that the experts did not follow "accepted audit or accounting procedures" in their analysis. [Avalon, ECF 225 at 15; New Concept, ECF 208 at 15]. Again, this is not right. At the damages inquest, Christian explained repeatedly that this was an "agreed-upon engagement" whereby he followed standard accounting procedures under the guidelines of the AICPA (American Institute of Certified Public Accountants). (Tr. #2 at 194–95)[4]. He was not engaged to perform an "audit" of MintBroker, which would have far exceeded what the damages inquest called for. Nevertheless, Christian described the multiple procedures he utilized to become comfortable with the distinction between company and customer accounts (through a sample review of accountholder names) and to determine customer-initiated trades reflected in the #32810 account.[5]

Likewise, Plaintiffs mistakenly insist that the expert reports "incorporate a nonsensical concept of 'negative' beneficial ownership . . ." [Avalon, ECF 225 at 18; New Concept, ECF 208 at 18]. But the expert reports do not reflect purportedly "negative beneficial ownership." The

---

[4] The second expert, Brenden Beresford performed a narrower scope of analysis and was engaged to confirm the accuracy of the calculations. He testified that he relied on information provided to him regarding customer trading information. (Tr. #2 at 289–90).

[5] This is described in Gentile's post-hearing brief, along with an explanation for the experts' exclusion of recordkeeping entries in the #32812 account. [Avalon, ECF 224 at 7, 14–15; New Concept, ECF 207 at 7, 14–15].

6

A-1878

collection of data reviewed by the experts was **pulled directly** from the iBoss system into a .csv spreadsheet, which included data beginning on a random date in June. Because of the arbitrary date, sales immediately following that date appear to reflect a short position. Regardless, all parties agree the trades at issue occurred weeks later in July, rendering irrelevant the argument that Christian's chart showed purported "negative beneficial ownership" during a time completely outside of the scope of the damages inquest.

Plaintiffs' misunderstanding is further highlighted by their suggestion that the experts' calculations improperly exclude "riskless principal" trades. [Avalon, ECF 225 at 15; New Concept, ECF 208 at 15]. As Gentile explained at the hearing, riskless principal trading occurs when the customer initiates an order and MintBroker facilitates the transaction by acquiring the shares from the market and instantaneously transferring them to the customer. (Tr. #1 at 92–93, 130–32, 182–83). In those transactions, MintBroker is never the beneficial owner of the shares and has no economic interest in those shares (beyond standard commissions). Thus, exclusion of profits made by customers through riskless principal trades were *properly excluded* from the experts' calculations.

Finally, in Plaintiffs' opposition brief, they present for the first-time new charts (attached as appendices to their brief), which were not produced and not presented at the inquest hearing. Like the rest of Plaintiffs' efforts to avoid the undeniable error of their reliance on the incomplete InteractiveBrokers Records, these new charts they created do nothing to rebut, challenge, or even really address the experts' accurate calculations. They should be disregarded. The charts represent unauthenticated, uncorroborated lawyer's arguments that purportedly call into question the experts' damages calculations without any supporting evidence or context. Plaintiffs had their

opportunity to engage experts and to present evidence to rebut the reliability of the MintBroker Records and Gentile's experts, but Plaintiffs declined.

3. **Plaintiffs' post-hearing opening brief misrepresents Gentile's testimony concerning his control over customer trading activity and the purported effect of Judge Broderick's summary judgment order.**

Plaintiffs' arguments regarding Gentile's control over MintBroker's operations are not supported by the record. For example, Plaintiffs incorrectly assert: "*Gentile testified that he alone controlled whether to execute trades on the market* in MintBroker's Interactive Brokers account, and that customer transactions that were otherwise reconciled internally or 'executed' by Mintbroker [] were not reported to the market and did not represent market trades. (Hearing Tr. pp.40-41, 48.)" [Avalon, ECF 225 at 8; New Concept, ECF 208 at 8] (emphasis added). But Gentile did not testify that he controlled whether to execute trades on the market and no language to support that assertion by Plaintiffs appears on the transcript pages they cite. In fact, on Page 48 of the transcript, Gentile testified that once a customer placed an order, MintBroker's "algorithm" would decide whether to send the order for execution through InteractiveBrokers or another clearing firm. (Tr. #1 at 48). And, when asked if MintBroker could "decide" whether or not to fulfill customer orders from inventory, Gentile clarified: "No . . . it was automated for the most part . . ." (Tr. #1 at 134). Gentile testified only that if certain stocks were "extremely volatile," MintBroker's trade desk managers had the ability to block fulfilment through the inventory account for that particular symbol. (Tr. #1 at 134–35).

Gentile also testified to the following:

> A. [G. Gentile]: . . . it wasn't something that I would do, it's something that the trade desk managers would do based on risk that they're monitoring -- they can turn off some stocks to interact with our trading account.
>
> Q. [M. Tauber]: Don't the trade desk managers report to you?

A-1880

A. No. I wasn't -- I wasn't there all the time. The trade desk managers were the managers. They were the ones who managed the trading desk.

Q. They had -- they had complete authority to just change the algorithm or do whatever they wanted with --

A. No. They weren't changing algorithms. They just had some controls like, turn off this -- this stock. They were managing risk; that's what they were doing.

Q. And they could do that without speaking with you, without consulting you.

A. Correct.

(Tr. #1 at 135–36). And MintBroker's former IT manager, Stephen Darville, confirmed that Gentile was rarely present in the office, testifying that MintBroker employees "didn't really see him often" as Gentile would just "pop in" every few months. (Darville Tr. at 106–07).

Similarly, Plaintiffs inaccurately suggest: ". . . Mr. Gentile testified that *he had the authority to close out client positions and cancel client orders*. (See, e.g., Hearing Tr. p.176-180.)" [Avalon, ECF 225 at 17; New Concept, ECF 208 at 17] (emphasis added). But he never said that. At the inquest hearing, Gentile testified only that if a customer did not meet margin requirements, they could be forced to liquidate their position.[6] (Tr. #1 at 176–77). He *did not* testify that he had authority to close client position or cancel client orders.

Along these same lines, Plaintiffs misperceive the significance of Judge Broderick's findings on summary judgment in this damages inquest. *See* [Avalon, ECF 225 at 7, 16, 24; New Concept, ECF 208 at 7, 16, 24]. First, it is already well-established that at the time of summary

---

[6] Broker-imposed margin requirements—and the broker's ability to close a position if an investor is unable to meet a margin call—are a well-known, accepted industry practice. *See* James Chen, *Margin Call: What It Is and How to Meet One with Examples*, Investopedia.com, Mar. 15, 2023, https://www.investopedia.com/terms/m/margincall.asp ("If an investor isn't able to meet the margin call, a broker may close out any open positions to replenish the account to the minimum required value. They may be able to do this without the investor's approval.").

9

A-1881

judgment, Gentile was unable to obtain the MintBroker documents. The reasons for Gentile's good faith delayed production of the MintBroker Records were described in Gentile's post-hearing brief, [Avalon, ECF 224 at 4–6, 9; New Concept, ECF 207 at 4–6, 9], his opposition to Plaintiffs' motion *in limine*, and through his testimony at the inquest hearing (See Tr. #1 at 73–74). Because these records were never considered on summary judgment, that Order did not address the beneficial ownership issues addressed at the damages inquest.

The issue before this Court, whether shares beneficially owned by MintBroker's customers should be excluded from the calculation of short-swing profits, was not briefed, argued, or otherwise considered on summary judgment.[7] In fact, at the close of summary judgment, Judge Broderick's Order acknowledged "the parties still dispute the amount of profits Defendants earned, including the exact period of time that Defendants were more-than-10% beneficial owners . . ." [Avalon, ECF 225 at 25; New Concept, ECF 208 at 25]. This is precisely why this matter was referred to Your Honor for this inquest on damages. *See* [Avalon, ECF 225 at 1; New Concept, ECF 208 at 1] (Plaintiffs acknowledging "the object of the inquest—to determine *when* the Defendants were more-than-10% beneficial owners") (emphasis added). Plaintiffs make their arguments, and rely on the summary judgment Order, under the assumption the MintBroker Records are not going to be considered by Your Honor. To the extent the trading records are admitted, Plaintiffs' argument concerning the import of the summary judgment order have no value. Their attempted distractions from the client trading distinction demonstrated in the MintBroker Records must fail.

---

[7] On summary judgment, Judge Broderick understood the crux of Defendants' argument to be that MintBroker never "purchased or sold" the securities because naked shorting caused the existence of phantom shares, that is, shares that did not exist and were not available for purchase. He nonetheless concluded that the obligation to settle created an ownership interest. Through additional company records and testimony, Gentile proved at the damages inquest that the "beneficial owners" of many of these "phantom shares" were MintBroker clients, not MintBroker.

A-1882

Dated: May 19, 2023                                  FORD O'BRIEN LANDY LLP

                                                     /s/ Matthew A. Ford
                                                     Matthew A. Ford
                                                     Cara J. Filippelli (pro hac vice)
                                                     275 Madison Avenue, Fl.24
                                                     New York, NY 10016
                                                     mford@fordobrien.com
                                                     cfilippelli@fordobrien.com
                                                     212.858.0040

                                                     *Attorneys for Defendant Guy Gentile*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the Defendant Guy Gentile's

Response in Opposition to Plaintiffs' Post-Hearing Brief was served this 19th day of May 2023

via CM-ECF on all counsel.

                                                     By: /s/ Matthew A. Ford
                                                     Matthew A. Ford

11

A-1883

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AVALON HOLDINGS CORP., | No. 18-cv-7291 (VSB) (RJL) |
| Plaintiff, | |
| v. | ECF Case |
| GUY GENTILE and MINTBROKER INTERNATIONAL, LTD., | |
| Defendants. | |

Related to:

| | |
|---|---|
| NEW CONCEPT ENERGY, INC. | No. 18-cv-8896 (VSB) (RJL) |
| Plaintiff, | |
| v. | ECF Case |
| GUY GENTILE and MINTBROKER INTERNATIONAL, LTD., | |
| Defendants. | |

<u>**PLAINTIFFS' POST-HEARING REPLY BRIEF**</u>

David Lopez (DL-6779)
LAW OFFICES OF DAVID LOPEZ
171 Edge of Woods Road | P.O. Box 323
Southampton NY 11969-0323
(631) 287-5520 | DavidLopezEsq@aol.com

Miriam Tauber (MT-1979)
MIRIAM TAUBER LAW PLLC
885 Park Ave. # 2A
New York NY 10075
(323) 790-4881| MiriamTauberLaw@gmail.com

*Attorneys for Plaintiffs*

A-1884

## <u>OVERVIEW</u>

Defendants' Post-Inquest Brief demonstrates that Mintbroker and Gentile have no competent evidence relevant to the Court's inquiry into damages. Defendants attempt to show times when Mintbroker customers were allocated claims of ownership against shares owned in Mintbroker's Interactive Brokers omnibus account. This is sleight of hand. The issue before the Court is not whether or when Mintbroker *customers* were beneficial owners. The issue is when *Mintbroker itself* was a more-than-10% beneficial owner. Two or more persons can share beneficial ownership.

Even accepting, *arguendo*, that journal allocations represent customer "beneficial ownership" of referenced shares, Defendants were *also beneficial owners* of the shares for purposes of determining when they crossed the 10% threshold under SEC Rule 16a-1. Defendants admit—and even emphasize in their Brief—that they used the omnibus account to engage in proprietary trading and did not segregate "customer" shares. Regardless of any customer claim of beneficial ownership to any shares traded through the omnibus account (which has not been asserted by any customers, or proven by Defendants), Defendants exercised investment control over the entirety of the omnibus account and were thereby beneficial owners of all shares in the account as defined by the applicable SEC Rule.

As Judge Broderick explained, Plaintiffs established that Defendants beneficially owned the shares in the omnibus account—i.e., that Defendants had the authority to sell the shares—because Defendants did, in fact, sell those shares, and at a substantial profit. The record also establishes that Defendants cashed out those profits by withdrawing funds from the omnibus account. Without any evidence that any of those withdrawals or any funds were ever segregated or custodied in designated customer accounts, Defendants' own brokerage statements require entry

1

A-1885

of judgment in the amounts calculated by Plaintiffs under the strict liability statute. *See* <u>SJ Order,</u> 597 F. Supp. 2d at 656 ("the trading records demonstrate that Defendants successfully sold thousands of shares that they bought at a much lower price, and Defendants have failed to create a genuine dispute that they have not reaped the profits between the purchase price and the sale price.") Judge Broderick's reference of the case to Your Honor to compute damages has been re-interpreted by the defense to be an invitation to re-litigate the whole of the case, liability included, using a purpose-built and indefensible methodology that should be excluded or otherwise rejected as inconsistent with the law and facts of this case.

**I.**    <u>It Is Defendants' Burden to Prove Their Liability Is Less Than Plaintiffs Calculate</u>

Defendants wrongly assert that Plaintiffs bear the burden of proving damages. Defendants cite standards applied in cases not involving §16(b) strict liability, or any provision of the federal securities laws. (Def. Br. p.8) (citing trademark, breach of contract cases). The burden of the parties in this case is well established: "The Plaintiff in a §16(b) action bears the burden of making a *prima facie* showing of the maximum profit made by the defendant on the short swing sale. The burden then shifts to defendant to prove the extent to which the actual profit was less than this maximum." *Lewis v. Realty Equities Corp. of N.Y.*, 396 F. Supp. 1026, 1032 (S.D.N.Y. 1975); *Stella v. Graham-Paige Motors Corp.*, 232 F. 2d 299, 302 (2d Cir. 1956). As Judge Broderick held:

> Plaintiffs bear the ultimate burden of proof at trial that Defendants actually "purchased" or "sold" the shares, or were ever more-than 10% beneficial owners of the companies. Bearing in mind this burden of proof, and, after reviewing all the evidence submitted by the parties, I find that Plaintiffs have met their burden of establishing that no genuine factual dispute exists and that no reasonable jury could find for Defendants. Therefore, Plaintiffs in both actions are entitled to judgment as a matter of law. *Avalon Holdings Corp. v. Gentile* ("<u>SJ Order</u>"), 597 F. Supp. 2d 640, 650 (S.D.N.Y. 2022).

2

A-1886

The evidence cited by Judge Broderick included "the trading records that display thousands of trades by Mintbroker in Avalon and New Concept shares during the Short Swing Periods." Id. at 651. These records establish when Defendants became subject to the statute, as reflected at Pl. Ex. #8, #8A, and their short swing profits are calculated by applying the lowest-in/highest-out algorithm, *see* Pl. Ex. #13, #13A. Plaintiffs have made their *prima facie* case. The burden has shifted to the Defendants. *See Stella*, 232 F. 2d at 302 (Defendants' own "statements of profit" established plaintiff's *prima facie* §16(b) claim). As Your Honor stated at the pre-inquest conference:

> "I already have before me, before there was this issue with the new documents—enough information to issue an inquest ruling without the need for a hearing. The hearing came up because of the issue raised by the Defendants in terms of this new information that suggests, at least according to the Defendants, that the … amount that would be payable as a result of Summary Judgment would be far less than what Plaintiffs have currently calculated. So the Court already has what it needs with respect the Plaintiffs' calculations and everything related to that. The hearing is focused on this new material and [whether it] comes in and what its significance is." (1/18/2023 Conf. Tr., *Avalon* Dkt #199 pp.17-18.)

Defendants refused to produce a single client agreement reflecting Mintbroker's authority over client accounts—the critical inquiry in determining whether Mintbroker is the "beneficial owner" of shares held in client accounts. They refused to produce any customer account statements or financial records reflecting that any trading proceeds were transferred or credited to customers. Their selective records and self-serving testimony fail to prove any reduction in their beneficial ownership or liability. *Schur v. Salzman*, 365 F. Supp. 725, 734 (S.D.N.Y. 1973) (testimony insufficient to prove §16(b) exemption absent corroborating documentary evidence).

## II. The "Foreign Registered Broker" Exemption Does Not Apply

In their Post-Hearing Brief, and for the first time in the five years that these cases have been pending, Defendants attempt to invoke the beneficial ownership exemption provided to

3

A-1887

qualified foreign broker/dealers under SEC Rule 16a-1(a)(1)(i), (x), 17 C.F.R. §240.16a-1. The availability of an SEC Rule exemption is an affirmative defense that Defendants are required to plead and prove. *See Packer v. Raging Capital Mgmt., LLC*, 242 F. Supp. 3d 141, 149 (E.D.N.Y. 2017) (plaintiff was not required to plead the unavailability of SEC Rule exemption to §16(b), which is an affirmative defense that defendant must prove) (citing *Rosen v. Brookhaven Capital Mgmt., Co., Ltd.*, 194 F. Supp. 2d 224, 228 (S.D.N.Y. 2002); *see also Sun River Energy v. McMillan*, 2014 WL 4771852, (N.D. Tex. Sept. 25, 2014) (citing numerous cases holding that "statutory exemptions to §16(b) liability on which defendants rely are affirmative defenses that must be pleaded under F.R.C.P. 8(c)"). Defendants failed to plead the availability of the foreign broker exemption as an affirmative defense in their Answer and failed to raise it in opposing or moving for summary judgment. They have waived any defense based on the exemption and cannot raise it in the context of these proceedings.

Apart from their characteristic disregard for procedure, Defendants cannot establish their entitlement to the exemption in any case. The exemption is available to enumerated qualified institutions, including U.S.-registered and "foreign equivalent" broker/dealers, that hold securities "for the benefit of third parties or *in customer or fiduciary accounts* in the ordinary course of business as long as such shares are acquired … *without the purpose or effect of changing or influencing control of the issuer.*" 17 C.F.R. §240.16a-1 (emphasis added).

The omnibus account was not a "customer" or "fiduciary" account, but an account used for proprietary trading by Mintbroker at Gentile's discretion. Additionally, in the Scheds. 13D filed in response to these lawsuits, Defendants admit that they acquired and exercised investment and voting control over Plaintiffs' stocks for a control purpose disqualifying them from the same foreign broker/dealer exemption applicable under §13(d). (Pl. Ex. #6, #6A, Item 4.) *See*

4

A-1888

*generally* Romeo & Dye, *§16 Treatise & Reporting Guide* 5th ed. §2.03(5)(d)) (Rule 16a-1 "beneficial ownership" exemptions for qualified institutions track the analogous Rule 13d-1 exemptions). Defendants also asserted this control purpose in statements to the media (*see* Compl., *Avalon* Dkt #1 ¶19), and through counsel in response to Interactive Brokers' investigation into their trading of these stocks. (*See* Pl. Ex #21; Interactive R.30(b)(6) Dep. Tr., Pl. Ex #2 p.127.)

Defendants also cannot claim the "foreign registered broker" exemption because Mintbroker International, Ltd., the entity that held and traded the omnibus account, was not properly registered with the Bahamas Securities Commission. Mintbroker formerly operated under the name Swiss America Securities ("SASL") and had not sought authority for the name change. This is what prompted the Bahamas Securities Commission to investigate and ultimately liquidate Mintbroker. (*See* Hearing Tr. p.3; Gentile Pre-Inquest Dep. Tr., Pl Ex. #34 p.8; Winding-Up Pet., 12/11/2019 Ltr., Pl. Ex #37 p.149) Interactive Brokers also flagged Mintbroker's failure to obtain the required regulatory approval to operate under a new name in conducting the investigation that ultimately led Interactive Brokers to close Mintbroker's omnibus account. (Pl. Ex #27 pp.34-37.)

Moreover, foreign brokers who solicit U.S. customers are required to register as U.S. broker/dealers under Sec. Exch. Act §15(a), 15 U.S.C. §77(a), and cannot claim the regulatory exemptions available to foreign institutions. The SEC is currently suing Mintbroker in the Southern District of Florida for failing to register under U.S. regulations during the short swing trading periods. *SEC v. Mintbroker Internat'l Ltd.*, No. 21-CV-21079 (S.D. Fl., Compl., Dkt #1, filed 3/22/2021.) The SEC alleges that the majority of Mintbroker's customers were U.S. citizens solicited through seven "day trading school websites" that Mintbroker "referred to internally as 'affiliates,'" who were given "free access to Mintbroker's trading platform" and other preferences (Id. ¶52, §2.c).

5

A-1889

Defendants have refused Plaintiffs' post-discovery requests for information about the identities of the account owners indicated on the records they seek to introduce—including any affiliated account owners, and the owner of Account #MBS010067, Defendants' single largest client, which Defendants contend is responsible for the transactions reported in their New Concept 13D as executed with a "control purpose" and with "margin funds." (Pl. Ex. #6A.) Defendants have similarly refused to provide this information to the SEC in the case pending in Florida.

Which is yet another reason why the foreign broker exemption is unavailable to Mintbroker. The exemption is extended by the SEC to foreign institutions that are subject to foreign disclosure requirements similar to §13(d), or where the SEC would not have difficulty obtaining Schedule 13D information. *Brian V. Breheny*, SEC No-Action Letter, 2006 WL 1318692, at *1 (May 5, 2006) ("We also note the undertaking by the Canada Pension Plan Investment Board to furnish to the Commission, upon request, the information that would be required to be disclosed if it filed Schedules 13D"). Defendants' refusal to produce the information required to be disclosed under §13(d) precludes them from claiming the benefit of the exemption.

## III. Mintbroker's Customer Transactions Do Not Reduce Defendants' Beneficial Ownership or §16(b) Liability

Defendants' "beneficial ownership," for purposes of determining their status as 10% beneficial owners subject to §16(b), is defined to include all shares within their dispositive or voting authority. Defendants had dispositive authority and voting authority over all shares held in the omnibus account—even if they claim to have exercised that authority on behalf of any Mintbroker customers (*see* above re: unavailability of the exemption for qualified broker/dealers).

Defendants' Post-Hearing Brief asserts that Mintbroker's clients "were trading through the omnibus account" (Def. Br. 4), that the omnibus account included "trades placed by [Mintbroker's] clients" (Def. Br. 16), or transactions "initiated" by Mintbroker's clients. But as

6

A-1890

Gentile testified, Mintbroker's clients did not have the ability to "place trades" in the omnibus account. Instead, Mintbroker's clients "entered orders" in their Suretrader accounts. Gentile, in his sole discretion, determined whether to "fulfill" client orders by placing a corresponding trade in Mintbroker's omnibus account at Interactive Brokers. (Hearing Tr. pp.37-40; Gentile Dep. Tr., Pl. Ex #1 p.58.)

The Interactive Brokers Consolidated Account Clearing Agreement (the "IB Clearing Agreement") governing the omnibus account provided Mintbroker with the option of permitting customers to trade the omnibus account directly. (*See* appended Tauber Aff. Ex. A ¶E.1.) Gentile explains that he deliberately chose not to provide clients with direct trading capabilities because he wanted to be able to force clients to trade against each other without submitting or reporting their orders to the market, which was prohibited by Interactive Brokers (Hearing Tr. pp.38-40; *see also* Def. Br. p.4 n.2), and by numerous U.S. broker/dealer regulations, e.g., "best execution" and "conflict of interest" rules.

Defendants characterize the customer's Suretrader order and any corresponding trade placed by Gentile in Mintbroker's omnibus account trade as "riskless principal" trading. (Def. Br. p.14; Hearing Tr. pp.24-25). In true "riskless principal" trading, a broker goes into the market to fulfill a customer order and immediately deposits the shares or funds into a designated "principal trading" account or into the customer account. *See, e.g.,* Reg-SHO, 17 C.F.R. §242.201(a)(8) (Pl. Ex. #15 p.4.) The IB Clearing Agreement provided the option of creating "sub-accounts" for this purpose. (Clearing Agreement, Tauber Aff. Ex. A ¶D.3.) Gentile did not utilize this option. (*See* Hearing Tr. p.142.)

The IB Clearing Agreement permitted Minbroker to use the omnibus account for "proprietary" trading but required Mintbroker to "maintain its proprietary and customer accounts

7

A-1891

in such a manner as to enable Interactive and FINRA to specifically identify the proprietary and customer accounts." (Clearing Agreement, Tauber Aff. Ex. A ¶3.M.) Gentile used Mintbroker's omnibus account to engage in proprietary trading and for the trading he tells the Court were "initiated" by clients, *without differentiation*. (Def. Br. p.5.) Because Defendants failed to segregate customer and proprietary trades, any shares in the omnibus account could be sold by Defendants in a proprietary trade executed at their discretion and for their own account—even shares purportedly acquired "on behalf" or at the "initiation" of a Mintbroker client. *See Capital Mgmt. Select Fund Ltd. v Bennett*, 680 F.3d 214, 220-221 (2d Cir. 2012) (customer agreements permitted the use of client funds and securities for proprietary trading by broker).

Judge Broderick found that Defendants did in fact sell all of the shares. While Defendants describe some of the transactions they attempt to exclude as customer transactions against "inventory" (Def. Br. p.15), no shares were transferred from the omnibus account into an inventory or "principal trading" account or customer account. All shares acquired in the omnibus account were sold on the open market from the omnibus account at Gentile's direction.

Judge Broderick also held that Defendants profited from these sales. Defendants' Interactive Brokers statement reflects their actual cash profits of $6,727,617.45 in New Concept and $5,605,946.91 in Avalon. (Pl. Ex. #4 p.134, #4A *(complete version at* New Concept *Dkt #69-4)* p.60) (*See* Interactive Dep. Tr., Pl. Ex. #2 p.32). The omnibus account statements reflect the disbursement of funds from the omnibus account at the direction of Mintbroker employee Antonio Collie. (Pl. Ex. #17 p.2, #17A p.9). No financial records or account statements reflecting that any customers were recipients of these withdrawals are in evidence.

Defendants' refusal to identify affiliated accounts, and their admitted practice of internally reconciling Mintbroker's customer transactions after the conclusion of each trading day

8

A-1892

(Hearing Tr. p.46), also raises the distinct possibility that Defendants profited from trading affiliated accounts at the expense of other client accounts (Hearing Tr. p.275). *See SEC v. Strong Inv. Mgmt., Ltd.*, No. 18-CV-293, 2018 WL 8731559, at \*6 (C.D. Cal. Aug. 9, 2018) (adviser delayed allocating omnibus account securities to client accounts until after he observed how securities performed throughout the day, allocating profitable trades to himself and unprofitable trades to clients, reaping substantial profits at clients' expense); *Valor Capital Asset Mgmt., LLC,* SEC Release No. 4864, 2018 WL 1234187 (Mar. 6, 2018) (cherry-picking scheme in which profitable trades from omnibus trading account were allocated to adviser's personal account and unprofitable trades to client accounts.)

## IV.    Plaintiffs' Motion *in Limine* Should Be Granted

Plaintiffs' Motion *in Limine* (Avalon Dkt #194; New Concept Dkt #183), a decision on which was deferred pending the inquest, should now be granted. To be clear, Gentile has been in possession, custody, or control of all records at all times throughout this litigation. No order of the Supreme Court of the Bahamas enjoined him from discharging his discovery duties to this Court. Gentile has consistently testified that a complete copy of Mintbroker's files were delivered to his personal Bahamian counsel (in addition to the copy delivered to Mintbroker's counsel)— which is how he selectively retrieved the files he presented to his experts and seeks now to present to the Court. Plaintiffs also remind the Court that any claimed unavailability of corroborating account and financial records was caused solely by Gentile's voluntary dissolution of Mintbroker while discovery was pending, a dissolution contrary to the directive of the Bahamas Securities Commission, which required a reconciliation of customer accounts and audited financial records as a pre-condition. Gentile simply locked the door, turned off the lights and left the jurisdiction.

9

A-1893

To avoid attribution of beneficial ownership over customer shares (and reconcile his affirmative representations to the Court and to Plaintiffs during discovery), Gentile testified and asserts that he did not exercise discretionary authority over customer "managed accounts." Absent production of customer account agreements themselves, Gentile's testimony describing their contents is excludable under the "best evidence rule," F.R.E. 1001, *et. seq.*, even if exclusion were not *also* warranted as a discovery sanction under F.R.C.P. 37.

Defendants' experts did not review any account agreements or documents relevant to Defendants' "beneficial ownership" of so-called "customer accounts," or the Interactive Brokers omnibus account statements that were the basis for Judge Broderick's finding of liability. Their reports and testimony are irrelevant and unhelpful, and therefore also excludable under F.R.E. 702.

The experts' analysis is also wrong. Apart from not knowing that beneficial ownership turns on voting or dispositive control, we discuss the nonsensical concept of "negative" beneficial ownership used by the experts at Pt. IV.E. of our main Brief. This concept is at odds with the law and facts of this case. To illustrate, the chart below compares the total AWX trading on July 24, 2018: (i) reflected in the omnibus account statements (and included in Plaintiffs' calculations); (ii) indicated in Mintbroker's journal as executed "by or on behalf" of customers; and (ii) included by Defendants' experts. (A similar chart prepared by Plaintiffs was cited by the Court at <u>SJ Order</u>, 597 F. Supp. 3d at 644-45 nn.6, 13-14).

| AWX 7/24/2018* | Interactive Brokers omnibus account | "Client" transactions *(per "new" materials)* | Expert-included "Mintbroker" transactions |
|---|---|---|---|
| **Total Buys** | 624, 073 | 763,442 | 37,355 |
| **Total Sells** | -99,086 | -144,310 | -125,867 |
| **Net Position** *(end of day)* | **524,987** | **619,132** | **-88,512** |

*\* Mintbroker owned 0 AWX shares prior to the first trade on July 24, 2018.*

10

A-1894

Mintbroker owed more AWX shares to clients than Mintbroker held in the omnibus account at the end of the trading day. This difference is approximately equal to the "negative" beneficial ownership calculated by Defendants' experts. Plaintiffs' main Brief Pt. IV.C. discusses how Gentile used the omnibus account to "hedge" off-market transactions entered by Mintbroker's customers on the "Suretrader" system—but he maintained total investment control over—*and "beneficial ownership" cf*—the omnibus account. *See SEC v. Worldwide Markets Ltd.*, No. 19-CV-14205 (D.N.J., Compl. ¶41, filed 6/25/2019) (broker sold "contract-for-difference" positions to customers "then hedged its exposure by making a corresponding trade in the security underlying the CFD using an omnibus held in its own name at a U.S.-registered broker-dealer.") The experts were hired to calculate Mintbroker's "unhedged" position—i.e., shares Mintbroker claimed to hold for customers, but did not own (or, where a positive number is indicated, shares held in the omnibus account within Mintbroker's control but without a customer order). Gentile has repeatedly opined that only these "unhedged" shares should "count" under §16(b). The law is otherwise.

## CONCLUSION

Judgment should enter for the Plaintiffs as calculated at <u>Pl. Ex. #13, #13A</u>, plus pre-judgment interest as computed at *New Concept* Dkt #91-2, *Avalon* Dkt #102-2. Exclusion and/or alternative sanctions are warranted under F.R.C.P. 37, including: attorneys' fees incurred in pre-inquest discovery; interest accruing from entry of Summary Judgment; such other relief as the Court deems appropriate.

Respectfully submitted,

| | |
|---|---|
| */s/ David Lopez* | */s/ Miriam Tauber* |
| David Lopez (DL-6779) | Miriam Tauber (MT-1979) |

*Attorneys for Plaintiffs*

11

A-1895

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AVALON HOLDINGS CORPORATION,<br><br>        Plaintiff,<br><br>-against-<br><br>GUY GENTILE and MINTBROKER INTERNATIONAL, LTD.,<br><br>        Defendants. | 18-CV-7291 (DLC)(RWL)<br><br>18-CV-8896 (DLC)(RWL) |
| NEW CONCEPT ENERGY, INC.,<br><br>        Plaintiff,<br><br>-against-<br><br>GUY GENTILE and MINTBROKER INTERNATIONAL, LTD.,<br><br>        Defendants. | |

**DEFENDANT GUY GENTILE'S OBJECTIONS TO THE REPORT AND RECOMMENDATION TO HON. DENISE L. COTE: SHORT-SWING PROFITS AWARD**

12253004-15

A-1896

Table of Contents

Page

Preliminary Statement....................................................................................................1

Statement of Facts........................................................................................................3

      A.    Mr. Gentile and MintBroker ................................................................3

      B.    Procedural History ..............................................................................4

      C.    The MintBroker Records, Damages Inquest, and Report and
          Recommendation ................................................................................7

Legal Standard ............................................................................................................10

Objections ...................................................................................................................11

   I    THE R&R FAILED TO CONSIDER MR. GENTILE'S PECUNIARY
       INTEREST.................................................................................................11

   II   THE R&R FAILED TO PROPERLY WEIGH THE MINTBROKER
       RECORDS  AND EXPERT TESTIMONY RELATING TO THOSE
       RECORDS .................................................................................................14

      A.    The R&R Erred By Refusing to Consider the MintBroker Records
          and Related Testimony ......................................................................15

      B.    The R&R Improperly Excluded Mr. Gentile's Expert Witnesses. ...........17

   III  THE R&R INCORRECTLY DETERMINED SHORT-SWING PROFITS.........20

   IV  THE R&R ERRONEOUSLY AWARDED PRE-JUDGMENT
       INTEREST.................................................................................................22

   V   PLAINTIFFS LACK STANDING.......................................................................23

Conclusion ..................................................................................................................25

i

A-1897

Table of Authorities

Page

CASES

*Avalon Holdings Corp. v. Gentile,*
 18-cv-7291, Dkt. Nos. 202, 204...........................................................................................3

*Avalon Holdings Corp. v. Gentile,*
 597 F. Supp. 3d 640 (S.D.N.Y. 2022).............................................................................6, 12

*Avalon Holdings Corp. v. Gentile,*
 597 F. Supp. 3d at 655–56 .................................................................................................13

*Bernardez v. Graham,*
 No. 11-CIV-6463-NSR-JCM, 2016 WL 8715936 (S.D.N.Y. Apr. 15, 2016)
 (Román, J.)..........................................................................................................................10

*Chem. Fund, Inc. v. Xerox Corp.,*
 377 F.2d 107 (2d Cir. 1967)..........................................................................................19, 21

*Donoghue v. Bulldog Investors General Partnership,*
 696 F.2d 170 (2d Cir. 2012)...............................................................................................23

*Donoghue v. Casual Male Retail Grp., Inc.,*
 375 F. Supp. 2d 226 (S.D.N.Y. 2005)............................................................................22, 23

*Editek, Inc. v. Morgan Capital, L.L.C.,*
 150 F.3d 830 (8th Cir. 1998) ..............................................................................................12

*Fed. Ins. Co. v. Mertz,*
 No. 12-CV-1597-NSR-JCM, 2017 WL 3206336 (S.D.N.Y. July 26, 2017)
 (Román, J.)..........................................................................................................................10

*Feder v. Frost,*
 220 F.3d 29 (2d Cir. 2000)..................................................................................................12

*Griffiths v. Francillon,*
 2012 WL 1341077 (E.D.N.Y. Jan. 30, 2012), *report and recommendation
 adopted,* 2012 WL 1354481 (E.D.N.Y. Apr. 13, 2012) ....................................................10

*Huppe v. Special Situations Fund III QP, L.P.,*
 565 F. Supp. 2d 495 (S.D.N.Y. 2008).................................................................................12

*Lenard v. Design Studio,*
 889 F. Supp. 2d 518 (S.D.N.Y. 2012).................................................................................10

ii

A-1898

Table of Authorities
(continued)

Page

*Levner v. Saud,*
    903 F. Supp. 452 (S.D.N.Y. 1994), *aff'd* 61 F.3d 8 (2d Cir. 1995) ................................... 19, 21

*Levy v. Seaton,*
    358 F. Supp. 1 (S.D.N.Y. 1973) ............................................................................. 20, 21

*Morales v. Quintel Entm't, Inc.,*
    249 F.3d 115 (2d Cir. 2001) .................................................................................. 19

*New Concept Energy Inc. v. Gentile,*
    18-cv-8896 ............................................................................................................. 3

*RGI Brands LLC v. Cognac Brisset- Aurige, S.a.r.l.,*
    2013 WL 1668206 (S.D.N.Y. Apr. 18, 2013), *report and recommendation
    adopted,* 2013 WL 4505255 (S.D.N.Y. Aug. 23, 2013) ......................................... 10

*Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.,*
    No. 88 CIV. 9127 (DNE), 1992 WL 296314 (S.D.N.Y. Oct. 6, 1992) ................... 13

STATUTES

28 U.S.C. § 636(b)(1) ................................................................................................. 1, 10

Securities Exchange Act of 1934 § 16, 15 U.S.C. § 78p(b) ...................................... passim

Securities Exchange Act of 1934 § 13(d), 15 U.S.C. § 78m(d) ................................. passim

RULES

17 C.F.R. § 240.16a-1(a) ............................................................................................ passim

17 C.F.R. § 240.13d-3(a) ............................................................................................ passim

Fed. R. Civ. P. 72(b) ................................................................................................... 1

Federal Rule of Evidence 702 ..................................................................................... 10, 14

Fed. R. Civ. P. 37 ........................................................................................................ 15

OTHER AUTHORITIES

Peter Romeo & Alan Dye, Section 16 Treatise and Reporting Guide § 2.03(iv)
    (5th ed. 2019) .......................................................................................................... 2

iii

Defendant Guy Gentile ("Mr. Gentile") respectfully submits the following objections to Magistrate Judge Lehrburger's Report and Recommendation dated October 6, 2023 in the above-captioned actions (the "Report" or "R&R"). 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

<u>Preliminary Statement</u>

The Report suffers from a fundamental flaw that permeates every aspect of its quantification of sums allegedly owed under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b). The Report accepts as "law of the case" that Guy Gentile is the beneficial owner of all shares reported on Schedules 13D filed by MintBroker International, Ltd. ("MintBroker") for positions in Avalon Holdings Corp. ("Avalon") and New Energy Concepts Inc. ("New Energy" and together with Avalon, "Plaintiffs") and further, that as the beneficial owner he is liable for all profits earned on those shares, regardless of any beneficial ownership by others. While the District Court indeed determined that Mr. Gentile was a beneficial owner for reporting purposes under Sections 13(d) and Section 16 of the 1934 Act, it made no determination as to the amount of pecuniary interest that Mr. Gentile or MintBroker held. The very purpose of the referral for a damage computation was to make that determination. But the Report ignores that issue and wrongfully assumes that the determination of beneficial ownership by the District Court rendered Mr. Gentile liable for 100% of profits regardless of his actual pecuniary interest.

Rule 16a-1(a)(2), 17 C.F.R. 240 § 16a-1(a), draws a distinction between "beneficial ownership" to determine reporting obligations for the ten percent threshold and the application of the term to the quantification of damages, where "the term beneficial owner shall mean any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares a direct or indirect *pecuniary interest* in the equity securities...." (emphasis added). As the Romeo & Dye treatise explains, "The broker's beneficial ownership of shares is not exclusive of the customer and it is possible that both the customer and the broker will

12253004-15

A-1900

be deemed beneficial owners of the same shares." *See* Peter Romeo & Alan Dye, Section 16 Treatise and Reporting Guide § 2.03(iv) (5th ed. 2019). During the course of the hearing, Magistrate Judge Lehrburger ignored pecuniary interest, stating: "I just want to figure out what the evidence tells me in terms of whether the definition of beneficial ownership has or hasn't been met. So that's the scope of what I have to do." (Tr. at 310.) The Report mistakes beneficial ownership for reporting purposes with pecuniary interest, which in the foregoing would be held by the customer, not the broker. Throughout, the Report ignores this distinction, treating the District Court's award as determinative of all aspects of pecuniary interest. MintBroker may have had dispositive or voting power over shares held at Interactive Brokers, but that position included shares where the profit and loss went to its customers, not to MintBroker.

The Report's flawed premise permeates its analysis of Mr. Gentile and the expert evidence that he put forth. The Report casts Mr. Gentile in a negative light for seeking to prove that customers indeed earned profits from trading in Avalon and New Energy, suggesting that he had been dilatory or perhaps acted in bad faith. The Report mistakenly criticizes Mr. Gentile for not producing documents he did not have, and for not requiring customers to make filings under Section 16(a), when no such filings were required since none of the customers remotely approached 10% beneficial ownership. Based on the same flawed reasoning, the Magistrate Judge did not permit Mr. Gentile time to obtain documents through letters rogatory addressed to MintBroker, via its appointed Joint Official Liquidators in The Bahamas, to establish the scope of customer ownership.

For the reasons set forth in detail below, we respectfully request that the Court decline to confirm the Report and further that it award $0 in damages or, alternatively $1,212,974 in damages, without prejudgment interest or fees. Alternatively, if the Court believes that more evidence is

2

12253004-15

A-1901

required to verify customer accounts, Mr. Gentile requests that this Court schedule a new trial after Mr. Gentile has been afforded a reasonable opportunity to obtain further documents from MintBroker regarding customer ownership.

Statement of Facts

A.    Mr. Gentile and MintBroker

Defendant Gentile is the founder and former CEO of MintBroker. (Tr. at 34–35.[1]) In 2011, MintBroker became registered and licensed under Bahamian law as a broker-dealer to provide online day trading services to its clients. (Tr. at 34.) It began with three employees, but the company grew to 80 employees at one point. (Tr. at 34–35). MintBroker held a proprietary trading account, and also had customer (client) accounts.  In 2018, (the relevant time period of the trading at issue in these matters), MintBroker had three or four traders that would place trades on behalf of MintBroker in the company's proprietary trading account. (Tr. at 37.)  At its peak, MintBroker had as many as 50,000 customer (client) accounts. (Tr. at 34.) MintBroker only offered self-directed accounts, whereby its customers made their own trading decisions. (Tr. at 38.) It did not offer customer accounts whereby MintBroker employees made trading decisions, commonly referred to as managed accounts. (*Id.*)

MintBroker customer trades were submitted by customers through the web-based DAS Trader system. (Tr. at 37–38.) A customer would log onto their DAS Trader account with a username and password, search for the security they wanted to trade, choose the type of order to place and the number of shares, and enter the order. (Tr. at 48.) The order would then get sent to MintBroker's designated server in DAS Trader, which would then either route the order to one of

---

[1] References to the Tr. refer to the Transcript of the February 1 and February 2, 2023 hearing in these actions. (*Avalon Holdings Corp. v. Gentile*, 18-cv-7291 ("*AV Action*"), Dkt. Nos. 202, 204). "*NC Action*" refers to *New Concept Energy Inc. v. Gentile*, 18-cv-8896. "DX-" refers to Defendant Gentile's exhibits introduced at that hearing.

3

12253004-15

the clearing firms it used (*e.g.*, InteractiveBrokers) to execute the order in the market, or it would be executed through an internal cross-trade within the DAS Trader system.[2] (Tr. at 48–49.)

MintBroker's omnibus account at InteractiveBrokers functioned both as a method to hold its own positions and to execute client transactions. (Tr. at 82–83.) As Gentile explained, when a foreign broker-dealer, like MintBroker, opens an account at a U.S. clearing firm, the clearing firm recognizes the broker-dealer as the account holder, but understands that it is utilizing the omnibus account to execute trades on behalf of its underlying clients. (Tr. at 82.) The shares held by MintBroker appeared as a single book entry at InteractiveBrokers, inclusive of customer and proprietary positions. InteractiveBrokers was not provided with the names of MintBroker clients who were trading through the omnibus account and had no way of identifying whether a trade in the omnibus account was placed on behalf of MintBroker or a client. (Tr. at 83; Plaintiffs' Exhibit ("PX") 2 (Dep. of Brad Klauseger) at 7–8.)

B.    Procedural History

The underlying actions were commenced against Mr. Gentile and MintBroker on August 13, 2018 (the *AV Action*) and September 28, 2018 (the *NC Action*). In each of those actions, Plaintiffs seek to recover short-swing profits under 15 U.S.C. § 78p(b) for trading alleged to have been done by MintBroker in the summer of 2018.

In September 2019, Mr. Gentile left The Bahamas. Immediately upon leaving, Mr. Gentile was "out of the firm" and no longer had any access to, or authority to obtain, MintBroker's records. (Tr. at 79, 111–13.) At that time, MintBroker was in the process of shutting down and firing all

---

[2] The DAS Trader system enabled internal cross-trading as a method of efficiently executing multiple customer trades in certain circumstances (one buying, one selling the same security) because clearing firms do not allow wash trading in the market and, when trading in an omnibus account, clearing firms cannot see that the trades are on behalf of two separate beneficial owners. (Tr. at 39–40.)

4

staff. (Tr. at 111–13.) MintBroker's closure "was based on a board resolution between the board of directors" and unrelated to the present litigation. (DX-32 at 159.) Mr. Gentile was not the sole director of MintBroker and did not have sole control over any such decision. (Tr. at 111, 113.) In October 2019, Plaintiffs served their first set of document requests on Mr. Gentile and MintBroker. (DX-33 at 79; (*See* Plaintiffs' Motion In Limine to Exclude Defendants' Post-Discovery Production, Expert Testimony and Reports ("Pl. Motion In Limine") (*AV Action*, Dkt. No. 194; *NC Action*, Dkt. No. 183.) at App. 5 & 6).) As Mr. Gentile testified at his 2020 deposition, MintBroker's records, including those relating to customer accounts, were retained by MintBroker's attorneys in The Bahamas. (DX-32 at 159–160.) The records were delivered to MintBroker's Bahamian attorneys by MintBroker's IT or compliance department on a thumb drive. Mr. Gentile did not have access to or a copy of that thumb drive. (DX-32 at 161–63.)

Mr. Gentile produced the records he had access to from the United States, such as records from Interactive Brokers, but could not produce records that were not in his possession, custody or control (including all documents located in The Bahamas or held by MintBroker's Bahamian counsel, and for which Bahamas law restricted disclosure). (DX-33 at 78-81.) While Mr. Gentile requested additional records from MintBroker's attorneys, those attorneys stated that they would not provide them to Mr. Gentile or instruct anyone else on MintBroker's staff to do so. (Tr. at 114–15; DX-33 at 38–43.)

Among the records that Mr. Gentile did not have access to was data from a system used by MintBroker called iBoss (Internal BackOffice Support System). (Tr. at 44, 73.) The iBoss system self-populated data with information concerning executed trades. (Tr. at 119, 170.) The data contained in the iBoss system could not be altered, as it was a "view-only system." (Tr. at 46, 48, 72; DX-34 (Darville Tr.) at 21–22.) The InteractiveBrokers records for MintBroker's omnibus

5

12253004-15

account did not have identifiers distinguishing client accounts and company accounts. The iBoss system, on the other hand, had identifiers to distinguish client and MintBroker proprietary accounts. (*See* PX-2 (Dep. of Brad Klauseger.) at 7–8; Tr. at 140–142, 201; DX-34 (Darville Tr.) at 28.)

On April 8, 2022, this Court (Hon. Vernon S. Broderick) granted in part Plaintiffs' motion for summary judgment against both Mr. Gentile and MintBroker. The Court found that Defendants were strictly liable under Section 16(b), but that the amount of profits Defendants earned and the exact period that Defendants were more than 10% beneficial owners was in dispute. *See Avalon Holdings Corp. v. Gentile*, 597 F. Supp. 3d 640, 654-56 (S.D.N.Y. 2022). The Court held, *inter alia*, that Defendants were "beneficial owners" as defined in Rule 13d-3 because they had or shared, or had a right to acquire within sixty days, voting power and/or investment power of more than 10% of Avalon and New Concept shares during the relevant time period. *Id.* The Court also held that Defendants generally had a pecuniary interest in at least some of the shares at issue, but did not quantify that interest, stating: "Defendants had pecuniary interests in these shares because they had the opportunity to and did profit from them. As I explained, the trading records demonstrate that Plaintiffs successfully sold thousands of shares that they bought at a much lower price, and Defendants have failed to create a genuine dispute that they have not reaped the profits between the purchase price and the sale price." *Id.* at 655-56. The Court referred the case to Magistrate Judge Lehrburger for an inquest on damages as "the parties still dispute[d] the amount of profits Defendants earned, including the exact period of time that Defendants were more-than-10% beneficial owners, as well as the calculation of damages." *Id.* at 656–57.

In November 2022, this Court stayed these actions as to MintBroker because MintBroker was subject to Bahamian liquidation proceedings giving rise to an automatic stay. (R&R at 26.)

6

12253004-15

A-1905

The liquidation proceedings commenced in March 2020. In March 2023, this Court also denied Mr. Gentile's motion to dismiss for lack of standing. (*AV Action*, Dkt. No. 238; *NC Action*, Dkt. No. 92.)

C.      The MintBroker Records, Damages Inquest, and Report and Recommendation

Following the Court's decision on summary judgment, in or around late April 2022, Mr. Gentile again reached out to Bahamian counsel to request information in the possession of MintBroker's attorneys. They again refused. This time, however, they advised that they did not object to Mr. Gentile contacting former MintBroker employees. Mr. Gentile then contacted MintBroker's former Chief Compliance Officer, Mr. Cooper. Mr. Cooper advised Mr. Gentile he had asked a former IT Manager for MintBroker, Stephen Darville, to keep a copy of MintBroker's records. Mr. Gentile contacted Mr. Darville, who told Mr. Gentile that he found a copy of a drive containing MintBroker records, including data from the iBoss system. Mr. Darville then rebuilt MintBroker's iBoss system, and provided the iBoss records to forensic accountants retained by Mr. Gentile. (Tr. at 72–74; DX-28.) Those records were produced to the Plaintiffs in May 2022 (the "MintBroker Records"), and identify account names with respect to MintBroker's trading activity. MintBroker's proprietary trading account was identified as account 32810, its journal entry recordkeeping account was identified as account 32812, and its client accounts were identified based on their account names starting with the letters "PFS" or "MBS." (DX-34 (Darville Tr.) at 28; Tr. at 47–53, 233–34.)

Mr. Gentile engaged two independent forensic accountants to calculate short-swing profits for shares beneficially owned by MintBroker in Avalon (AWX) and New Concept (GBR). The first accountant, Robert Christian ("Christian"), was shown by Darville a demonstration of the iBoss system through a videoconference "walk-through." (Tr. at 196.) Darville then provided Christian with credentials which gave him direct access to iBoss. (Tr. at 196.) Darville described

7

A-1906

the process of providing Christian with direct access to the iBoss system and further testified that Gentile did not place any limits on the types of documents Darville could share with the experts. (DX-34 (Darville Tr.) at 42–44, 88.)

Through his remote access, Christian generated reports for AWX and GBR for the relevant time period. (Tr. at 196.) He was able to review the data provided (including random sampling of names provided for trades) to distinguish between client accounts and MintBroker accounts. He determined that account 32810 was the only "corporate trading account" relevant for purposes of determining short-swing profits. (Tr. 52–53, 208.) Both Gentile and Christian testified that the account 32810 featured both company propriety trades as well as some instances of inventory trades. (Tr. at 53, 208–09.) Gentile explained: "If the firm, for example, had a thousand shares of a particular stock long or short, and a client placed an offsetting trade, the system, meaning the DAS system, would automatically execute against inventory first before routing out to the market." (Tr. at 53.) He also explained that because trades reflected in the account 32810 could have been client orders filled from MintBroker's inventory, determination of beneficial ownership requires filtration of the data to determine who initiated the transaction, MintBroker or a client. (Tr. at 128–129.) This is precisely what the forensic accountant, Christian, did by locating exact replicate offsetting trades in client accounts. (Tr. 208–09, 221.)

Using these methodologies, Christian concluded that MintBroker did not cross the 10% beneficial ownership with respect to New Concept (GBR) and that MintBroker's short-swing profits with respect to Avalon (AWX) were approximately $1.2 million. (Tr. at 231; DX-1 (Independent Accountant's Report of R. Christian).) An additional forensic accountant, Brendan Beresford ("Beresford") relied on representations regarding the distinctions between client account

8

A-1907

names, the MintBroker proprietary account, and client offset inventory trades and reached the same conclusion. (DX-19 (Forensic Accountant's Report of B. Beresford).)

Mr. Gentile also sought additional customer records directly from MintBroker through letters rogatory. (*AV Action*, Dkt. Nos. 167, 176-77; *NC Action*, Dkt. Nos. 153, 165-66.) Magistrate Judge Lehrburger granted Mr. Gentile's motion on October 18, 2022. However, as of the date of the inquest, the MintBroker liquidators had not yet produced responsive documents. (R&R at 25-26.)

Plaintiffs presented no expert testimony or evidence rebutting Defendants' experts' calculations, but sought a total award of over $12 million, plus pre-judgment interest, based on MintBroker's Interactive Brokers data and Schedule 13D filings. (*See generally* R&R; *AV Action*, Dkt. Nos. 225, 233; *NC Action*, Dkt. Nos. 208, 216.)

The Court held a two-day inquest on damages, at which only Mr. Gentile presented witnesses, on February 1-2, 2023. On October 6, 2023, Magistrate Judge Lehrburger entered the R&R. In the R&R, Judge Lehrburger held, *inter alia*, that:

1. The MintBroker Records reflecting customer trades are fundamentally incompatible with the Court's summary judgment finding that MintBroker and Mr. Gentile were beneficial owners subject to Section 16(b) liability, and thus the law-of-the-case doctrine barred consideration of the MintBroker Records;

2. Alternatively, the MintBroker Records should not be excluded as a discovery sanction, but an award of reasonable attorneys' fees would be warranted, if those records were allowed into evidence;

9

12253004-15

A-1908

3. Testimony by Mr. Gentile's expert witnesses depended on the MintBroker Records, and thus should be disregarded as incompatible with the law of the case or, alternatively, based on Federal Rule of Evidence 702; and

4. Mr. Gentile is required to disgorge $6,235,908 with respect to Avalon and $6,102,002 with respect to New Concept, plus pre-judgment interest.

<u>Legal Standard</u>

This Court is empowered to "accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Upon a timely objection, "[a] district court 'must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." *Fed. Ins. Co. v. Mertz*, No. 12-CV-1597-NSR-JCM, 2017 WL 3206336, at *1 (S.D.N.Y. July 26, 2017) (Román, J.). This *de novo* review requires the court to "consider the '[r]eport, the record, applicable legal authorities, along with … objections and replies." *Bernardez v. Graham*, No. 11-CIV-6463-NSR-JCM, 2016 WL 8715936, at *2 (S.D.N.Y. Apr. 15, 2016) (Román, J.) (alteration in original).

On an inquest for damages, the burden of proof falls on the plaintiff who must introduce sufficient evidence to establish the amount of damages. *RGI Brands LLC v. Cognac Brisset-Aurige, S.a.r.l.*, 2013 WL 1668206, at *6 (S.D.N.Y. Apr. 18, 2013), *report and recommendation adopted*, 2013 WL 4505255 (S.D.N.Y. Aug. 23, 2013). "Where, on a damages inquest, a plaintiff fails to demonstrate its damages to a reasonable certainty, the court should decline to award damages, even though liability has been established . . . ." *Lenard v. Design Studio*, 889 F. Supp. 2d 518, 527 (S.D.N.Y. 2012); *see also Griffiths v. Francillon*, 2012 WL 1341077, at *1 (E.D.N.Y. Jan. 30, 2012), *report and recommendation adopted*, 2012 WL 1354481, at *1 (E.D.N.Y. Apr. 13, 2012).

10

12253004-15

**A-1909**

<u>Objections</u>

This Court should reject the findings set forth in the R&R for the following reasons: (1) the R&R failed to consider Mr. Gentile's pecuniary interest in the shares at issue, instead relying on the definition of "beneficial ownership" applicable to reporting liability, not disgorgement; (2) the R&R failed to properly weigh the MintBroker Records and expert testimony; (3) the R&R failed to properly compute short-swing profits where Plaintiffs failed to prove short-swing profits and Mr. Gentile submitted reliable evidence contradicting the computations proposed by Plaintiffs; and (4) the R&R improperly awarded pre-judgment interest. Thus, the Court should reject Plaintiffs' claimed damages in their entirety or, alternatively, order that Mr. Gentile disgorge a total of $1,212,974 with respect to Avalon and zero with respect to New Concept, without prejudgment interest or fees.

I

<u>THE R&R FAILED TO CONSIDER MR. GENTILE'S PECUNIARY INTEREST</u>

This Court should reject the R&R in its entirety, because the R&R failed to consider the fundamental distinction between the definition of beneficial ownership under Section 13(d) (which focuses on control and voting power), and the pecuniary interest test required to compute the amount of disgorgement under Section 16(b).

In granting partial summary judgment, this Court recognized that in an action for disgorgement of short-swing profits under Section 16(b), there are two different relevant definitions of "beneficial owners." The first applies to determine whether a person is a more-than 10% beneficial owner. Under that test, "a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares: (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) Investment power which includes the power to dispose, or to direct the

11

A-1910

disposition of, such security." *Avalon Holdings Corp. v. Gentile*, 597 F. Supp. 3d 640, 654

(S.D.N.Y. 2022) (quoting 17 C.F.R. § 240.13d-3(a)).

While this Court, on summary judgment, found that Mr. Gentile was liable under that

definition of "beneficial owner" applied for purposes of *liability*, the Court acknowledged that a

different definition of "beneficial owner" applies for purposes of *disgorgement – i.e.*, one that

considers "pecuniary interest" in addition to voting and investment power.  As this Court held,

"[o]nce a person meets th[e liability] criterion and becomes liable under § 16(b), the extent of their

liability, i.e., how much short-swing profits they have to disgorge, is governed by another

definition of 'beneficial owner' as provided under Rule 16a-1(a)(2):

> Other than for purposes of determining whether a person is a
> beneficial owner of more than ten percent of any class of equity
> securities . . . the term beneficial owner shall mean any person who,
> directly or indirectly . . . has or shares a direct or indirect pecuniary
> interest in the equity securities . . . The term pecuniary interest . . .
> shall mean the opportunity, directly or indirectly, to profit or share
> in any profit derived from a transaction in the subject securities."

*Id.* at 655 (quoting 17 C.F.R. 240.16a-1(a)(2) and citing *Huppe v. Special Situations Fund III QP,*

*L.P.*, 565 F. Supp. 2d 495, 499 (S.D.N.Y. 2008)); *see also Feder v. Frost*, 220 F.3d 29, 33 (2d Cir.

2000); *Editek, Inc. v. Morgan Capital, L.L.C.*, 150 F.3d 830, 834 (8th Cir. 1998) ("It may seem

odd that [defendant] both was and was not a beneficial owner . . . , but the SEC has long recognized

the two definitions of *beneficial owner* can result in different determinations of beneficial

ownership.").

The R&R failed to properly consider Mr. Gentile's pecuniary interest in the shares at issue.

Instead, it erroneously found that any holding that Mr. Gentile was not the "beneficial owner" of

all shares of Avalon and New Concept traded by MintBroker was "fundamentally incompatible"

with this Court's summary judgment decision. (R&R at 35-43.) On summary judgment, this Court

considered in detail whether Mr. Gentile and MintBroker met the definition of "beneficial owner"

12

12253004-15

A-1911

for purposes of liability, but did not consider the *extent* to which either Defendant met the second definition of beneficial ownership for purposes of disgorgement. While this Court did note that "Defendants had pecuniary interests in these shares because they had the opportunity to and did profit from them," this Court did not consider or determine the extent of those profits that could be attributed to either Defendant. *Avalon Holdings Corp. v. Gentile*, 597 F. Supp. 3d at 655–56.

The Court's error colored its analysis of the evidence, as it viewed Mr. Gentile and his experts in a negative light for seeking to contradict the partial summary judgment ruling.

The evidence presented to Magistrate Judge Lehrburger clearly shows that Mr. Gentile did not have a pecuniary interest in many of the trades at issue. *See infra*. Instead, MintBroker facilitated "riskless principal trading" for its customer trades, whereby MintBroker did not have any risk or interest in the outcome of the transaction passing through its inventory account and did not profit from those transactions. (Tr. at 93, 182.) MintBroker's customer trades thus should not have been included in the R&R's computation of short-swing profits.

Moreover, even if a holding that Mr. Gentile did not have a pecuniary interest in some of the trades at issue was incompatible with the Court's summary judgment decision – which it is not – the R&R incorrectly held that reconsideration of that decision would be inappropriate. Reconsideration is appropriate based on "the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." R&R at 37-38 (citing *Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*, No. 88 CIV. 9127 (DNE), 1992 WL 296314, at *3 (S.D.N.Y. Oct. 6, 1992)). Here, the MintBroker Records, and testimony of the witnesses, shows that Mr. Gentile was not a "beneficial owner" of many of the shares at issue for purposes of computation of short-swing

13

12253004-15

A-1912

profits to be disgorged because MintBroker clients had a pecuniary interest in those shares, and not Mr. Gentile (or MintBroker). *See* Points II, III, IV *infra*.[3]

Moreover, the MintBroker Records from the iBoss system were unavailable to Mr. Gentile at the time of this Court's summary judgment decision, and could not have been discovered by Mr. Gentile with the exercise of reasonable diligence. *See* pp. 4-6, 9 *supra*; Point II.A, *infra*. Nor were those records necessary to determine the issue addressed by the Court – status as a 10% beneficial owner under Section 16. As soon as Mr. Gentile became aware that those records had become available, Mr. Gentile produced the records to Plaintiffs. And it would be manifestly unjust to compel Mr. Gentile to disgorge funds that he never received and had no pecuniary interest in in the first place. Any such ruling is contrary to Rule 16a-1(a)(2). 17 C.F.R. § 16a-1(a)(2).

II

### THE R&R FAILED TO PROPERLY WEIGH THE MINTBROKER RECORDS AND EXPERT TESTIMONY RELATING TO THOSE RECORDS

The R&R also failed to properly weigh the MintBroker Records and expert testimony, holding that consideration of the MintBroker Records and testimony based on those records were barred by the law-of-the-case doctrine and, alternatively, that the expert testimony presented by Mr. Gentile's two expert witnesses should be excluded under Federal Rule of Evidence 702.

---

[3] The evidence at trial also shows that Mr. Gentile had no voting or investment power over the MintBroker customer trades. For example, Mr. Gentile testified:

> Q. [M. Ford]: . . . Who would have the right to vote a share that was purchased by a client?
> A. [G. Gentile]: The client.
> Q. Would MintBroker have the capability to dispose of a share that a client purchased through MintBroker?
> A. Not without the permission of the client . . .

(Tr. at 81–82).

14

A-1913

A.    The R&R Erred By Refusing to Consider the MintBroker Records and Related Testimony

The R&R failed to consider both the MintBroker Records, and expert reports and testimony based on those records, on the grounds that doing so would be at odds with the Court's determination on liability and the law-of-the-case. However, as set forth in detail above, there is no incompatibility with considering the MintBroker Records for determining the extent of Mr. Gentile's *pecuniary* interest in (rather than voting power or control over) the trades at issue, where the Court's summary judgment decision did not deal with that issue. Since Mr. Gentile's pecuniary interest is key to a determination of the amount of short-swing profits to be disgorged, the R&R improperly refused to consider that information, which was reflected in the MintBroker Records. *See* Point I., *supra*.

For the avoidance of doubt, the R&R's related contention that Mr. Gentile "was not sufficiently diligent in producing the records" has no merit.[4] At the time that Plaintiffs served discovery requests in these actions, only MintBroker and its Bahamas counsel, and not Mr. Gentile, had access to the iBoss data underlying the MintBroker Records. (Tr. at 79, 111–13; DX-32 at 165–168.) At that time, MintBroker was in the process of shutting down and firing all staff for reasons unrelated to the instant litigation. (Tr. at 111–13; DX-32 at 159.) As Mr. Gentile testified at his 2020 deposition, MintBroker's records, including those relating to customer accounts, were retained by MintBroker's attorneys in The Bahamas and he did not have access to those documents due to his departure from MintBroker and Bahamas law which precluded disclosure of the

---

[4] Even if those records were not timely produced, the R&R properly refused to exclude the MintBroker Records on that basis under Rule 37. (R&R at 43-48.) The R&R noted, however, that if it did not recommend exclusion of the MintBroker Records based on the law of the case doctrine, then the circumstances "would fully justify" awarding Plaintiffs attorneys' fees incurred as a result of Mr. Gentile's "belated disclosure." (R&R at 48.) Since there was no "belated disclosure," any such award should be rejected.

15

12253004-15

A-1914

documents. (DX-32 at 160, 165–168.) Mr. Gentile informed Plaintiffs in 2020 that the records were delivered to MintBroker's Bahamian attorneys by MintBroker's IT or compliance department on a thumb drive, and that Mr. Gentile did not have access to or a copy of the contents of that drive. (DX-32 at 160–63.)

There is no dispute that Mr. Gentile produced the records that he had access to. However, he simply could not produce records that were not in his possession, custody or control. (DX-33 at 78–81.) Mr. Gentile requested records from MintBroker's attorneys, but they informed him that they would not provide those documents or instruct anyone else on MintBroker's staff to do so. (Tr. at 114–15; DX-33 at 38–43.)

In 2022, following developments in this litigation and The Bahamas liquidation proceedings, Mr. Gentile again reached out to Bahamian counsel to request information in the possession of MintBroker. They again refused. Thereafter, Mr. Gentile learned for the first time that a former employee, Mr. Darville, had a copy of a drive containing MintBroker records, including data from the iBoss system. Mr. Darville then rebuilt MintBroker's iBoss system, and provided the iBoss records to forensic accountants retained by Mr. Gentile. (Tr. at 73–74; DX-28.) Those records were promptly produced to the Plaintiffs in May 2022. (*AV Action*, Dkt. No. 103 at 1; *NC Action*, Dkt. No. 92 at 1.) Any claim that Mr. Gentile did not act diligently or appropriately is belied by the record.

Magistrate Judge Lehrburger's suggestion that Mr. Gentile made prior statements that were inconsistent with the MintBroker Records is also incorrect. For example, the Report points to an interrogatory response stating that there were no "Managed Accounts" that traded or voted in Avalon and New Concept securities. (R&R at 15, 20.) "Managed Accounts" was defined as "any investment or trading account managed by You or MintBroker, whether directly or indirectly, for

16

12253004-15

A-1915

their own benefit, or for the benefit or on behalf of one or more clients or costumers . . . , and in which you or MintBroker directed, executed, placed, received, cleared, handled, or in any way reviewed or processed orders." (R&R at 20.) But as Mr. Gentile testified, MintBroker did not manage any customer accounts. (Tr. at 38, 81–82; DX-32 at 30, 50.) Holding securities for a customer and managing a customer account are two separate matters. Nor did Mr. Gentile's counsel represent that MintBroker's lawyers in The Bahamas or any third parties possessed no additional documents – instead, his representation that all documents were produced referred solely to Mr. Gentile. (*See* R&R at 16 (quoting 1/22/2020 Conference Transcript in which defense counsel responded that "*He* does not" have any other information and "*he* has done a diligent search") (emphasis added).)

B.    The R&R Improperly Excluded Mr. Gentile's Expert Witnesses.

The R&R recommended exclusion of the testimony and reports of Mr. Gentile's expert witnesses, Christian and Beresford, as contrary to the law of the case and also on the grounds that their opinions "are not based on 'sufficient facts or data' and are not 'the product of reliable principles and methods.'" (R&R at 50-56.)

Magistrate Judge Lehrburger took issue with Christian's methodology, complaining that his procedure to identify customer accounts was not sufficiently clear. But Christian testified at length about his procedure. For example, Christian testified that he reviewed account names, names of entities, names of the persons, addresses, phone numbers, and the like, for trades. That information would reveal whether or not an account belonged to a client or was a proprietary MintBroker account. Christian reviewed this information for a random sampling of accounts – including the highest value accounts as well as typically 20% of other accounts, to assure that the relevant account identifiers belonged to customers and/or MintBroker. (Tr. at 203–05, 234.)

17

12253004-15

A-1916

Magistrate Judge Lehrburger also took issue with the fact that "[n]either expert did anything to confirm whether client-related transactions . . . were 'actually effected for the clients.'" (R&R at 52.) According to Judge Lehrburger, there was not enough evidence to show that customer accounts actually belonged to customers. But that is precisely what Christian found in his expert review of the MintBroker Records, and what Mr. Gentile testified to repeatedly. (Tr. at 81-82, 93, 182, 256–257; DX-1 (Independent Accountant's Report of R. Christian).) The Magistrate Judge's suggestion that MintBroker's thousands of customers were fictitious has no factual basis. Why would MintBroker have complex liquidation proceedings if it had no customers?[5]

Moreover, Mr. Gentile sought additional information regarding customer accounts from MintBrokers through its letters rogatory. If Mr. Gentile and Christian's testimony and the MintBroker Records was not sufficient to segregate client trades – and it was – then Judge Lehrburger should have allowed time for that evidence to be obtained from The Bahamas. Mr. Gentile expects that any records received in response to his letters rogatory will show evidence of trades in which only MintBroker's customers held a pecuniary interest.

None of the other purported defects identified by Magistrate Judge Lehrburger merit exclusion or any discounting of the experts' opinions. For example, the R&R claims that the analysis of "wash" trades was unreliable as a result of the issues with customer trades. (R&R at 53-54.) But that proposition should be rejected as the experts' analysis of customer trades is reliable. *See supra*. And Magistrate Judge Lehrburger takes issue with the inclusion of "negative"

---

[5] In response to this surprising contention, Gentile obtained a declaration from one customer that he made trades in both Avalon and New Concept shares through MintBroker for his own customer account during the relevant time period. *See* Declaration of Nicholas Abadiotakis dated November 2, 2023.

18

A-1917

beneficial ownership to MintBroker. But that "negative" ownership occurred only when MintBroker had a short position. (R&R at 54-55; Tr. at 210.) And Magistrate Judge Lehrburger did not consider the alternative possibility of valuation with removal of negative positions, and instead improperly threw out the experts' entire reports, increasing purported disgorgement by over ten times. The R&R also takes issue with the fact that the expert witnesses did not consider the Interactive Broker records or MintBroker's Schedule 13Ds. (R&R at 55.) But as Mr. Gentile testified, the Interactive Broker records (and thus any Schedule 13D based on those records) did not contain any information that would enable a viewer to distinguish between customer trades and proprietary trades.

If anything, the Magistrate Judge's reliance on Schedule 13D's filed by MintBroker was error. Courts have recognized that, in light of the disclaimers associated with reporting under Section 13(d), disclosure of a position on such a filing carries no weight. *See Levner v. Saud*, 903 F. Supp. 452, 461 (S.D.N.Y. 1994), *aff'd* 61 F.3d 8 (2d Cir. 1995) ("I find it irrelevant that . . . the filed Schedule 13D . . . represented Alwaleed to be a beneficial owner. . . . Regardless of Alwaleed's representative's interpretation of the law, liability will not be imposed unless he meets the statutory definition of an insider.") The court in *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 129 (2d Cir. 2001), for example, rejected the argument that defendants' Schedule 13D "constitute[d] [an] admission[] of membership in a § 13(d) group," because "it [was] undisputed that the [the defendant had] explicitly disclaimed beneficial ownership in the text of the Schedule 13D he filed with the SEC. . ." The court also found that even when such disclaimers of beneficial ownership were absent, SEC filings still were not "persuasive." *Id.* Thus, it is black-letter law that a filing under Section 13 cannot establish beneficial ownership, nor can any filing on Form 3 or 4 under Section 16(a). *See Chem. Fund, Inc. v. Xerox Corp.*, 377 F.2d 107, 112 (2d Cir. 1967) ("there

19

12253004-15

A-1918

was no dispute [that defendant] was [not] the beneficial owner of the securities in question [and f]ailure to [include a Rule 13d-4] disclaimer [in defendant's Forms 3 and 4] cannot fairly be read to dispose of the question of statutory interpretation presented in this case."); *Levy v. Seaton*, 358 F. Supp. 1, 4 (S.D.N.Y. 1973) (finding it irrelevant that the defendant filed a form 4).

Thus, the expert reports were reliable and should have been afforded significant weight by Magistrate Judge Lehrburger.

## III

### THE R&R INCORRECTLY DETERMINED SHORT-SWING PROFITS

Upon consideration of the MintBroker Records and expert testimony, short-swing profits subject to disgorgement, if any, are at most approximately $1.2 million.

*First*, the customer accounts identified by Mr. Christian in the MintBroker Records may not be counted for purposes of short-swing profits since Mr. Gentile lacks any pecuniary interest in those trades. *See supra.* A pecuniary interest is an "opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities." 17 C.F.R § 240.13d-3(a)(2)(i). As Mr. Gentile described at the hearing, MintBroker facilitated "riskless principal trading" whereby MintBroker and Mr. Gentile had no risk or interest in the outcome of the trades and did not profit from those transactions. (Tr. at 93, 182.) Thus, MintBroker did not profit from short-swing profits realized in its customers' accounts, including those trades that passed through its inventory account.

*Second*, the recordkeeping account identified by Christian in the MintBroker Records did not reflect any actual trading activity, and thus could not be considered for purposes of computing short-swing profits. (Tr. at 48, 51, 204–205.)

*Third*, what remains, with respect to MintBroker's short-swing profits analysis, is the activity reflected in MintBroker's propriety trading account, account 32810. (Tr. at 53.) Because

20

12253004-15

A-1919

that account included both company propriety trades as well as some instances of client trades facilitated through MintBroker's inventory, it is not possible to determine on the face of the entries in that account alone who the beneficial owner of the shares was. (Tr. at 53, 57–58.) Instead, the data for that account had to be filtered to determine who initiated the transaction, MintBroker or a client. (Tr. at 58, 128–129.) This is precisely what the forensic accountant, Christian, did by locating exact replicate offsetting trades in client accounts. (Tr. 208–209, 221.) Specifically, Christian testified that he was able to "isolate . . . the true corporate trades" of MintBroker from those client trades executed through inventory by locating "offsetting" account 32810 trades "at the exact same time as a client trade." (Tr. 209, 221.) MintBroker's initial acquisition of those shares into inventory, purchased through its proprietary account, were counted as part of the experts' calculations of MintBroker's short-swing profits. (Tr. at 58–59.)

Upon proper exclusion of the account 32812 journal entries and trades of shares beneficially owned by clients, both experts concluded that MintBroker never crossed the 10% threshold with respect to trading in New Concept (GBR) and that its short-swing profits of shares of Avalon (AWX) beneficially owned by MintBroker totaled approximately $1.2 million. (DX-1; DX-19; Tr. at 214.)

Plaintiffs have presented no evidence to refute or rebut the accuracy of the experts' reports or calculations. Instead, the evidence presented by Plaintiffs – the Interactive Broker records and Schedule 13D – carry no weight in determining short-swing profits. *See Levner v. Saud*, 903 F. Supp. at 461 *Chem. Fund, Inc. v. Xerox Corp.*, 377 F.2d at 112 ("there was no dispute [that defendant] was [not] the beneficial owner of the securities in question [and f]ailure to [include a Rule 13d-4] disclaimer [in defendant's Forms 3 and 4] cannot fairly be read to dispose of the question of statutory interpretation presented in this case."); *Levy v. Seaton*, 358 F. Supp. 1, 4

21

A-1920

(S.D.N.Y. 1973). Moreover, evidence establishes that it is impossible to differentiate customer trades and proprietary trades in MintBroker's omnibus account at InteractiveBrokers. That account functioned both as a method to hold MintBroker's own positions and to execute client transactions. (Tr. at 82.) InteractiveBrokers was not provided with the names of MintBroker clients who were trading through the omnibus account and had no way of identifying whether a trade in the omnibus account was placed on behalf of MintBroker or a client. (Tr. at 83; PX-2 (Dep. of Brad Klauseger) at 7–8.) Any data obtained from InteractiveBrokers thus does not show whether or not Mr. Gentile (or MintBroker) held a proprietary interest in the trades at issue.

IV

### THE R&R ERRONEOUSLY AWARDED PRE-JUDGMENT INTEREST

This Court should also reject the portion of the R&R that recommended an award of prejudgment interest. "The decision of whether interest should be awarded in a particular Section 16(b) action is within the discretion of the Court . . . Because 'Section 16(b) says nothing about interest one way or the other,' the Supreme Court has held that interest should be 'given in response to considerations of fairness'" and "denied when its exaction would be inequitable.'" *Donoghue v. Casual Male Retail Grp., Inc.*, 375 F. Supp. 2d 226, 238 (S.D.N.Y. 2005). Here, it would be unfair and inequitable to award prejudgment interest against Mr. Gentile for at least three reasons.

*First*, there is zero evidence that Mr. Gentile himself had any pecuniary interest in many of the trades at issue. In fact, the evidence shows that only customers – and not Mr. Gentile or MintBroker – held a pecuniary interest in those trades. *See* Points II and III, *supra*. And while Mr. Gentile's expert Christian calculated short-swing profits at $1.2 million based on the lowest-in, highest-out method, he also determined that *actual* profits were only $177,491 (DX-1.) It would be inequitable to force Mr. Gentile to disgorge interest in addition to profits that he never received.

22

12253004-15

A-1921

*Second*, the R&R incorrectly found that Mr. Gentile did not act innocently based on a Schedule 13D. But Mr. Gentile had no role in reviewing or preparing that document. (*See* Tr. at 154–55; DX-32 at 46–48.)

*Third*, Mr. Gentile did not attempt to "derail" the proceedings just because motions that he made to stay or dismiss for lack of standing were unsuccessful. *See Donoghue v. Casual Male Retail Gip., Inc.*, 375 F. Supp. 2d 226, 238 (S.D.N.Y. 2005) (denying request for prejudgment interest despite argument that "Defendants have prolonged proceedings by denying liability" because there defendants did not act in bad faith). Nor is there any "indicia of bad faith" (R&R at 59) and the R&R's assertion that Mr. Gentile failed to preserve documents that were not in his possession, custody or control for litigation has no merit. *See* Point II.A, *supra*. The R&R also blamed Mr. Gentile for delaying the proceeding but ignored several other factors that contributed to progress of the proceedings, including the COVID-19 pandemic that began in early 2020, and the fact that summary judgment was initially briefed in October 2020 but not decided until April 2022. (AV Action, Dkt. Nos. 238; NC Action, Dkt. Nos. 91, 97.)

V

PLAINTIFFS LACK STANDING

Defendant Gentile acknowledges that the Court has previously ruled that *Donoghue v. Bulldog Investors General Partnership*, 696 F.2d 170 (2d Cir. 2012), remains controlling precedent in this Circuit. (*AV Action*, Dkt. No. 238; *NC Action*, Dkt. No. 221.) To preserve his appeal rights on standing, Mr. Gentile objects to confirmation on the ground that neither Plaintiff established concrete injury in the hearing before the Magistrate Judge—or at any other time in this proceeding.

Neither Plaintiff offered any evidence at the hearing that Mr. Gentile had access to, much less utilized, confidential corporate information in connection with the trading at issue. Nor did

23

12253004-15

A-1922

either Plaintiff offer any evidence of any fiduciary or quasi-fiduciary relationship involving plaintiff. This Court may take judicial notice of each Plaintiff's filings with the Securities and Exchange Commission which refute any contention that Mr. Gentile was, or could be deemed, a corporate fiduciary by virtue any beneficial ownership in excess of 10% of the shares at issue.

Under no conceivable scenario could Mr. Gentile acquire control over the affairs of Avalon. MintBroker purchased Class A common stock, a junior voting class. On all corporate matters other than the election of directors, the Class B shareholders controlled 66% of the vote. For the election of directors, the Class A shareholders could elect only 25% of the Board. Avalon's Form 10-K for the year ended December 31, 2018 discloses at page 6:

> Avalon has two classes of common stock, Class A and Class B. Each share of Class A Common Stock is entitled to one vote and each share of Class B Common Stock is entitled to ten votes on all matters submitted to a vote of the shareholders. Except for the election of Avalon's Board of Directors, the Class A Common Stock and the Class B Common Stock vote together as a single class on all matters presented for a vote to the shareholders. The holders of the Avalon Class B Common Stock, which consists principally of the management of Avalon, have approximately 66 percent of the aggregate voting power of the outstanding Avalon Common Stock. Currently, the holders of the Avalon Class A Common Stock will not, either alone or acting collectively, be able to elect a majority of the members of Avalon's Board of Directors (the "Avalon Board") or control many corporate actions. However, the holders of the Avalon Class A Common Stock, voting as a separate class, have the right to elect the number of directors equal to at least 25 percent of the total Board of Directors of Avalon until the outstanding Avalon Class B Common Stock constitutes less than 50 percent of the total voting power of the outstanding Avalon Common Stock....[6]

The New Concept Energy Form 10-K for the year ended December 31, 2018 discloses that one shareholder beneficially owned 59.63% of the outstanding shares. (*See* Fleming Decl., Ex. 2 (Form 10-K) at p. 17.) That shareholder, Realty Advisors Inc., filed a Schedule 13D on June 27,

---

[6] *See* Declaration of Thomas J. Fleming dated November 3, 2023 ("Fleming Decl."), Ex. 1 (Form 10-K) at p. 6.

24

12253004-15

A-1923

2018 disclosing its share ownership. (*See* Fleming Decl., Ex. 3.)    The share purchases by MintBroker therefore could not possibly have exerted control over New Concept Energy.

Conclusion

For all of the foregoing reasons, Defendant Guy Gentile respectfully requests that the Court reject the Report and Recommendations of Magistrate Judge Robert W. Lehrburger, dated October 6, 2023, and award $0, alternatively $1,212,974 in disgorgement, without prejudgment interest or fees. Alternatively, if the Court believes that more evidence is required to verify customer trades, Mr. Gentile requests that this Court schedule a new trial after Mr. Gentile has been afforded a reasonable opportunity to obtain documents from MintBroker regarding customer ownership.

Dated: New York, New York
       November 3, 2023

OLSHAN FROME WOLOSKY LLP


By:    /s/ Thomas J. Fleming
        Thomas J. Fleming
        Kerrin T. Klein
        1325 Avenue of the Americas
        New York, New York 10019
        (212) 451-2300

        *Counsel for Defendant Guy Gentile*

25

12253004-15

A-1924

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AVALON HOLDINGS CORP., <br><br> Plaintiff, <br><br> v. <br><br> MINTBROKER INTERNATIONAL, LTD., and GUY GENTILE, <br><br> Defendant. | DECLARATION <br><br> No. 18-Civ. 7291-VSB |

Related Case:

| | |
|---|---|
| NEW CONCEPT ENERGY, INC., <br><br> Plaintiff, <br><br> v. <br><br> MINTBROKER INTERNATIONAL, LTD., and GUY GENTILE, <br><br> Defendant. | DECLARATION <br><br> No. 18-Civ.8896-VSB |

STATE OF FLORIDA          )
                                        ) ss.:
COUNTY OF PALM BEACH   )

NICHOLAS ABADIOTAKIS declares under penalties of perjury, pursuant to 28 U.S.C. § 1746, that:

1.      I am a former customer of Mint Broker International Ltd. ("Mint Broker") and I submit this affidavit on personal knowledge.

2.      I opened a client account at SureTrader, a trade name for Mint Broker ("SureTrader"), in The Bahamas to day trade during the time period of 2018 through 2019.

1

12258271-1

A-1925

3.    My day trading included shares of Avalon Holdings Corp., ticker symbol AWX, and New Concept Energy Inc., ticker symbol GBR. I would regularly (every few months) take screenshots of my account because SureTrader did not provide monthly brokerage statements. I retained some of my SureTrader records in my computer. I have attached as Exhibit A screenshots of one of my monthly reports from June and July of 2018 from SureTrader's website concerning my trading of AWX and GBR in my account.

4.    The screenshot attached as Exhibit A shows the following: I traded in GBR on 6/29/2018 and I traded in AWX on July 25, 26, and 27, 2018:

> I bought 2500 shares of GBR at $3.33 per share; at14:16:32
> I sold 1000 shares of GBR at 3.98 per share; at 14:43:26
> I sold 500 shares of GBR at 3.95 per share; at 14:43:26
> I sold 1000 shares of GBR at 3.99 per share; at 15:15:31
>> I bought 1000 shares of AWX at $3.06875 per share; at 7/25/18 08:04:52
>> I bought 100 shares of AWX at $3.03 per share; at 7/25/18 08:32:13
> I bought 900 shares of AWX at $3.74 per share; at 7/25/18 13:07:31
> I Sold 500 shares of AWX at $4.36 per share; at 7/25/18 14:10:16
> I Sold 1000 shares of AWX at $4.82 per share; at 7/26/18 09:51:50
> I Sold 500 shares of AWX at $4 per share; at7/26/18 10:21:28
> I bought 500 shares of AWX at $7.35 per share; at 7/27/18 11:22:11
> I bought 500 shares of AWX at $7.35 per share; at 7/27/18 11:23:44
> I bought 500 shares of AWX at $6.34 per share; at 7/27/18 12:38:30
> I Sold 500 shares of AWX at $6.95 per share; at 7/27/18 15:16:54
> I Sold 500 shares of AWX at $7.30 per share; at 7/27/18 15:17:39
> I Sold 500 shares of AWX at $9.45 per share; at 7/27/18 15:40:24

5.    The screenshot attached as Exhibit B shows the following: I made a gross profit of $3,592.25 on ticker AWX Avalon Holdings Corp. and a gross profit of $1,620.00 on ticker GBR New Concept Energy, Inc.

6.    The screenshot attached as Exhibit B shows the following: On July 2, 2018, I withdrew $5,000 from SureTrader. These funds were deposited into my personal bank account.

Executed on November 2nd, 2023

*Nicholas Abadiotakis*

State of Texas County of Harris

NICHOLAS ABADIOTAKIS



*Courtney Jones* 07/11/2027

Courtney Jones Notarized online using audio-video communication

2

12258271-1 This instrument was acknowledged before me by means of an interactive two-way audio and video communication on 11/02/2023 by Nicholas Abadiotakis.

A-1926

12258271-1

A-1927

# EXHIBIT A

A-1928



## Trade History

Enter Starting Date: 06/01/2018    Enter Ending Date: 06/30/2018    Account:    Symbol:
(mm/dd/yyyy)

| Account | T/D | Type | B/S | Symbol | Quantity | Price | Exec Time | Commissio |
|---|---|---|---|---|---|---|---|---|
| MBS01540 | 06/28/2018 | 2 | BUY | UUU | 2500 | 1.15 | 11:32:22 | 2 |
| MBS01540 | 06/29/2018 | 2 | BUY | GBR | 2500 | 3.33 | 14:16:32 | 2 |
| MBS01540 | 06/29/2018 | 2 | SELL | GBR | 1000 | 3.98 | 14:43:26 | 1 |
| MBS01540 | 06/29/2018 | 2 | SELL | GBR | 500 | 3.95 | 14:51:20 | |
| MBS01540 | 06/29/2018 | 2 | SELL | GBR | 1000 | 3.99 | 15:15:31 | 1 |



**SWISS AMERICA**
**SECURITIES, LTD**

**Customer Account**
Logon User: **MBS01540**       Logoff
View Account: **MBS01540**       Account Name: **Nichol**

Daily Summar       Trading Blotter       Activity       ▶ Report

## Trade History

Enter Starting Date: 07/01/2018       Enter Ending Date: 07/31/2018       Account:       Symbol:

| Account | T/D | Type | B/S | Symbol | Quantity | Price | Exec Time | Commission | Trade F |
|---|---|---|---|---|---|---|---|---|---|
| MBS01540 | 07/03/2018 | 2 | SELL | UUU | 500 | 1.3 | 11:08:00 | 5.00 | |
| MBS01540 | 07/09/2018 | 2 | SELL | UUU | 2000 | 1.26125 | 15:56:49 | 20.00 | |
| MBS01540 | 07/09/2018 | 2 | BUY | WMLP | 1000 | 1.98055 | 15:57:46 | 10.00 | |
| MBS01540 | 07/09/2018 | 2 | SELL | WMLP | 1000 | 2.0385 | 16:27:04 | 10.00 | |
| MBS01540 | 07/10/2018 | 2 | BUY | MTSL | 1000 | 2.485 | 10:49:07 | 10.00 | |
| MBS01540 | 07/10/2018 | 2 | SELL | MTSL | 500 | 2.9 | 10:59:16 | 5.00 | |
| MBS01540 | 07/10/2018 | 2 | SELL | MTSL | 500 | 2.996 | 10:59:40 | 5.00 | |
| MBS01540 | 07/10/2018 | 2 | BUY | MTSL | 1000 | 1.7 | 11:37:16 | 10.00 | |
| MBS01540 | 07/10/2018 | 2 | SELL | MTSL | 1000 | 1.95 | 12:09:45 | 10.00 | |
| MBS01540 | 07/10/2018 | 2 | BUY | MTSL | 1000 | 1.91 | 15:38:37 | 10.00 | |
| MBS01540 | 07/10/2018 | 2 | BUY | MTSL | 1000 | 1.85 | 15:42:00 | 10.00 | |
| MBS01540 | 07/10/2018 | 2 | SELL | MTSL | 1000 | 2.4 | 15:53:00 | 10.00 | |
| MBS01540 | 07/10/2018 | 2 | SELL | MTSL | 1000 | 2.4 | 15:53:06 | 10.00 | |
| MBS01540 | 07/12/2018 | 2 | BUY | LMFA | 2500 | 0.59 | 12:25:17 | 25.00 | |
| MBS01540 | 07/12/2018 | 2 | SELL | LMFA | 2500 | 0.67 | 13:41:37 | 25.00 | |
| MBS01540 | 07/16/2018 | 2 | BUY | MTSL | 1000 | 2.61 | 11:17:02 | 10.00 | |
| MBS01540 | 07/16/2018 | 2 | SELL | MTSL | 1000 | 3.27 | 11:37:51 | 10.00 | |
| MBS01540 | 07/16/2018 | 2 | BUY | MTSL | 1000 | 2.85 | 11:45:38 | 10.00 | |
| MBS01540 | 07/16/2018 | 2 | BUY | MTSL | 1000 | 2.9 | 11:54:50 | 10.00 | |
| MBS01540 | 07/16/2018 | 2 | SELL | MTSL | 500 | 3.35 | 12:05:35 | 5.00 | |
| MBS01540 | 07/16/2018 | 2 | SELL | MTSL | 500 | 3.55 | 13:21:09 | 5.00 | |
| MBS01540 | 07/16/2018 | 2 | SELL | MTSL | 500 | 3.7 | 13:22:36 | 5.00 | |
| MBS01540 | 07/16/2018 | 2 | SELL | MTSL | 500 | 4.7 | 14:07:52 | 5.00 | |
| MBS01540 | 07/16/2018 | 2 | BUY | MTSL | 500 | 5.05 | 15:45:45 | 5.00 | |
| MBS01540 | 07/16/2018 | 2 | BUY | MTSL | 500 | 4.65 | 15:48:58 | 5.00 | |
| MBS01540 | 07/16/2018 | 2 | BUY | MTSL | 500 | 3.63 | 15:58:23 | 5.00 | |
| MBS01540 | 07/16/2018 | 2 | SELL | MTSL | 500 | 2.6409 | 16:39:57 | 5.00 | |
| MBS01540 | 07/17/2018 | 2 | SELL | MTSL | 1000 | 2.95 | 09:21:20 | 10.00 | |
| MBS01540 | 07/25/2018 | 2 | BUY | AWX | 1000 | 3.06875 | 08:04:52 | 10.00 | |
| MBS01540 | 07/25/2018 | 2 | BUY | AWX | 100 | 3.03 | 08:32:13 | 4.95 | |
| MBS01540 | 07/25/2018 | 2 | BUY | AWX | 900 | 3.74 | 13:07:31 | 9.00 | |
| MBS01540 | 07/25/2018 | 2 | SELL | AWX | 500 | 4.36 | 14:10:16 | 5.00 | |
| MBS01540 | 07/26/2018 | 2 | SELL | AWX | 1000 | 4.82 | 09:51:50 | 10.00 | |
| MBS01540 | 07/26/2018 | 2 | SELL | AWX | 500 | 4 | 10:21:28 | 5.00 | |
| MBS01540 | 07/27/2018 | 2 | BUY | AWX | 500 | 7.35 | 11:22:11 | 5.00 | |
| MBS01540 | 07/27/2018 | 2 | BUY | AWX | 500 | 7.35 | 11:23:44 | 5.00 | |
| MBS01540 | 07/27/2018 | 2 | BUY | AWX | 500 | 6.34 | 12:38:30 | 5.00 | |
| MBS01540 | 07/27/2018 | 2 | SELL | AWX | 500 | 6.95 | 15:16:54 | 5.00 | |
| MBS01540 | 07/27/2018 | 2 | SELL | AWX | 500 | 7.3 | 15:17:39 | 5.00 | |
| MBS01540 | 07/27/2018 | 2 | SELL | AWX | 500 | 9.45 | 15:40:24 | 5.00 | |

A-1930

# EXHIBIT B

 Profit and Loss Summary    x    +

← → C    🔒 https://myboss.suretrader.com/PLSummary.aspx?tk=77D813B10A38A8CF075F9D6

 **SWISS AMERICA**
SECURITIES, LTD

**Customer Account**
Logon User: **MBS01540**    Logoff
View Account: **MBS01540**    Accou

| Daily Summary | Trading Blotter | Activity |

## Profit and Loss Summary

Enter Starting Date 06/01/2018    Enter Ending Date: 06/30/2018    **Go**   (mm/dd/yyyy)

**Trading Summary**    Download csv

| Symbol | Tickets | Open Qty | Long Qty | Short Qty | Long Amount | Short Amount | Realized P&L |
|---|---|---|---|---|---|---|---|
| ▼ GBR | 4 | 0 | 2,500 | 2,500 | 8,325.00 | 9,945.00 | 1,620.00 |
| ▼ UUU | 1 | 0 | 2,500 | 0 | 2,875.00 | 0.00 | 0.00 |
| **TOTAL** | 5 | | 5,000 | 2,500 | 11,200.00 | 9,945.00 | 1,620.00 |

**Cash Move Summary**    Download csv

| Account | Name | DAS User | Entry Date | |
|---|---|---|---|---|

**Equity Change**

| 05/31/2018 | USD | 9,746.52 | 0.00 |
|---|---|---|---|
| 06/01/2018 | USD | 9,746.52 | 0.00 |
| 06/04/2018 | USD | 9,746.52 | 0.00 |
| 06/05/2018 | USD | 9,746.52 | 0.00 |
| 06/06/2018 | USD | 9,746.52 | 0.00 |
| 06/07/2018 | USD | 9,746.52 | 0.00 |
| 06/08/2018 | USD | 9,746.52 | 0.00 |
| 06/11/2018 | USD | 9,746.52 | 0.00 |
| 06/12/2018 | USD | 9,746.52 | 0.00 |
| 06/13/2018 | USD | 9,746.52 | 0.00 |
| 06/14/2018 | USD | 9,746.52 | 0.00 |
| 06/15/2018 | USD | 9,746.52 | 0.00 |
| 06/18/2018 | USD | 9,746.52 | 0.00 |
| 06/19/2018 | USD | 9,746.52 | 0.00 |
| 06/20/2018 | USD | 9,746.52 | 0.00 |
| 06/21/2018 | USD | 9,746.52 | 0.00 |
| 06/22/2018 | USD | 9,746.52 | 0.00 |
| 06/25/2018 | USD | 9,746.52 | 0.00 |
| 06/26/2018 | USD | 9,746.52 | 0.00 |
| 06/27/2018 | USD | 9,746.52 | 0.00 |
| 06/28/2018 | USD | 9,846.52 | 100.00 |
| 06/29/2018 | USD | 11,290.97 | 1,444.45 |
| **TOTAL** | | | 1,544.45 |



# SWISS AMERICA
## SECURITIES, LTD

**Customer Account**

Logon User: **MBS01540**    Logoff

View Account: **MBS01540**    Account Name: **Nichol**

| Daily Summary | | Trading Blotter | | Activity | | ▶ Report |

## Profit and Loss Summary

Enter Starting Date: 07/01/2018    Enter Ending Date: 07/31/2018    Go

### Trading Summary    Download csv

| Symbol | Tickets | Open Qty | Long Qty | Short Qty | Long Amount | Short Amount | Realized P&L | Unrealized P |
|---|---|---|---|---|---|---|---|---|
| ▾ AWX | 12 | 0 | 3,500 | 3,500 | 17,257.75 | 20,850.00 | 3,592.25 | |
| ▾ LMFA | 2 | 0 | 2,500 | 2,500 | 1,475.00 | 1,675.00 | 200.00 | |
| ▾ MTSL | 22 | 0 | 8,500 | 8,500 | 22,970.00 | 24,888.45 | 1,918.45 | |
| ▾ UUU | 2 | 2,500 | 0 | 2,500 | 0.00 | 3,172.50 | 297.50 | |
| ▾ WMLP | 2 | 0 | 1,000 | 1,000 | 1,980.55 | 2,038.50 | 57.95 | |
| TOTAL | 40 | | 15,500 | 18,000 | 43,683.30 | 52,624.45 | 6,066.15 | |

### Cash Move Summary    Download csv

| Account | Name | DAS User | Entry Date | Currency | Deposit | |
|---|---|---|---|---|---|---|
| MBS01540 | Nicholas Abadiotakis | MBS01540 | 07/02/2018 | USD | 0.00 | |
| MBS01540 | Nicholas Abadiotakis | MBS01540 | 07/02/2018 | USD | 0.00 | |
| MBS01540 | Nicholas Abadiotakis | MBS01540 | 07/02/2018 | USD | 0.00 | |
| TOTAL | | | | USD | 0.00 | |

### Equity Change

| | | | |
|---|---|---|---|
| 06/28/2018 | USD | 9,846.52 | 0.00 |
| 06/29/2018 | USD | 11,290.97 | 1,444.45 |
| 07/02/2018 | USD | 6,575.97 | (4,715.00) |
| 07/03/2018 | USD | 6,570.89 | (5.08) |
| 07/05/2018 | USD | 6,470.89 | (100.00) |
| 07/06/2018 | USD | 6,570.89 | 100.00 |
| 07/09/2018 | USD | 6,510.87 | (60.03) |
| 07/10/2018 | USD | 8,183.12 | 1,672.25 |
| 07/11/2018 | USD | 8,183.12 | 0.00 |
| 07/12/2018 | USD | 8,332.78 | 149.66 |
| 07/13/2018 | USD | 8,332.78 | 0.00 |
| 07/16/2018 | USD | 8,307.49 | (25.29) |
| 07/17/2018 | USD | 8,407.30 | 99.81 |
| 07/18/2018 | USD | 8,407.30 | 0.00 |
| 07/19/2018 | USD | 8,407.30 | 0.00 |
| 07/20/2018 | USD | 8,407.30 | 0.00 |
| 07/23/2018 | USD | 8,407.30 | 0.00 |
| 07/24/2018 | USD | 8,407.30 | 0.00 |
| 07/25/2018 | USD | 10,300.48 | 1,893.19 |
| 07/26/2018 | USD | 10,625.13 | 324.65 |
| 07/27/2018 | USD | 11,924.65 | 1,299.52 |
| 07/30/2018 | USD | 11,924.65 | 0.00 |
| 07/31/2018 | USD | 11,924.65 | 0.00 |
| TOTAL | | | 2,078.13 |

A-1933

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AVALON HOLDINGS CORPORATION,

                Plaintiff,

    -against-

GUY GENTILE and MINTBROKER
INTERNATIONAL, LTD.,

                Defendants.

NEW CONCEPT ENERGY, INC.,

                Plaintiff,

    -against-

GUY GENTILE and MINTBROKER
INTERNATIONAL, LTD.,

                Defendants.

18-CV-7291 (DLC)(RWL)

18-CV-8896 (DLC)(RWL)

**NOTICE OF APPEAL**

NOTICE IS HEREBY GIVEN that defendant Guy Gentile, by his attorneys, Olshan Frome Wolosky LLP, hereby appeals to the United States Court of Appeals for the Second Circuit from a Judgment entered in the above-captioned actions on March 20, 2024 (the "Judgment"), which entered awarded plaintiffs a judgment in the total amount of $16,292,458. Annexed hereto are copies of the Court's March 20, 2024 Judgment and the Court's related Opinion and Order, dated February 5, 2024.

Dated:    April 15, 2024

OLSHAN FROME WOLOSKY LLP

By:    */s/ Thomas J. Fleming*
        Thomas J. Fleming
        Kerrin T. Klein
        1325 Avenue of the Americas
        New York, New York 10019
        (212) 451-2300
        *Attorney for Defendant Guy Gentile*