# 24-0999-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————————

AVALON HOLDINGS CORPORATION,

*Plaintiff-Appellee,*

— v. —

GUY GENTILE,

*Defendant-Appellant,*

MINTBROKER INTERNATIONAL, LTD., JOHN DOES 1 THRU 10,

*Defendants.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT

Thomas J. Fleming
Kerrin TenEyck Klein
Olshan Frome Wolosky LLP
*Attorneys for Defendant-Appellant*
1325 Avenue of the Americas
New York, New York 10019
(212) 451-2300

CP COUNSEL PRESS · (800) 4-APPEAL • (331518)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ iii

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF ISSUES PRESENTED ............................................. 2

STATEMENT OF THE CASE ............................................................. 3

SUMMARY OF ARGUMENT ............................................................ 5

STATEMENT OF FACTS .................................................................. 7

    I.     APPELLANT AND MINTBROKER ....................................... 7

    II.    THE TRADES AT ISSUE ................................................... 9

    III.   PROCEDURAL HISTORY ................................................ 10

          A.    Commencement of the Underlying Actions ............................. 10

          B.    Appellant Has No Authority Over MintBroker or Access to its Records ................................................. 10

          C.    The District Court Awards Plaintiffs-Appellees Summary Judgment, Stays Proceedings Against MintBroker and Denies Appellant's Motion to Dismiss for Lack of Standing ................................................. 12

          D.    Appellant Obtains the MintBroker Records ............................. 13

          E.    The Damages Inquest and Report and Recommendation ................................................. 16

          F.    The District Court Adopts the Report and Recommendation and Awards Pre-Judgment Interest ............. 17

STANDARD OF REVIEW .............................................................. 19

ARGUMENT ............................................................................... 20

    I.     THE DISTRICT COURT AND MAGISTRATE JUDGE ERRED IN THEIR COMPUTATION OF THE AMOUNT OF SHORT-SWING PROFITS ................................................. 20

i

A. The District Court and Magistrate Judge Erred by Failing to Properly Consider Appellant's Pecuniary Interest in the Securities at Issue ................................................ 20

B. The District Court and Magistrate Judge Erred by Failing to Properly Consider Documents Produced in Advance of the May 2023 Hearing and Appellant's Experts' Testimony ................................................ 25

    1. The District Court and Magistrate Judge Erred by Refusing to Consider the MintBroker Records and Related Testimony ................................................ 25

    2. The District Court and Magistrate Judge Abused their Discretion in Excluding Appellant's Expert Witnesses ................................................ 30

C. The District Court and Magistrate Judge Incorrectly Determined the Amount of Short-Swing Profits ................................................ 34

II. THE DISTRICT COURT ERRED IN AWARDING PLAINTIFFS-APPELLEES SUMMARY JUDGMENT NOTWITHSTANDING ISSUES OF MATERIAL FACT ................................................ 37

III. THE DISTRICT COURT AND MAGISTRATE JUDGE INCORRECTLY AWARDED AND COMPUTED PRE-JUDGMENT INTEREST ................................................ 40

A. The District Court and Magistrate Judge Erred in Awarding Pre-Judgment Interest ................................................ 40

B. The District Court Erred in Computing Pre-Judgment Interest ................................................ 41

IV. THE DISTRICT COURT ERRED IN DENYING APPELLANT'S MOTION TO DISMISS FOR LACK OF STANDING, AND IN ENTERING JUDGMENT NOTWITHSTANDING ANY EVIDENCE OF ACTUAL INJURY TO PLAINTIFFS-APPELLEES ................................................ 47

CONCLUSION ................................................ 49

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Algie v. RCA Glob. Commc'ns, Inc.*,
  891 F. Supp. 875 (S.D.N.Y. 1994), *aff'd*, 60 F.3d 956 (2d Cir. 1995)...............42

*Analytical Survs., Inc. v. Tonga Partners, L.P.*,
  06CIV.2692KMWRLE, 2008 WL 4443828
  (S.D.N.Y. Sept. 29, 2008) .................................................... 40, 41, 44

*Arch Ins. Co. v. Precision Stone, Inc.*,
  584 F.3d 33 (2d Cir. 2009).............................................. 19, 20

*Avalon Holdings Corp. v. Gentile*,
  18CV7291 (DLC), 2024 WL 449278 (S.D.N.Y. Feb. 5, 2024) ................. *passim*

*Avalon Holdings Corp. v. Gentile*,
  18CV7291DLCRWL, 2023 WL 6566810 (S.D.N.Y. Oct. 6, 2023) .......... *passim*

*Avalon Holdings Corp. v. Gentile*,
  597 F. Supp. 3d 640 (S.D.N.Y. 2022) ........................................ *passim*

*Chem. Fund, Inc. v. Xerox Corp.*,
  377 F.2d 107 (2d Cir. 1967)........................................... 34, 36

*Com. Union Assur. Co., plc v. Milken*,
  17 F.3d 608 (2d Cir. 1994)..............................................42

*Donoghue v. Bulldog Invs. Gen. P'ship*,
  696 F.3d 170 (2d Cir. 2012)..............................................19

*Donoghue v. Casual Male Retail Grp., Inc.*,
  375 F. Supp. 2d 226 (S.D.N.Y. 2005) ........................................ 40, 41

*Dreiling ex rel. Infospace, Inc. v. Jain*,
  281 F. Supp. 2d 1234 (W.D. Wash. 2003).........................................43

*Editek, Inc. v. Morgan Capital, L.L.C.*,
  150 F.3d 830 (8th Cir. 1998) ..............................................22

*Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*,
  67 F.3d 1063 (2d Cir. 1995)..............................................41

*Feder v. Frost*,
  220 F.3d 29 (2d Cir. 2000)..............................................22

iii

*Goenaga v. Mar. of Dimes Birth Defects Found.*,
    51 F.3d 14 (2d Cir. 1995) ...................................................................38

*Holtz v. Rockefeller & Co.*,
    258 F.3d 62 (2d Cir. 2001) .................................................................39

*Horn v. Med. Marijuana, Inc.*,
    80 F.4th 130 (2d Cir. 2023), *cert. granted*, 144 S. Ct. 1454 (2024) ...................19

*Huppe v. Special Situations Fund III QP, L.P.*,
    565 F. Supp. 2d 495 (S.D.N.Y. 2008) ...............................................22

*James v. Nat'l R.R. Passenger Corp.*,
    1:02-CV-03915-RJH, 2005 WL 6182322 (S.D.N.Y. Mar. 28, 2005) ...............47

*Jones v. UNUM Life Ins. Co. of Am.*,
    14 F. App'x 44 (2d Cir. 2001) ...........................................................43

*Jones v. UNUM Life Ins. Co. of Am.*,
    223 F.3d 130 (2d Cir. 2000) ...............................................................41

*Levner v. Saud*,
    903 F. Supp. 452 (S.D.N.Y. 1994), *aff'd* 61 F.3d 8 (2d Cir. 1995) ............. 33, 36

*Levy v. Seaton*,
    358 F. Supp. 1 (S.D.N.Y. 1973) ................................................. 34, 37

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
    03 CIV 2175 SAS, 2013 WL 105776 (S.D.N.Y. Jan. 9, 2013) .........................43

*Morales v. Quintel Entm't, Inc.*,
    249 F.3d 115 (2d Cir. 2001) ....................................................... 33, 34

*Packer on behalf of 1-800-Flowers.Com, Inc. v. Raging Cap. Mgmt., LLC*,
    105 F.4th 46 (2d Cir. 2024) ................................................... 47, 48, 49

*Rai v. WB Imico Lexington Fee, LLC*,
    09 CIV. 9586 (PGG), 2014 WL 12899673 (S.D.N.Y. May 12, 2014) ...............42

*Richardson v. Corr. Med. Care, Inc.*,
    22-210, 2023 WL 3490904 (2d Cir. May 17, 2023) ...........................................30

*Roth v. Jennings*,
    03 CIV 7760 (DAB), 2009 WL 1440670 (S.D.N.Y. May 21, 2009) ...............44

*S.E.C. v. Brethen*,
    C-3-90-071, 1992 WL 420867 (S.D. Ohio Oct. 15, 1992) ..................................43

iv

*S.E.C. v. Contorinis*,
   743 F.3d 296 (2d Cir. 2014)..................................................................20

*Thole v. U. S. Bank N.A.*,
   590 U.S. 538 (2020)................................................................... 48, 49

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021)..................................................................48

*Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*,
   88 CIV. 9127 (DNE), 1992 WL 296314 (S.D.N.Y. Oct. 6, 1992).....................26

## Statutes & Other Authorities:

U.S. Const., Art. III ................................................................... 47, 49

15 U.S.C. § 78aa ...........................................................................1

15 U.S.C. § 78p(b) ........................................................... *passim*

28 U.S.C. § 1291 ...........................................................................2

28 U.S.C. § 1331 ...........................................................................1

28 U.S.C. § 1332 ...........................................................................1

28 U.S.C. § 1961 ................................................................... 43, 44, 46, 47

28 U.S.C. § 1961(a) .......................................................................42

29 U.S.C. § 1109 .........................................................................49

17 C.F.R. § 240.13d-3 ...................................................................12

17 C.F.R. § 240.13d-3(a) ...............................................................21

17 C.F.R. § 240.13d-3(a)(2)(i) .......................................................35

17 C.F.R. § 240.13d-4 ...................................................................37

17 C.F.R. § 240.16a-1(a) ...............................................................6

17 C.F.R. § 240.16a-1(a)(2) ........................................................... *passim*

Fed. R. Evid. 702 ................................................................... 17, 25

Peter Romeo & Alan Dye, Section 16 Treatise and Reporting Guide § 2.03(iv)
   (5th ed. 2019) .........................................................................6

SEC Rule 10b-5 .........................................................................43

## JURISDICTIONAL STATEMENT

Subject matter jurisdiction in the District Court was based on 28 U.S.C. § 1331 and 15 U.S.C. § 78aa. Subject matter in the District Court was also based on 28 U.S.C. § 1332. Plaintiff-Appellee, Avalon Holdings Corporation ("Avalon") is an Ohio corporation with its principal place of business in Ohio. A38, ¶ 3, A53, ¶ 11.[1] Plaintiff-Appellee in the underlying coordinated action, New Concept Energy, Inc. ("New Concept," and together with Avalon, "Appellees" or "Plaintiffs-Appellees"), is a Nevada corporation with its principal place of business in Texas. Appellant Guy Gentile ("Appellant" or "Gentile") and co-defendant MintBroker International, Limited ("MintBroker," and together with Appellant, "Defendants") are residents of Puerto Rico and The Bahamas, respectively. A64, ¶ 11.

On April 8, 2022, the District Court (Hon. Vernon S. Broderick) granted Plaintiffs-Appellees' motion for summary judgment against both Appellant and MintBroker, and referred the case to Magistrate Judge Lehrburger for a hearing on damages. SPA1. In November 2022, the District Court stayed both underlying actions as to MintBroker because MintBroker was subject to Bahamian liquidation proceedings. A701. On July 25, 2023, the District Court (Hon. Denise Cote) denied

---

[1] Citations in the form of A__ and SPA__ refer to the relevant pages of the Appendix and Special Appendix, respectively, being filed simultaneously with this Brief.

Appellant's motion to dismiss for lack of standing. SPA27. Following a hearing on damages, Magistrate Judge Lehrburger issued a Report and Recommendation dated October 6, 2023. SPA43. On February 5, 2024, the District Court (Hon. Denise Cote) adopted the Report and Recommendation with modifications. SPA103. On March 20, 2024, the District Court entered final judgment, awarding Plaintiff-Appellee Avalon judgment amount of $8,219,175, and awarding Plaintiff-Appellee New Concept judgment amount of $8,073,283. SPA119. Gentile filed a timely Notice of Appeal in each of the underlying coordinated actions on April 16, 2024. A1933. Therefore, this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## **STATEMENT OF ISSUES PRESENTED**

1. Did the District Court and Magistrate Judge err by failing to properly consider Appellant's pecuniary interest in the securities at issue, including in connection with the District Court's award of summary judgment, the Magistrate Judge's Report and Recommendation on damages, and the District Court's adoption of the Report and Recommendation and award of final judgment against Appellant?

2. Did the District Court and Magistrate Judge err by failing to properly consider documents produced in advance of the May 2023 hearing and Appellant's experts' testimony?

2

3. Did the District Court and Magistrate Judge incorrectly determine the amount of short-swing profits?

4. Did the District Court and Magistrate Judge incorrectly award, and/or did the District Court incorrectly compute, pre-judgment interest?

5. Did the District Court err in denying Appellant's motion to dismiss for lack of standing, and in entering Judgment notwithstanding the lack of any evidence of actual injury on the part of Plaintiffs-Appellees?

## STATEMENT OF THE CASE

Appellant takes this appeal from a Judgment entered on March 20, 2024 in two coordinated actions. The actions were brought by Plaintiffs-Appellees against MintBroker and Appellant under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) for disgorgement of short-swing profits.

On April 8, 2022, the District Court (Hon. Vernon S. Broderick) granted Plaintiffs-Appellees' motion for summary judgment against both Appellant and MintBroker. SPA1. The District Court found that Defendants were strictly liable under Section 16(b), but that the amount of profits Defendants earned and the exact period that Defendants were more than 10% beneficial owners was in dispute. SPA25. The District Court referred the case to Magistrate Judge Lehrburger for a hearing on damages as "the parties still dispute[d] the amount of profits

3

Defendants earned, including the exact period of time that Defendants were more-than-10% beneficial owners, as well as the calculation of damages." *Id*.

In November 2022, the District Court stayed these actions as to MintBroker because MintBroker was subject to Bahamian liquidation proceedings giving rise to an automatic stay. A701. On July 25, 2023, the District Court (Hon. Denise Cote) also denied Appellant's motion to dismiss for lack of standing. SPA27.

Magistrate Judge Lehrburger held a hearing on damages on May 1 and 2, 2023. *See* A726. Following that hearing, Magistrate Judge Lehrburger issued a Report and Recommendation dated October 6, 2023, recommending that (1) Plaintiff-Appellee Avalon be awarded disgorged profits in the amount of $6,235,908; (2) Plaintiff-Appellee New Concept be awarded disgorged profits in the amount of $6,102,002; and (3) each Plaintiff-Appellee be awarded prejudgment interest. SPA43. Appellant filed objections thereto. A1895. On February 5, 2024, the District Court (Hon. Denise Cote) adopted the Report and Recommendation with modifications, and directed Plaintiffs to submit revised prejudgment interest calculations. SPA103. On March 20, 2024, the District Court entered final judgment, awarding Plaintiff-Appellee Avalon pre-judgment interest in the amount of $1,983,267, for a total final judgment amount of $8,219,175, and awarding Plaintiff-Appellee New Concept pre-judgment interest in the amount of

$1,971,281, for a total final judgment amount of $8,073,283. SPA119. Appellant filed the instant Notice of Appeal on April 16, 2024. A1933.

## SUMMARY OF ARGUMENT

The District Court and Magistrate Judge's decisions suffer from a fundamental flaw that permeates every aspect of its holdings of liability and quantification of sums allegedly owed under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) – its misapplication of the requirement that Appellant hold a pecuniary interest in the shares at issue in order to be required to disgorge his short-swing profits.

The District Court and Magistrate Judge's decisions computing damages accept as "law of the case" that Appellant is the beneficial owner of all shares reported on Schedules 13D filed by MintBroker for positions in Avalon and New Concept and further, that as the beneficial owner he is liable for all profits earned on those shares, regardless of any beneficial ownership by others. While the District Court's summary judgment decision indeed held that Appellant was a beneficial owner for reporting purposes under Sections 13(d) and Section 16 of the 1934 Act, it made no determination as to the amount of pecuniary interest that Appellant or MintBroker held. The very purpose of the referral for a damage computation was to make that determination. But the District Court and Magistrate Judge ignored that issue and wrongfully assumed that the determination of

beneficial ownership by the District Court on summary judgment rendered Appellant liable for 100% of profits regardless of his actual pecuniary interest.

Rule 16a-1(a)(2), 17 C.F.R. 240 § 16a-1(a), draws a distinction between "beneficial ownership" to determine reporting obligations for the ten percent threshold and the application of the term to the quantification of damages, where "the term beneficial owner shall mean any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares a direct or indirect pecuniary interest in the equity securities.…" (emphasis added). As the Romeo & Dye treatise explains, "The broker's beneficial ownership of shares is not exclusive of the customer and it is possible that both the customer and the broker will be deemed beneficial owners of the same shares." *See* Peter Romeo & Alan Dye, Section 16 Treatise and Reporting Guide § 2.03(iv) (5th ed. 2019). During the course of the hearing, Magistrate Judge Lehrburger ignored pecuniary interest, stating: "I just want to figure out what the evidence tells me in terms of whether the definition of beneficial ownership has or hasn't been met. So that's the scope of what I have to do." A036.

The District Court accepted the Magistrate Judge's conflation of beneficial ownership for reporting purposes with pecuniary interest, and simply relied on the District Court's summary judgment decision as conclusive evidence of Appellant's pecuniary interest in all trades at issue. But the summary judgment decision did not

6

so hold. And if it had, any such holding was in error given that Plaintiffs-Appellees failed to establish the absence of material issues of fact with respect to Appellant's pecuniary interest in the trades at issue, and should thus be reversed.

The District Court's and Magistrate Judge's flawed premise permeates their analysis of Appellant and the expert evidence that he put forth. Their decisions cast Appellant in a negative light for seeking to prove that customers indeed earned profits from trading in Avalon and New Concept, suggesting that he had been dilatory or perhaps acted in bad faith. They criticize Appellant for not producing documents he did not have, and then erroneously refused to consider those documents when they became available in advance of the damages inquest because those documents allegedly undermined the District Court's summary judgment determination.

Thus, for the reasons set forth in detail below, we respectfully request that the Court reverse the Judgment against Appellant, and award such other relief as it deems just and proper.

## STATEMENT OF FACTS

### I.   APPELLANT AND MINTBROKER

Defendant-Appellant Gentile is the founder and former CEO of MintBroker. A759-60. In 2011, MintBroker became registered and licensed under Bahamian law as a broker-dealer to provide online day trading services to its clients. A759. It

7

began with three employees, but the company grew to 80 employees at one point. A759-60. MintBroker held numerous customer (client) accounts. At its peak, MintBroker also had as many as 50,000 customer (client) accounts. A759. MintBroker only offered self-directed accounts, whereby its customers made their own trading decisions. A763. It did not offer customer accounts whereby MintBroker employees made trading decisions, commonly referred to as managed accounts. *Id*. In 2018, (the relevant time period of the trading at issue in these matters), MintBroker also had engaged in trading for its own purposes, and had three or four traders that would place trades on behalf of MintBroker in the company's trading account. A762.

MintBroker customer trades were submitted by customers through the web-based DAS Trader system. A762-763. A customer would log onto their DAS Trader account with a username and password, search for the security they wanted to trade, choose the type of order to place and the number of shares, and enter the order. A773. The order would then get sent to MintBroker's designated server in DAS Trader, which would then either route the order to one of the clearing firms it used (*e.g.*, InteractiveBrokers) to execute the order in the market, or it would be executed through an internal cross-trade within the DAS Trader system.[2] A773-72.

---

[2] The DAS Trader system enabled internal cross-trading as a method of efficiently executing multiple customer trades in certain circumstances (one buying, one selling the same security) because clearing firms do not allow wash trading in the

8

MintBroker's omnibus account at InteractiveBrokers functioned both as a method to hold its own positions and to hold client shares and execute client transactions. A807-08. When a foreign broker-dealer, like MintBroker, opens an account at a U.S. clearing firm, the clearing firm recognizes the broker-dealer as the account holder, but understands that it is utilizing the omnibus account to hold shares and execute trades on behalf of its underlying clients. A807. The shares held by MintBroker appeared as a single book entry at InteractiveBrokers, inclusive of customer and proprietary positions. InteractiveBrokers was not provided with the names of MintBroker clients who were trading through the omnibus account and had no way of identifying whether a trade in the omnibus account was placed on behalf of MintBroker or a client. A808, A1060-61.

## II. THE TRADES AT ISSUE

The District Court found that: (i) MintBroker purchased 1,922,095 shares in Avalon on June 15, 2018, traded the stock thousands of times, and reduced its Avalon holdings to zero by August 21, 2018, and (ii) MintBroker purchased 1,073,713 shares of New Concept stock on May 14, 2018, engaged in thousands of trades, and sold all of its shares by September 25, 2018. *Avalon Holdings Corp. v. Gentile*, 18CV7291 (DLC), 2024 WL 449278, at *1 (S.D.N.Y. Feb. 5, 2024); *see*

---

market and, when trading in an omnibus account, clearing firms cannot see that the trades are on behalf of two separate beneficial owners. A764-65.

*also*, SPA103. The parties dispute if, and when, MintBroker became a greater than 10% beneficial owner of shares of Avalon and/or New Concept.

## III.   PROCEDURAL HISTORY

### A.   Commencement of the Underlying Actions

Plaintiffs-Appellees Avalon and New Concept filed two coordinated actions against Appellant and MintBroker on August 13, 2018, and September 28, 2018, respectively. A36. In each of those actions, Plaintiffs-Appellees sought to recover short-swing profits under 15 U.S.C. § 78p(b) for trading alleged to have been done by MintBroker in the summer of 2018.

### B.   Appellant Has No Authority Over MintBroker or Access to its Records

In September 2019, Appellant left The Bahamas. Immediately upon leaving, Appellant was "out of the firm" (Mintbroker) and no longer had any access to, or authority to obtain, MintBroker's records. A804, A836-38. At that time, MintBroker was in the process of shutting down and firing all staff. A836-38. MintBroker's closure "was based on a board resolution between the board of directors" and unrelated to the underlying litigation. A1426. Appellant was not the sole director of MintBroker and did not have sole control over any such decision. A836, 838. In October 2019, Plaintiffs-Appellees served their first set of document requests on Appellant and MintBroker. A1579, A706. As Appellant testified at his 2020 deposition, MintBroker's records, including those relating to customer

10

accounts, were retained by MintBroker's attorneys in The Bahamas. A1426-27. The records were delivered to MintBroker's Bahamian attorneys by MintBroker's IT or compliance department on a thumb drive. Appellant did not have access to or a copy of that thumb drive. A1428-30.

Appellant produced the records he had access to from the United States, but could not produce records that were not in his possession, custody or control (including all documents located in The Bahamas or held by MintBroker's Bahamian counsel, and for which Bahamas law restricted disclosure). A1576-79. While Appellant requested additional records from MintBroker's attorneys, those attorneys stated that they would not provide them to Appellant or instruct anyone else on MintBroker's staff to do so. A839-40, A1536-41.

Among the records that Appellant did not have access to was data from a system used by MintBroker called iBoss (Internal BackOffice Support System). A769, A798. The iBoss system self-populated data with information concerning executed trades. A844, A895. The data contained in the iBoss system could not be altered, as it was a "view-only system." A771, A773, A797, A1688-89. The InteractiveBrokers records for MintBroker's omnibus account, which were produced in discovery, combined client trades with MintBroker proprietary trades, and did not have data that could be used to distinguish client accounts and company accounts. The iBoss system, on the other hand, had identifiers to

11

distinguish client and MintBroker proprietary trades. *See* A1060-61, A865-67, A927, A1695.

### C. The District Court Awards Plaintiffs-Appellees Summary Judgment, Stays Proceedings Against MintBroker and Denies Appellant's Motion to Dismiss for Lack of Standing

On April 8, 2022, the District Court (Hon. Vernon S. Broderick) granted in part Plaintiffs-Appellees' motion for summary judgment against both Appellant and MintBroker. The Court found that Appellant and MintBroker were strictly liable under Section 16(b), but that the amount of profits they earned and the exact period that they were more than 10% beneficial owners was in dispute. *See Avalon Holdings Corp. v. Gentile*, 597 F. Supp. 3d 640, 654-56 (S.D.N.Y. 2022). *See also,* SPA 21-25. The Court held, *inter alia*, that Appellant and MintBroker were "beneficial owners" as defined in Rule 13d-3 because they had or shared, or had a right to acquire within sixty days, voting power and/or investment power of more than 10% of Avalon and New Concept shares during the relevant time period. *Id.* The Court also held that Appellant and MintBroker generally had a pecuniary interest in at least some of the shares at issue, but did not quantify that interest, stating: "Defendants had pecuniary interests in these shares because they had the opportunity to and did profit from them. As I explained, the trading records demonstrate that Plaintiffs successfully sold thousands of shares that they bought at a much lower price, and Defendants have failed to create a genuine dispute that

they have not reaped the profits between the purchase price and the sale price." *Id*. at 655-56. *See also*, SPA 23-25. The Court referred the case to Magistrate Judge Lehrburger for an inquest on damages as "the parties still dispute[d] the amount of profits Defendants earned, including the exact period of time that Defendants were more-than-10% beneficial owners, as well as the calculation of damages." *Id*. at 656-57. *See also*, SPA 23-25.

In November 2022, the District Court stayed these actions as to MintBroker because MintBroker was subject to Bahamian liquidation proceedings giving rise to an automatic stay. A701. The liquidation proceedings commenced in March 2020. On July 25, 2023, the District Court (Hon. Denise Cote) denied Appellant's motion to dismiss for lack of standing. SPA27.

## D. **Appellant Obtains the MintBroker Records**

Following the Court's decision on summary judgment, in or around late April 2022, Appellant again reached out to Bahamian counsel to request information in the possession of MintBroker's attorneys. They again refused. This time, however, they advised that they did not object to Appellant contacting former MintBroker employees. Appellant then contacted MintBroker's former Chief Compliance Officer, Mr. Cooper. Mr. Cooper advised Appellant he had asked a former IT Manager for MintBroker, Stephen Darville ("Darville"), to keep a copy of MintBroker's records. Appellant contacted Darville, who told Appellant that he

13

found a copy of a drive containing MintBroker records, including data from the iBoss system. Darville then rebuilt MintBroker's iBoss system, and provided the iBoss records to forensic accountants retained by Appellant. A797-99, A1264. Those records were produced to the Plaintiffs-Appellees in May 2022 (the "MintBroker Records"), and identified account names with respect to MintBroker's trading activity. MintBroker's proprietary trading account was identified as account 32810, its journal entry recordkeeping account was identified as account 32812, and its client accounts were identified based on their account names starting with the letters "PFS" or "MBS." A1695, A772-78, A959-60.

Appellant engaged two independent forensic accountants to calculate short-swing profits for shares beneficially owned by MintBroker in Avalon (AWX) and New Concept (GBR). The first accountant, Robert Christian ("Christian"), was shown by Darville a demonstration of the iBoss system through a videoconference "walk-through." A922. Darville then provided Christian with credentials which gave him direct access to iBoss. A922. Darville described the process of providing Christian with direct access to the iBoss system and further testified that Gentile did not place any limits on the types of documents Darville could share with the experts. A1709-11, A-1755.

Through his remote access, Christian generated reports for AWX and GBR for the relevant time period. A922. He was able to review the data provided

14

(including random sampling of names provided for trades) to distinguish between client accounts and MintBroker accounts. He determined that account 32810 was the only "corporate trading account" relevant for purposes of determining short-swing profits. A777-74, A934. Both Appellant and Christian testified that the account 32810 featured both company propriety trades as well as some instances of inventory trades. A778, A934-35. Appellant explained: "If the firm, for example, had a thousand shares of a particular stock long or short, and a client placed an offsetting trade, the system, meaning the DAS system, would automatically execute against inventory first before routing out to the market." A778. He also explained that because trades reflected in the account 32810 could have been client orders filled from MintBroker's inventory, determination of beneficial ownership requires filtration of the data to determine who initiated the transaction, MintBroker or a client. A853-54. This is precisely what the forensic accountant, Christian, did by locating exact replicate offsetting trades in client accounts. A934-35, A947.

Using these methodologies, Christian concluded that MintBroker's proprietary trades did not cross the 10% beneficial ownership with respect to New Concept (GBR) and that MintBroker's short-swing profits with respect to Avalon (AWX) were approximately $1.2 million. A957, A1258. An additional forensic accountant, Brendan Beresford ("Beresford") relied on representations regarding

15

the distinctions between client account names, the MintBroker proprietary account, and client offset inventory trades and reached the same conclusion. A1262.

Appellant also sought additional customer records directly from MintBroker through letters rogatory. A23, A699, A703. Magistrate Judge Lehrburger granted Appellant's motion on October 18, 2022. A697. However, as of the date of the inquest, the MintBroker liquidators had not yet produced responsive documents. SPA67-68.

### E.     The Damages Inquest and Report and Recommendation

Magistrate Judge Lehrburger held a two-day inquest on damages, at which only Appellant presented witnesses, on February 1-2, 2023. Plaintiffs-Appellees presented no expert testimony or evidence rebutting Appellant's experts' calculations, but sought a total award of over $12 million, plus pre-judgment interest, based on MintBroker's Interactive Brokers data and Schedule 13D filings. *See generally* SPA43, A1844, A1883. Appellant opposed. A1822, A1872.

On October 6, 2023, Magistrate Judge Lehrburger issued a Report and Recommendation holding, *inter alia*, that:

> 1. The MintBroker Records reflecting customer trades are fundamentally incompatible with the District Court's summary judgment finding that MintBroker and Appellant were beneficial owners subject to Section

16

16(b) liability, and thus the law-of-the-case doctrine barred consideration of the MintBroker Records;

2. Alternatively, the MintBroker Records should not be excluded as a discovery sanction, but an award of reasonable attorneys' fees would be warranted, if those records were allowed into evidence;

3. Testimony by Appellant's expert witnesses depended on the MintBroker Records, and thus should be disregarded as incompatible with the law of the case or, alternatively, based on Federal Rule of Evidence 702; and

4. Appellant should be required to disgorge $6,235,908 with respect to Avalon and $6,102,002 with respect to New Concept, plus pre-judgment interest.

*See* SPA43.

Appellant filed timely objections to the Report and Recommendation.

### F. <u>The District Court Adopts the Report and Recommendation and Awards Pre-Judgment Interest</u>

On February 5, 2024, the District Court (Hon. Denise Cote) adopted the Report and Recommendation with modifications, and directed Plaintiffs-Appellees to submit revised prejudgment interest calculations. *Avalon Holdings Corp. v. Gentile*, 18CV7291 (DLC), 2024 WL 449278, at *5 (S.D.N.Y. Feb. 5, 2024). *See also*, SPA118. The District Court, *inter alia*:

17

- Rejected Appellant's objection that the Report and Recommendation failed to consider his pecuniary interest where the Magistrate Judge "expressly noted that the result of the calculation 'would be no different under the pecuniary interest standard'" and where Judge Broderick's summary judgment decision "found that the defendants failed to create a genuine dispute that they had a pecuniary interest in the trading as that term is defined in Rule 16a-1(a)(2)." (2024 WL 449278, at *4);

- Appellant's damages theory was based on documents and testimony that were "fundamentally incompatible with the summary judgment decision, which held that" trading records demonstrated that Defendants "'have failed to create a genuine dispute that they have not reaped the profits between the purchase price and the sale price'", and those documents and testimony were properly excluded or not considered by the Magistrate Judge (*id*.);

- The Report and Recommendation contained no clear error in its computation of damages (*id.*, at *5);

- Plaintiffs-Appellees should be awarded pre-judgment interest (*id*.); and

18

- Appellant's objection that Plaintiffs-Appellees lack standing is overruled for the reasons previously set forth by the Court on July 25, 2023. *Id*.

*See generally* 2024 WL 449278. *See also*, SPA103.

On March 20, 2024, the District Court entered final judgment, awarding Plaintiff-Appellee Avalon pre-judgment interest in the amount of $1,983,267, for a total final judgment amount of $8,219,175, and awarding Plaintiff-Appellee New Concept pre-judgment interest in the amount of $1,971,281, for a total final judgment amount of $8,073,283. SPA119.

Appellant filed a timely Notice of Appeal on April 16, 2024.  A1933.

## STANDARD OF REVIEW

This Court reviews "'*de novo* a district court's decision to grant summary judgment, construing the evidence in the light most favorable to the party against whom summary judgment was granted and drawing all reasonable inferences in that party's favor.'" *Horn v. Med. Marijuana, Inc.*, 80 F.4th 130, 135 (2d Cir. 2023), *cert. granted*, 144 S. Ct. 1454 (2024). This Court similarly reviews the denial of a motion to dismiss, including a motion to dismiss for lack of standing, *de novo*. *Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 173 (2d Cir. 2012).

This Court reviews the District Court's post-trial findings of fact for clear error and its conclusions of law *de novo*. *Arch Ins. Co. v. Precision Stone, Inc.*,

19

584 F.3d 33, 38-39 (2d Cir. 2009). "'Although the amount of recoverable damages is a question of fact, the measure of damages upon which the factual computation is based is a question of law.' . . . '[W]hether the district court correctly calculated damages is [thus] a question of law that [this Court] review[s] *de novo*.'" *Id.* at 40 (citations omitted).

The District Court's decision to award pre-judgment interest, and its method of computing pre-judgment interest, are both reviewed for abuse of discretion. *S.E.C. v. Contorinis*, 743 F.3d 296, 307 (2d Cir. 2014).

## ARGUMENT

**I.  THE DISTRICT COURT AND MAGISTRATE JUDGE ERRED IN THEIR COMPUTATION OF THE AMOUNT OF SHORT-SWING PROFITS**

### A.  The District Court and Magistrate Judge Erred by Failing to Properly Consider Appellant's Pecuniary Interest in the Securities at Issue

The District Court and Magistrate Judge both erred by failing to consider the fundamental distinction between the definition of beneficial ownership under Section 13(d) (which focuses on control and voting power), and the pecuniary interest test required to compute the amount of disgorgement under Section 16(b).

In granting partial summary judgment, the District Court recognized that in an action for disgorgement of short-swing profits under Section 16(b), there are two different relevant definitions of "beneficial owners." The first applies to determine whether a person is a more-than 10% beneficial owner. Under that test,

20

"a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares: (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) Investment power which includes the power to dispose, or to direct the disposition of, such security." *Avalon Holdings Corp. v. Gentile*, 597 F. Supp. 3d 640, 654 (S.D.N.Y. 2022) (quoting 17 C.F.R. § 240.13d-3(a)). *See also*, SPA21-22.

While the District Court, on summary judgment, found that Appellant was liable under that definition of "beneficial owner" applied for purposes of *liability*, it appropriately acknowledged that a different definition of "beneficial owner" applies for purposes of *disgorgement – i.e.*, one that considers "pecuniary interest" in addition to voting and investment power. As the District Court held, "[o]nce a person meets th[e liability] criterion and becomes liable under § 16(b), the extent of their liability, *i.e.*, how much short-swing profits they have to disgorge, is governed by another definition of 'beneficial owner' as provided under Rule 16a-1(a)(2):

> Other than for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities . . . the term beneficial owner shall mean any person who, directly or indirectly . . . has or shares a direct or indirect pecuniary interest in the equity securities . . . The term pecuniary interest . . . shall mean the opportunity, directly or indirectly, to profit or

> share in any profit derived from a transaction in the subject securities."

*Id*. at 655 (quoting 17 C.F.R. 240.16a-1(a)(2) and citing *Huppe v. Special Situations Fund III QP, L.P.*, 565 F. Supp. 2d 495, 499 (S.D.N.Y. 2008)); *see also Feder v. Frost*, 220 F.3d 29, 33 (2d Cir. 2000); *Editek, Inc. v. Morgan Capital, L.L.C.*, 150 F.3d 830, 834 (8th Cir. 1998) ("It may seem odd that [defendant] both was and was not a beneficial owner . . . , but the SEC has long recognized the two definitions of *beneficial owner* can result in different determinations of beneficial ownership.").

In computing short-swing profits, the District Court and Magistrate Judge both failed to properly consider Appellant's pecuniary interest in the shares at issue. Instead, they erroneously found that any holding that Appellant was not the "beneficial owner" of all shares of Avalon and New Concept traded by MintBroker was "fundamentally incompatible" with the District Court's summary judgment decision. *Avalon Holdings Corp. v. Gentile*, 18CV7291 (DLC), 2024 WL 449278, at *4 (S.D.N.Y. Feb. 5, 2024). *See also,* SPA79-85; SPA114. That holding fundamentally misunderstood the extent of the District Court's summary judgment holding.

On summary judgment, the District Court considered whether Appellant and MintBroker met the definition of "beneficial owner" for purposes of liability, but did not consider the *extent* to which either Defendant met the second definition of

22

beneficial ownership for purposes of disgorgement. The District Court did note that "Defendants had pecuniary interests in these shares because they had the opportunity to and did profit from them," and also that "Defendants have failed to create a genuine dispute that they have not reaped the profits between the purchase price and the sale price." *Avalon Holdings Corp. v. Gentile*, 597 F. Supp. 3d at 656. *See also*, SPA23-24. However, the District Court's summary judgment decision did not consider or determine the extent of those profits that could be attributed to either Defendant. *Avalon Holdings Corp. v. Gentile*, 597 F. Supp. 3d at 655–56. *See also,* SPA23-25. In fact, the District Court's summary judgment decision explicitly designated Magistrate Judge Lehrburger to determine "the amount of profits Defendants earned." *Avalon Holdings Corp. v. Gentile*, 597 F. Supp. at 656. *See also*, SPA25. But even if the summary judgment determined that Appellant had a pecuniary interest in all of the trades at issue, that decision would have been erroneous as there were material questions of fact regarding Appellant's pecuniary interest. *See* Point I.B, *infra*.

And while the Magistrate's Report and Recommendation improperly focused on "Rule 13d-3's standard of voting power and/or investment power," it stated in a footnote that "the result would be no different under the 'pecuniary interest' standard." *Avalon Holdings Corp. v. Gentile*, 18CV7291DLCRWL, 2023 WL 6566810, at *2 (S.D.N.Y. Oct. 6, 2023), *report and recommendation adopted*

23

*as modified*, 18CV7291 (DLC), 2024 WL 449278, at *4 (S.D.N.Y. Feb. 5, 2024). *See also* SPA47-48. However, neither the Magistrate Judge nor District Court in adopting the Report and Recommendation offered any basis for that holding other than citing to the District Court's summary judgment opinion. *Id*. This is because the evidence does not support such a holding. The evidence presented to Magistrate Judge Lehrburger and the District Court clearly shows that Appellant did not have a pecuniary interest in many of the trades at issue. *See infra*. Instead, MintBroker facilitated "riskless principal trading" for its customer trades, whereby MintBroker did not have any risk or interest in the outcome of the transaction passing through its inventory account and did not profit from those transactions. A818, A907. MintBroker's customer trades thus should not have been included in the Magistrate Judge and District Court's computation of short-swing profits.

Moreover, even if a holding that Appellant did not have a pecuniary interest in some of the trades at issue was incompatible with the Court's summary judgment decision – which it was not – that decision was erroneous (*see infra* at Point I.B) and the District Court incorrectly held that reconsideration of that decision would be inappropriate (*see id.*).

24

**B.** **The District Court and Magistrate Judge Erred by Failing to Properly Consider Documents Produced in Advance of the May 2023 Hearing and Appellant's Experts' Testimony.**

The District Court and Magistrate Judge also failed to properly weigh the MintBroker Records and expert testimony, holding that consideration of the MintBroker Records and testimony based on those records were barred by the law-of-the-case doctrine and that the expert testimony presented by Appellant's expert witnesses should be excluded under Federal Rule of Evidence 702.

### 1. The District Court and Magistrate Judge Erred by Refusing to Consider the MintBroker Records and Related Testimony

The District Court and Magistrate Judge failed to consider both the MintBroker Records, and expert reports and testimony based on those records, on the grounds that doing so would be at odds with the District Court's summary judgment determination. However, as set forth in detail above, there is no incompatibility with considering the MintBroker Records for determining the extent of Appellant's *pecuniary* interest in (rather than voting power or control over) the trades at issue, where the Court's summary judgment decision did not deal with that issue. Yet even if it had, that decision was erroneous and should be reversed. And since Appellant's pecuniary interest is key to a determination of the amount of short-swing profits to be disgorged, the District Court and Magistrate Judge improperly refused to consider that information, which was reflected in the MintBroker Records. *See* Point I.A, *supra*. Other than this purported inconsistency,

25

there is no basis to refuse to consider the MintBroker Records and related testimony.

Yet even if the MintBroker Records and related testimony were incompatible with the District Court's summary judgment decision, the District Court erred by refusing to reconsider that decision based upon review of the MintBroker Records. Reconsideration is appropriate based on the availability of new evidence, or the need to correct a clear error or prevent manifest injustice. *Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*, 88 CIV. 9127 (DNE), 1992 WL 296314, at *3 (S.D.N.Y. Oct. 6, 1992). Here, the MintBroker Records, and testimony of the witnesses, show that Appellant was not a "beneficial owner" of many of the shares at issue for purposes of computation of short-swing profits to be disgorged because MintBroker clients had a pecuniary interest in those shares, and not Mr. Gentile (or MintBroker). *See infra*.[3]

Moreover, the MintBroker Records from the iBoss system were unavailable to Appellant at the time of the District Court's summary judgment decision, and

---

[3] The evidence at trial also shows that Mr. Gentile had no voting or investment power over the MintBroker customer trades. For example, Mr. Gentile testified:

> Q. [M. Ford]: . . . Who would have the right to vote a
> share that was purchased by a client?
> A. [G. Gentile]: The client.
> Q. Would MintBroker have the capability to dispose of a
> share that a client purchased through MintBroker?
> A. Not without the permission of the client . . .

A806-07.

26

could not have been discovered by him with the exercise of reasonable diligence. *See* Point III.B, *supra*; *infra*. Nor were those records necessary to determine the issue addressed by the Court – status as a 10% beneficial owner for purposes of liability. As soon as Appellant became aware that those records had become available, he produced the records to Plaintiffs-Appellees. And it would be manifestly unjust to compel Appellant to disgorge funds that he never received and had no pecuniary interest in in the first place. Any such ruling is contrary to Rule 16a-1(a)(2). *See* 17 C.F.R. § 16a-1(a)(2).

The District Court and Magistrate Judge refused to reconsider the District Court's summary judgment decision based upon the MintBroker Records because they found that Appellant was not sufficiently diligent in producing the records. *Avalon Holdings Corp. v. Gentile*, 18CV7291DLCRWL, 2023 WL 6566810, at *19 (S.D.N.Y. Oct. 6, 2023), *report and recommendation adopted as modified*, 18CV7291 (DLC), 2024 WL 449278, at *4 (S.D.N.Y. Feb. 5, 2024). *See also*, SPA80, SPA115. The District Court, without citation, erroneously held that Appellant had access to MintBroker's documents until March 2020. *Avalon Holdings Corp. v. Gentile*, 18CV7291 (DLC), 2024 WL 449278, at *4 (S.D.N.Y. Feb. 5, 2024). *See also*, SPA115. But at the time that Plaintiffs-Appellees served discovery requests in these actions, only MintBroker and its Bahamas counsel, and not Appellant, had access to the iBoss data underlying the MintBroker Records.

27

A804, A836-38, A1432-35. At that time, MintBroker was in the process of shutting down and firing all staff for reasons unrelated to the instant litigation. A836-38, A1426. As Appellant testified at his 2020 deposition, MintBroker's records, including those relating to customer accounts, were retained by MintBroker's attorneys in The Bahamas and he did not have access to those documents due to his departure from MintBroker and Bahamas law which precluded disclosure of the documents. A1427, A1432-35. Appellant informed Plaintiffs-Appellees in 2020 that the records were delivered to MintBroker's Bahamian attorneys by MintBroker's IT or compliance department on a thumb drive, and that Appellant did not have access to or a copy of the contents of that drive. A1427-30.

Appellant produced the records that he had access to. However, he simply could not produce records that were not in his possession, custody or control. A1576-79. Appellant requested records from MintBroker's attorneys, but they informed him that they would not provide those documents or instruct anyone else on MintBroker's staff to do so. A839-40, A1536-41.

In 2022, following developments in this litigation and The Bahamas liquidation proceedings, Appellant again reached out to Bahamian counsel to request information in the possession of MintBroker. They again refused. Thereafter, Appellant learned for the first time that a former employee, Darville,

28

had a copy of a drive containing MintBroker records, including data from the iBoss system. Darville then rebuilt MintBroker's iBoss system, and provided the iBoss records to forensic accountants retained by Appellant. A798-99, A1264. Those records were promptly produced to the Plaintiffs-Appellees in May 2022. A691. Any claim that Appellant did not act diligently or appropriately, or that he had access to the MintBroker Records during discovery in this action and prior to the District Court's summary judgment decision, is belied by the record.

Furthermore, Appellant did not represent that MintBroker's lawyers in The Bahamas or any third parties possessed no additional documents – instead, his representation that all documents were produced referred solely to Appellant. *Avalon Holdings Corp. v. Gentile*, 18CV7291DLCRWL, 2023 WL 6566810, at *19 (S.D.N.Y. Oct. 6, 2023) (quoting 1/22/2020 Conference Transcript in which defense counsel responded that "***He*** does not" have any other information and "***he*** has done a diligent search") (emphasis added); *see also*, SPA58 (same); *Avalon Holdings Corp. v. Gentile*, 18CV7291 (DLC), 2024 WL 449278, at *4 (S.D.N.Y. Feb. 5, 2024) (stating incorrectly and without citation that "Gentile repeatedly represented that all records had been produced and that other records did not exist or were merely duplicative of what had been produced."); *see also*, SPA115 (same). Nor did Appellant represent, as the District Court held, that the trades at issue "did not represent any client trades." *Avalon Holdings Corp. v. Gentile*,

29

18CV7291 (DLC), 2024 WL 449278, at *4 (S.D.N.Y. Feb. 5, 2024) (citing May 13, 2020 stipulation relating to "proprietary" account, and not pecuniary interest). *See also*, SPA115.

2. The District Court and Magistrate Judge Abused their Discretion in Excluding Appellant's Expert Witnesses.

The Magistrate Judge recommended exclusion of the testimony and reports of Appellant's expert witnesses, Christian and Beresford, as contrary to the law of the case and also on the grounds that their opinions "are not based on 'sufficient facts or data' and are not 'the product of reliable principles and methods.'" *Avalon Holdings Corp. v. Gentile*, 18CV7291DLCRWL, 2023 WL 6566810, at *23 (S.D.N.Y. Oct. 6, 2023). *See also*, SPA92-98. The District Court adopted that recommendation, holding that the experts' testimony was not based on "sufficient facts or data." *Avalon Holdings Corp. v. Gentile*, 18CV7291 (DLC), 2024 WL 449278, at *5 (S.D.N.Y. Feb. 5, 2024). *See also*, SPA116. This was an abuse of discretion. *See Richardson v. Corr. Med. Care, Inc*., 22-210, 2023 WL 3490904, at *1 (2d Cir. May 17, 2023) (A district court's decision to exclude expert testimony is reviewed for abuse of discretion).

Magistrate Judge Lehrburger took issue with Christian's methodology, complaining that his procedure to identify customer accounts was not sufficiently clear. The District Court adopted this complaint. But Christian testified at length about his procedure. For example, Christian testified that he reviewed account

30

names, names of entities, names of the persons, addresses, phone numbers, and the like, for trades. That information would reveal whether or not an account belonged to a client or was a proprietary MintBroker account. Christian reviewed this information for a random sampling of accounts – including the highest value accounts as well as typically 20% of other accounts, to assure that the relevant account identifiers belonged to customers and/or MintBroker. A929-31, A960.

Magistrate Judge Lehrburger, as adopted by the District Court, also took issue with the fact that "[n]either expert did anything to confirm whether client-related transactions . . . were 'actually effected for the clients.'" *Avalon Holdings Corp. v. Gentile*, 18CV7291DLCRWL, 2023 WL 6566810, at *24 (S.D.N.Y. Oct. 6, 2023). *See also*, SPA94. According to Magistrate Judge Lehrburger, there was not enough evidence to show that customer accounts actually belonged to customers. But that is precisely what Christian found in his expert review of the MintBroker Records, and what Appellant testified to repeatedly. A806-07, A818, A907, A982-83, A1258. The Magistrate Judge's suggestion that MintBroker's thousands of customers were fictitious has no factual basis. Why would MintBroker have complex liquidation proceedings if it had no customers?[4]

---

[4] In response to this surprising contention, Appellant obtained a declaration from one customer that he made trades in both Avalon and New Concept shares through MintBroker for his own customer account during the relevant time period. *See* A1924.

31

Moreover, Appellant sought additional information regarding customer accounts from MintBrokers through its letters rogatory. If Appellant and Christian's testimony and the MintBroker Records was not sufficient to segregate client trades – and it was – then the Magistrate Judge and the District Court should have allowed time for that evidence to be obtained from The Bahamas.

None of the other purported defects identified by Magistrate Judge Lehrburger or the District Court merit exclusion or any discounting of the experts' opinions. For example, the Magistrate Judge claimed that the analysis of "wash" trades was unreliable as a result of the issues with customer trades. *Avalon Holdings Corp. v. Gentile*, 18CV7291DLCRWL, 2023 WL 6566810, at *24 (S.D.N.Y. Oct. 6, 2023). *See also*, SPA95-96. But that proposition should be rejected as the experts' analysis of customer trades is reliable. *See supra*. And Magistrate Judge Lehrburger took issue with the inclusion of "negative" beneficial ownership to MintBroker. But that "negative" ownership occurred only when MintBroker had a short position. *Avalon Holdings Corp. v. Gentile*, 18CV7291DLCRWL, 2023 WL 6566810, at *24 (S.D.N.Y. Oct. 6, 2023). *See also*, SPA96-97, A936. And Magistrate Judge Lehrburger did not consider the alternative possibility of valuation with removal of negative positions, and instead improperly threw out the experts' entire reports, increasing purported

32

disgorgement by over ten times. The District Court failed to analyze any of these errors.

The Magistrate Judge also took issue with the fact that the expert witnesses did not consider the Interactive Broker records or MintBroker's Schedule 13Ds. *Avalon Holdings Corp. v. Gentile*, 18CV7291DLCRWL, 2023 WL 6566810, at *25 (S.D.N.Y. Oct. 6, 2023). *See also*, SPA97. But as Appellant testified, the Interactive Broker records (and thus any Schedule 13D based on those records) did not contain any information that would enable a viewer to distinguish between customer trades and proprietary trades. A808, A1060-61. If anything, the Magistrate Judge's reliance on Schedule 13D's filed by MintBroker (and District Court's citation thereto) was error. Courts have recognized that, in light of the disclaimers associated with reporting under Section 13(d), disclosure of a position on such a filing carries no weight. *See Levner v. Saud*, 903 F. Supp. 452, 461 (S.D.N.Y. 1994), *aff'd* 61 F.3d 8 (2d Cir. 1995) ("I find it irrelevant that . . . the filed Schedule 13D . . . represented Alwaleed to be a beneficial owner. . . . Regardless of Alwaleed's representative's interpretation of the law, liability will not be imposed unless he meets the statutory definition of an insider.") This Court in *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 129 (2d Cir. 2001), for example, rejected the argument that defendants' Schedule 13D "constitute[d] [an] admission[] of membership in a § 13(d) group," because "it [was] undisputed that

the [the defendant had] explicitly disclaimed beneficial ownership in the text of the Schedule 13D he filed with the SEC. . ." The Court also found that even when such disclaimers of beneficial ownership were absent, SEC filings still were not "persuasive." *Id.* Thus, it is black-letter law that a filing under Section 13 cannot establish beneficial ownership, nor can any filing on Form 3 or 4 under Section 16(a). *See Chem. Fund, Inc. v. Xerox Corp.*, 377 F.2d 107, 112 (2d Cir. 1967) ("there was no dispute [that defendant] was [not] the beneficial owner of the securities in question [and f]ailure to [include a Rule 13d-4] disclaimer [in defendant's Forms 3 and 4] cannot fairly be read to dispose of the question of statutory interpretation presented in this case."); *Levy v. Seaton*, 358 F. Supp. 1, 4 (S.D.N.Y. 1973) (finding it irrelevant that the defendant filed a form 4).

Thus, the expert reports were reliable and should have been afforded significant weight by Magistrate Judge Lehrburger and the District Court. Their failure to do so was an abuse of discretion.

### C. The District Court and Magistrate Judge Incorrectly Determined the Amount of Short-Swing Profits

The District Court and Magistrate Judge incorrectly calculated the amount of short-swing profits as $6,235,908 with respect to Avalon and $6,102,002 with respect to New Concept. Upon consideration of the MintBroker Records and expert testimony, short-swing profits subject to disgorgement, if any, are at most approximately $1.2 million.

34

The District Court and Magistrate Judge erred by failing to exclude customer accounts identified by Mr. Christian in the MintBroker Records for purposes of short-swing profits because Appellant lacks any pecuniary interest in those trades. *See supra*. A pecuniary interest is an "opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities." 17 C.F.R § 240.13d-3(a)(2)(i). MintBroker facilitated "riskless principal trading" whereby MintBroker and Appellant had no risk or interest in the outcome of the trades and did not profit from those transactions. A818, A907. Thus, MintBroker did not profit from short-swing profits realized in its customers' accounts, including those trades that passed through its inventory account.

The District Court and Magistrate Judge also erred by failing to exclude the recordkeeping account identified by Christian in the MintBroker Records, which did not reflect any actual trading activity, and thus could not be considered for purposes of computing short-swing profits. A773, A776, A930-31.

What remains, with respect to MintBroker's short-swing profits analysis, is the activity reflected in MintBroker's propriety trading account, account 32810. A778. Because that account included both company propriety trades as well as some instances of client trades facilitated through MintBroker's inventory, it is not possible to determine on the face of the entries in that account alone who the beneficial owner of the shares was. A778, A782-83. Instead, the data for that

account had to be filtered to determine who initiated the transaction, MintBroker or a client. A783, A853-54. This is precisely what Appellant's forensic accountant, Christian, did by locating exact replicate offsetting trades in client accounts. A934-35, A947. Specifically, Christian testified that he was able to "isolate . . . the true corporate trades" of MintBroker from those client trades executed through inventory by locating "offsetting" account 32810 trades "at the exact same time as a client trade." A935, A947. MintBroker's initial acquisition of those shares into inventory, purchased through its proprietary account, were counted as part of the experts' calculations of MintBroker's short-swing profits. A783-84.

Upon proper exclusion of the account 32812 journal entries and trades of shares beneficially owned by clients, both experts concluded that MintBroker never crossed the 10% threshold with respect to trading in New Concept (GBR) and that its short-swing profits of shares of Avalon (AWX) beneficially owned by MintBroker totaled approximately $1.2 million.  A1258, A1262, A940.

Plaintiffs-Appellees presented no expert testimony, and no evidence to refute or rebut the accuracy of the experts' reports or calculations. Instead, the evidence presented by Plaintiffs-Appellees – the Interactive Broker records and Schedule 13D – carry no weight in determining short-swing profits. *See Levner v. Saud*, 903 F. Supp. at 461 *Chem. Fund, Inc. v. Xerox Corp.*, 377 F.2d at 112 ("there was no dispute [that defendant] was [not] the beneficial owner of the

securities in question [and f]ailure to [include a Rule 13d-4] disclaimer [in defendant's Forms 3 and 4] cannot fairly be read to dispose of the question of statutory interpretation presented in this case."); *Levy v. Seaton*, 358 F. Supp. 1, 4 (S.D.N.Y. 1973). Moreover, evidence establishes that it is impossible to differentiate customer trades and proprietary trades in MintBroker's omnibus account at InteractiveBrokers. That account functioned both as a method to hold MintBroker's own positions and to execute client transactions. A807. InteractiveBrokers was not provided with the names of MintBroker clients who were trading through the omnibus account and had no way of identifying whether a trade in the omnibus account was placed on behalf of MintBroker or a client. A808, A1060-61. Any data obtained from InteractiveBrokers thus does not show whether or not Appellant (or MintBroker) held a proprietary interest in the trades at issue. The District Court and Magistrate Judge thus erred in relying solely on the InteractiveBroker records to compute short-swing profits.

## II.  THE DISTIRCT COURT ERRED IN AWARDING PLAINTIFFS-APPELLEES SUMMARY JUDGMENT NOTWITHSTANDING ISSUES OF MATERIAL FACT

The District Court erred in awarding Plaintiffs-Appellees summary judgment on liability notwithstanding issues of material facts. *First*, the District Court erred because Plaintiffs-Appellees failed to establish that Appellant held a pecuniary interest in *any* of the trades at issue. *Second*, while the District Court's

summary judgment decision did not find that Appellant held a pecuniary interest in *all* of the trades at issue, the Magistrate Judge and District Court later interpreted that decision to so hold. To the extent that this Court agrees with that interpretation, the District Court erred in granting summary judgment despite questions of material fact regarding whether Appellant held a pecuniary interest in all of the trades at issue.

It is movant that bears the burden of demonstrate that no material facts are in dispute when seeking summary judgment. *See Goenaga v. Mar. of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). Here, Plaintiffs-Appellees failed to meet that burden.

The District Court's summary judgment decision held that Appellant and MintBroker generally had a pecuniary interest in at least some of the shares at issue, stating: "Defendants had pecuniary interests in these shares because they had the opportunity to and did profit from them. As I explained, the trading records demonstrate that Plaintiffs successfully sold thousands of shares that they bought at a much lower price, and Defendants have failed to create a genuine dispute that they have not reaped the profits between the purchase price and the sale price." *Avalon Holdings Corp. v. Gentile*, 597 F. Supp. 3d 640, 655-56 (S.D.N.Y. 2022). *See also*, SPA23-24. This holding was in error. The trading records submitted on summary judgment list, for example, trade dates, quantities and prices (*see, e.g.*,

A152-468), but do not show or demonstrate in any way whether Appellant (or MintBroker) "reaped the profits between the purchase price and the sale price." *Avalon Holdings Corp. v. Gentile*, 597 F. Supp. 3d 640, 655-56 (S.D.N.Y. 2022). *See also* SPA24.

"The term pecuniary interest . . . shall mean the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities." *Id.* at 655. This analysis is key to the amount of short-swing profits, if any, subject to disgorgement but not necessary to determine liability as a beneficial owner. *See* Point I.B, *supra*.

Plaintiffs-Appellees included one paragraph in each of their Rule 56.1 Statements relating to pecuniary interest. That paragraph stated solely that "Both Defendants had a 'pecuniary interest' in the shares purchased and sold in the Trading Accounts within the meaning of Section 16(b) of the Act and SEC Rule 16a-1(a)(ii)." A85.3 ¶ 10. Notably, the paragraph was made *without citation*, and was disputed by Appellant. *Id.*; A643. Statements in a 56.1 statement that do not cite evidence are not entitled to any weight. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).

Moreover, if the District Court's summary judgment decision were interpreted to mean that Appellant held a pecuniary interest in *all* of the MintBroker trades at issue (though Appellant contends that such interpretation

would be erroneous), any such holding was erroneous. Plaintiffs-Appellees submitted no evidence to support that Appellant held a pecuniary interest in each of the trades at issue, much less evidence sufficient to establish that no question material of fact exists with respect to that proposition.

## III. THE DISTRICT COURT AND MAGISTRATE JUDGE INCORRECTLY AWARDED AND COMPUTED PRE-JUDGMENT INTEREST

### A. The District Court and Magistrate Judge Erred in Awarding Pre-Judgment Interest

"The decision of whether interest should be awarded in a particular Section 16(b) action is within the discretion of the Court . . . Because 'Section 16(b) says nothing about interest one way or the other,' the Supreme Court has held that interest should be 'given in response to considerations of fairness'" and "denied when its exaction would be inequitable.'" *Donoghue v. Casual Male Retail Grp., Inc.*, 375 F. Supp. 2d 226, 238 (S.D.N.Y. 2005). "Courts are disinclined to award pre-judgment interest when defendants, although liable, have not acted in bad faith (i.e., abused inside information)." *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 06CIV.2692KMWRLE, 2008 WL 4443828, at \*17 (S.D.N.Y. Sept. 29, 2008), *aff'd*, 684 F.3d 36 (2d Cir. 2012). Even where "[d]efendants have prolonged proceedings by denying liability," if defendants did not "act[ ] with wrongful intent in entering into the short-swing transaction at issue," then there is no bad faith and courts are disinclined to award prejudgment interest. *Donoghue v. Casual Male*

40

*Retail Grp., Inc.*, 375 F. Supp. 2d 226, 238 (S.D.N.Y. 2005). Here, there can be no dispute that Appellant did not "abuse[ ] inside information" in connection with the trades at issue. *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 2008 WL 4443828, at *17. Nonetheless, the District Court adopted the Magistrate Judge's recommendation that prejudgment interest be awarded, and held that an award of prejudgment interest would be proper because Appellant "did not violate § 16(b) inadvertently and repeatedly delayed this litigation." *Avalon Holdings Corp. v. Gentile*, 18CV7291 (DLC), 2024 WL 449278, at *5 (S.D.N.Y. Feb. 5, 2024). *See also*, SPA117. Since the standard requires that the District Court consider whether Appellant abused inside information (and he did not), the District Court abused its discretion in awarding prejudgment interest.

### B.  The District Court Erred in Computing Pre-Judgment Interest

Where a Court elects to award prejudgment interest, the rate of prejudgment interest granted is subject to the Court's "broad discretion." *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1071 (2d Cir. 1995). "In exercising such discretion, the court is to take into consideration '(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.'" *Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000). And "[i]n

deciding whether an award of prejudgment interest is warranted, it must be remembered that this is an equitable remedy and courts must be careful that an award does not overcompensate a plaintiff." *Com. Union Assur. Co., plc v. Milken*, 17 F.3d 608, 614 (2d Cir. 1994). Thus, when considering the interest rate for prejudgment interest, the Court's discretion must be "guided by the understanding that the aim of the relief awarded is to make the plaintiffs whole, but not to give them a windfall." *Algie v. RCA Glob. Commc'ns, Inc.*, 891 F. Supp. 875, 899 (S.D.N.Y. 1994), *aff'd*, 60 F.3d 956 (2d Cir. 1995).

The U.S. Code does not establish a prejudgment interest rate that governs federal claims. In response, "'[m]ost commonly, courts have borrowed the statutory post-judgment interest rate specified in 28 U.S.C. § 1961(a) in order to calculate pre-judgment interest.'" *Rai v. WB Imico Lexington Fee, LLC*, 09 CIV. 9586 (PGG), 2014 WL 12899673, at *4 (S.D.N.Y. May 12, 2014). Less frequently, courts have awarded "prejudgment interest at higher rates . . . for reasons that are not applicable here, including as a mechanism to force a defendant to disgorge 'benefits ... derived from its fraud,' to prevent a windfall to defendants 'where defendants have had the use of the money,' and to reflect 'the reprehensibility of [a] defendant['s] conduct.'" *Id. See also Algie v. RCA Glob. Commc'ns, Inc.*, 891 F. Supp. at 899 ("the federal rate is more appropriately used here since it provides a closer approximation of the likely return on plaintiffs' unpaid benefits since

1988"); *Jones v. UNUM Life Ins. Co. of Am.*, 14 F. App'x 44, 46 (2d Cir. 2001) (affirming application of prejudgment interest rate at the rate set forth in 28 U.S.C. § 1961). Courts have applied that same rate to federal securities claims, including claims under Section 16(b). *See, e.g.*, *Liberty Media Corp. v. Vivendi Universal, S.A.*, 03 CIV. 2175 SAS, 2013 WL 105776, at **1-4 (S.D.N.Y. Jan. 9, 2013) (for federal securities law claims under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5, as well as state law violations, awarding prejudgment interest based on the average rate of return on one-year Treasury bills as set forth in 28 U.S.C. § 1961, stating that "when 'a judgment is based on violations of both federal and state law, courts in this circuit uniformly have applied a federal interest rate, most commonly based on the average rate of return on one-year Treasury bills . . . for the relevant time period'"); *Dreiling ex rel. Infospace, Inc. v. Jain*, 281 F. Supp. 2d 1234, 1241 (W.D. Wash. 2003) (applying rate set forth in 28 U.S.C. § 1961 to prejudgment interest for claims under Section 16(b)); *S.E.C. v. Brethen*, C-3-90-071, 1992 WL 420867, at *23 (S.D. Ohio Oct. 15, 1992) (awarding prejudgment interest on claims pursuant to § 17(a), § 10(b) and Rule 10b–5 in accordance with 28 U.S.C. § 1961).

The District Court erred in accepting Plaintiffs-Appellees' argument that prejudgment interest should instead be the IRS underpayment rate, compounded quarterly. But Plaintiffs-Appellees relied primarily on cases in which the plaintiff

43

was the government (*i.e.*, the Securities and Exchange Commission) and thus distinguishable, as well as *Roth v. Jennings*, 03 CIV. 7760 (DAB), 2009 WL 1440670 (S.D.N.Y. May 21, 2009). In that case, counsel for Jennings withdrew after the Second Circuit remanded the case and a default judgment was awarded. Both the Decision and the Report and Recommendation by the Magistrate Judge came without any opposition. The District Court acknowledged that it could apply the rate of interest set forth in Section 1961, but approved of the higher IRS underpayment rate where, *inter alia*, the Court found the default judgment "serve[d] as some evidence of bad faith in connection with the transactions at issue." *Id*. at *6. Here, there is no evidence that Appellant engaged in bad faith, which Courts have interpreted to mean the "abuse [of] inside information" in connection with the trades at issue. *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 2008 WL 4443828, at *17.

The District Court's award of prejudgment interest also came without any showing of financial injury to either Plaintiff-Appellee or any evidence that Appellant abused inside information. For example, neither Plaintiff-Appellee has ever contended that Appellant possessed – or even had access to – confidential non-public information. Nor has either Plaintiff-Appellee claimed that Appellant utilized his share ownership to influence corporate decisions (only that Appellant and/or MintBroker intended to, but never actually did so). Section 16(b) designates

44

ten percent beneficial owners as "statutory insiders" on the premise that their share ownership provides access to control and/or non-public information, similar to directors and officers. Plaintiffs-Appellees have never offered evidence of access. Corporate control has never been possible because each Plaintiff-Appellee is controlled by a single shareholder. In the case of Avalon, the corporation has two classes of voting stock, with the senior class carrying 67% of the votes at a shareholder meeting and guaranteed a majority of the Board in the corporate charter. The senior class of shares has been held by one shareholder from 2018 through the present. *See, e.g.*, Form 14A, filed March 16, 2018 at page 6, available at https://www.sec.gov/Archives/edgar/data/1061069/000143774918004808/ awx20180305_def14a.htm; Form 14A, filed March 24, 2023 at page 2, available at https://www.sec.gov/Archives/edgar/data/1061069/000143774923007703/awx202 30313_def14a.htm.

The New Concept Form 10-K for the year ended December 31, 2018 discloses that one shareholder beneficially owned 59.63% of the outstanding shares. *See* Form 10-K, filed April 23, 2019, at p. 17, available at https://www.sec.gov/Archives/edgar/data/105744/000101054919000091/nce10- k123118.htm. That shareholder, Realty Advisors Inc., filed a Schedule 13D on June 27, 2018 disclosing its share ownership. *See* Schedule 13D, filed June 27, 2018, available at https://www.sec.gov/Archives/edgar/data/105744/00011

45

6552718000135/g8587.htm. In the case of New Concept, the possibility of access to non-public information is remote for an additional reason. That Plaintiff-Appellee has at all times been a shell, without meaningful business operations. New Concept sold its operating business for $85,000 in August 2020 and has not operated a business since then, apart from owning a single parcel of land that it leases for approximately $9,000 per month. *See* Form 10-Q, filed November 16, 2020, at page 8, Financial Statements at Note D, available at https://www.sec.gov/Archives/edgar/data/105744/000101054920000248/nce10q.htm; Form 10-K, filed March 21, 2023, page 4, available at https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/0000105744/000121465923004059/b32023010k.htm.

Because neither Plaintiff-Appellee has suffered any actual financial loss, and because Appellant did not abuse inside information, it was an abuse of discretion for the District Court to award an interest recovery in excess of the amount due applying the federal interest rate under 28 U.S.C. § 1961.

The application of a higher interest rate also unjustly penalized Appellant for delays that were out of his control. Several factors contributed to the progress of the proceedings, including the COVID-19 pandemic that began in early 2020, and the fact that summary judgment was initially briefed in October 2020 but not decided until April 2022. The latter delay may well have been a byproduct of the

46

disruptions caused by the pandemic. Appellant should not be penalized for these delays through compounding interest at rates in excess of 28 U.S.C. § 1961.

The District Court abused its discretion by computing pre-judgment interest in an amount exceeding the rate set forth in 28 U.S.C. § 1961 - the average U.S. treasury bill interest rate for the period from the date of accrual through the date of judgment, compounded annually. *See James v. Nat'l R.R. Passenger Corp.*, 1:02-CV-03915-RJH, 2005 WL 6182322, at *23 (S.D.N.Y. Mar. 28, 2005) (prejudgment interest computation pursuant to 28 U.S.C. § 1961 shall "use the average annual rate of return on one-year T-bills between the time the claim arises and the entry of judgment").

## IV. THE DISTRICT COURT ERRED IN DENYING APPELLANT'S MOTION TO DISMISS FOR LACK OF STANDING, AND IN ENTERING JUDGMENT NOTWITHSTANDING ANY EVIDENCE OF ACTUAL INJURY TO PLAINTIFFS-APPELLEES

Before the District Court, Appellant sought dismissal under Article III of the Constitution based on the absence of any actual injury by Plaintiffs-Appellees. At the hearing before the Magistrate Judge, Plaintiffs-Appellees offered no proof of actual injury, relying on the statutory violations alone for standing. Appellant acknowledges that this Court's ruling in *Packer on behalf of 1-800-Flowers.Com, Inc. v. Raging Cap. Mgmt., LLC* holds that a violation of Section 16, by itself, suffices to establish injury sufficient for standing under Article III. 105 F.4th 46, 56 (2d Cir. 2024). Appellant respectfully submits that the *Packer* ruling is contrary

47

to *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) and *Thole v. U. S. Bank N.A.*, 590 U.S. 538 (2020), and includes this point in its brief to preserve its right to seek review on a petition for certiorari.

*TransUnion* is clear that the standing inquiry requires more than associating a statutory violation with a traditionally recognized harm, however labelled. "[E]ven though 'Congress may 'elevate' harms that 'exist' in the real world before Congress recognized them to actionable legal status, it may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is.'" *TransUnion*, 594 U.S. at 426 (citations omitted). *TransUnion* recognizes that "Congress's views may be 'instructive,'" but "rejected the proposition that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue.'" *Id.* at 425-26. Instead, *TransUnion* requires a two-step analysis: first, determining a historical analogue and, second, determining if the plaintiff suffered a similar injury to the historical analogue. *Id.* at 432-39. Under *Packer*, the second step is not required.

The direct conflict between the *Packer* Opinion and *Thole v. U. S. Bank N.A.*, 590 U.S. 538 (2020), provides a second error. In *Thole*, the Supreme Court reviewed statutory breach of fiduciary duty claims asserted by ERISA plan participants against a plan trustee. The Court found that merely pleading a statutory

48

violation, including a breach of "fiduciary duty," 29 U.S.C. § 1109, was insufficient to satisfy Article III. The Supreme Court rejected the argument that "a plan fiduciary's breach of a trust-law duty of . . . loyalty itself harms ERISA defined-benefit plan participants even if the participants themselves have not suffered . . . any monetary harm." 590 U.S. at 542. The Court also addressed the contention that "ERISA affords . . . beneficiaries, and participants—including participants in a defined-benefit plan—a general cause of action to sue. . . ." *Id.* at 544. The Court responded, "But the cause of action does not affect the Article III standing analysis." *Id.* Because the alleged wrongful acts by the Trustee had not harmed the plan participants, they lacked standing. Here, by contrast, the *Packer* ruling allows plaintiffs, like Plaintiffs-Appellees here, to proceed in the absence of any injury beyond the alleged statutory breach which the *Packer* Panel deemed a breach of fiduciary duty.

## CONCLUSION

For the foregoing reasons, the Appellant respectfully requests that this Court reverse the District Court's Judgment and grant such other relief as the Court deems just and proper.

Dated:  New York, New York
        July 30, 2024

OLSHAN FROME WOLOSKY LLP

By:  */s/ Thomas J. Fleming*
      Thomas J. Fleming
      Kerrin T. Klein
      1325 Avenue of the Americas
      New York, New York 10019

      *Attorneys for Appellant Guy*
      *Gentile*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE
## REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of United States Court of Appeals for the Second Circuit Local Rule 32.1(a)(4)(A) because this brief contains 11,038 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2013 in 14-point Times New Roman font.

Dated: New York, New York
July 30, 2024

OLSHAN FROME WOLOSKY LLP

By:  */s/ Thomas J. Fleming*
Thomas J. Fleming
Kerrin T. Klein
1325 Avenue of the Americas
New York, New York 10019

*Attorneys for Appellant Guy Gentile*

51